## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE LEO M. GORDON, SENIOR JUDGE

| | | |
|---|---|---|
| DONGKUK S&C CO. LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Court No. 20-3686 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| WIND TOWER TRADE COALITION, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

### DEFENDANT'S PUBLIC RESPONSE TO PLAINTIFF'S
### MOTION FOR JUDGMENT UPON THE AGENCY RECORD

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:                                  ASHLEY AKERS
JESUS N. SAENZ                              Trial Attorney
Attorney                                        Department of Justice
Office of the Chief Counsel               Civil Division
    for Trade Enforcement and Compliance       Commercial Litigation Branch
U.S. Department of Commerce            P.O. Box 480
Washington, D.C.                             Ben Franklin Station
                                                    Washington, D.C. 20044
                                                    Telephone: (202) 353-0521
                                                    E-mail: Ashley.Akers@usdoj.gov

July 14, 2021                                 Attorneys for Defendant

# TABLE OF CONTENTS

**PAGES**

STATEMENT PURSUANT TO RULE 56.2 ..................................................................2

    I.    The Administrative Determination Under Review........................................2

    II.    Issues Presented For Review .........................................................................3

ARGUMENT ...........................................................................................................3

    I.    Standard Of Review......................................................................................3

    II.    Commerce's Weight-Averaging Of DKSC's Reported Steel Plate Costs Across CONNUMs Is Supported By Substantial Evidence And In Accordance With Law .......................................................................................5

        A.    Legal Framework .............................................................................5

        B.    Relevant Procedural Background ...................................................7

        C.    Commerce's Weight-Averaging SKDC's Reported Steel Plate Costs Across CONNUMs Is In Accordance With Law.................9

        D.    Substantial Evidence Supports Commerce's Finding That The Timing Of DKSC's Steel Plate Purchases Caused Material Cost Differences Between Products .......................................................14

    III.    Commerce's Calculation Of DKSC's CV Profit Is Supported By Substantial Evidence And In Accordance With Law..................................19

CONCLUSION.......................................................................................................25

# TABLE OF AUTHORITIES

**CASES**                                                                                          **PAGES**

*Alt. Sugar Ltd. v. United States*,
    744 F.2d. 1556 (Fed. Cir. 1984) ........................................................................4

*China Processed Food Imp. & Exp. Co. v. United States*,
    536 F. Supp. 2d 1347 (Ct. Int'l Trade 2008) .....................................................3

*Consol. Edison Co. v. NLRB*,
    305 U.S. 197 (1938) ..........................................................................................4

*Ceramica Regiomontana, S.A. v. United States*,
    810 F.2d 1137 (Fed. Cir. 1987) ........................................................................5

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984) ..........................................................................................5

*Consol. Edison Co. v. NLRB*,
    305 U.S. 197 (1938) ..........................................................................................4

*Corus Staal BV v. United States*,
    395 F.3d 1343 (Fed. Cir. 2005) ........................................................................5

*Dillinger France S.A. v. United States*,
    350 F. Supp. 3d 1349 (Ct. Int'l Trade 2018) .................................................9, 10

*Dong-A Steel Co. v. United States*,
    337 F. Supp. 3d 1356 (Ct. Int'l Trade 2018) ....................................................13

*Goldlink Indus. Co. v. United States*,
    431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) .....................................................4

*INS v. Elias-Zacarias*,
    502 U.S. 478 (1992) ..........................................................................................4

*IPSCO, Inc. v. United States*,
    965 F.2d 1056 (Fed. Cir. 1992) ........................................................................6

*NEXTEEL Co. v. United States*,
    355 F. Supp. 3d 1336 (Ct. Int'l Trade 2019) .................................................7, 13

*Nucor Corp. v. United States*,
    612 F. Supp. 2d 1264 (Ct. Int'l Trade 2009) .....................................................4

*QVD Food Co. v. United States,*
    658 F.3d 1318 (Fed. Cir. 2011) ........................................................................23

*Shandong Huarong Gen. Corp. v. United States,*
    159 F. Supp. 2d 714 (Ct. Int'l Trade 2001) ........................................................4

*Thai Plastic Bags Indus. Co. v. United States,*
    746 F.3d 1358 (Fed. Cir. 2014) ...................................................................7, 14

*Timken Co. v. United States,*
    354 F.3d 1334 (Fed. Cir. 2004) ...........................................................................5

*United States v. Eurodif S.A.,*
    555 U.S. 305 (2009) .............................................................................................5

*Wheatland Tube Co. v. United States,*
    161 F.3d 1365 (Fed. Cir. 1998) ......................................................................4, 5

## **STATUTES**

19 U.S.C. § 1561a(b)(1)(B)(i) ...................................................................................3, 4

19 U.S.C. § 1675(a)(2)(A) ...............................................................................................5

19 U.S.C. § 1677b(a) ........................................................................................................6

19 U.S.C. §§ 1677b(b) ......................................................................................................6

19 U.S.C. § 1677(15) ........................................................................................................6

19 U.S.C. § 1677b(a)(4) ..................................................................................................19

19 U.S.C. § 1677b(b)(2)(A)(ii) ........................................................................................9

19 U.S.C. § 1677b(b)(3)(A) ..............................................................................................6

19 U.S.C. § 1677b(e)(1) ..................................................................................................10

19 U.S.C. § 1677b(e)(2)(B) .............................................................................................20

19 U.S.C. § 1677b(f)(1)(A) ..............................................................................................6

19 U.S.C. § 3512(d) ........................................................................................................21

## ADMINISTRATIVE DETERMINATIONS

*Utility Scale Wind Towers from the Republic of Korea*, 85 Fed. Reg. 40,243 (Dep't of Commerce July 6, 2020), and the accompanying Issues And Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Utility Scale Wind Towers from the Republic of Korea (Dep't of Commerce June 29, 2020), available at https://enforcement.trade.gov/frn/summary/korea-south/2020-14438-1.pdf (last visited July 14, 2021).................................................................................... passim

*Utility Scale Wind Towers from Canada, Indonesia, the Republic of Korea, and the Socialist Republic of Vietnam,* 84 Fed. Reg. 37,992, 37,993-94 (Dep't of Commerce Aug. 5, 2020)..........................................................................................7

*Utility Scale Wind Towers from the Republic of Korea*, 85 Fed. Reg. 8,560 (Dep't of Commerce Feb. 14, 2020), and accompanying Preliminary Decision Memorandum at 17 (Feb. 5, 2020) ............................................................. passim

*Pipe & Tube from Turkey*, 82 Fed. Reg. 49,179 ...............................................13

*Pasta from Italy*, 83 Fed. Reg. 63,627 ..............................................................12

*Pipe & Tube from Turkey*, 82 Fed. Reg. 49,179 ...............................................12

*Pure Magnesium from Israel*, 66 Fed. Reg. 49,349.............................22, 24, 25

Statement of Administrative Action for Uruguay Round Agreements Act (SAA), H.R. Rep. No. 103-316, Vol. I, at 840 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4176.....................................................................................................................20

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE LEO M. GORDON, SENIOR JUDGE

_____

| | |
|---|---|
| DONGKUK S&C CO. LTD., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| ) | Court No. 20-3686 |
| v. ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| WIND TOWER TRADE COALITION, ) | |
| ) | |
| Defendant-Intervenor. ) | |

_____

## DEFENDANT'S PUBLIC RESPONSE TO PLAINTIFF'S
## RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD

Defendant, the United States, respectfully submits this opposition to the Rule 56.2 motion for judgment upon the agency record filed by plaintiff, Dongkuk S&C Co., Ltd., (DKSC). DKSC contests several aspects of the Department of Commerce's (Commerce) final determination of its antidumping duty investigation of utility scale wind towers from the Republic of Korea. We respectfully request that the Court sustain Commerce's final determination because it is supported by substantial evidence and it is in accordance with the law.

## STATEMENT PURSUANT TO RULE 56.2

### I.    The Administrative Determination Under Review

The administrative determination under review is *Utility Scale Wind Towers from the Republic of Korea*, 85 Fed. Reg. 40,243 (Dep't of Commerce July 6, 2020) (Final Results), and

the accompanying Issues And Decision Memorandum for the Final Affirmative Determination in

the Less-Than-Fair-Value Investigation of Utility Scale Wind Towers from the Republic of

Korea (Dep't of Commerce June 29, 2020), available at

https://enforcement.trade.gov/frn/summary/korea-south/2020-14438-1.pdf (last visited July 14,

2021) (Decision Memorandum).[1]  The period of investigation is July 1, 2018, through June 30,

2019.

## II.   Issues Presented For Review[2]

1.   Whether Commerce's decision to weight-average DKSC's reported steel plate

costs across CONNUMs[3] is supported by substantial evidence and is in accordance with law.

2.   Whether Commerce's calculation of DKSC's constructed value profit is

supported by substantial evidence and is in accordance with law.

## ARGUMENT

## I.   Standard Of Review

The Court will uphold Commerce's determination if it is supported by "substantial

---

[1] Citations to "P.D." refer to documents in the public record and "C.D." refer to documents in the confidential record.

[2] As DKSC notes in footnote 2 of its motion, ECF No. 22 at 2 n.2, it has abandoned Counts Three, Four, and Five of its complaint.  As such, we do not address the merits of these claims, and, in deciding the pending motion for judgment upon the agency record, the Court should not address the merits of these counts because they have been abandoned and waived. *See* CIT Rule 56.2(c) (requiring that a party moving for judgment upon the agency record state in its brief "the issues of law presented together with the reasons for contesting or supporting the administrative determination"); *see also, e.g.*, *China Processed Food Imp. & Exp. Co. v. United States*, 536 F. Supp. 2d 1347, 1356 (Ct. Int'l Trade 2008) ("Because plaintiff did not include its first claim in its motion for judgment upon the agency record, that claim is not before the court.").

[3] A CONNUM is a "control number" assigned to a group of materially identical products to distinguish them from similar but non-identical products.

evidence on the record" and is otherwise "in accordance with law."  19 U.S.C.

§ 1516a(b)(1)(B)(i).  Substantial evidence is "more than a mere scintilla" of relevant and

reasonable evidence to support the underlying conclusions.  *Consol. Edison Co. v. NLRB*, 305

U.S. 197, 229 (1938).  The requisite proof amounts to "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion" in light of "the entire record, including

whatever fairly detracts from the substantiality of the evidence."  *Atl. Sugar, Ltd. v. United*

*States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) (footnote and internal quotation marks omitted).

That the Court may draw two inconsistent conclusions from the record "does not prevent

an administrative agency's finding from being supported by substantial evidence."  *Consolo v.*

*Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citation omitted).  Rather, when Congress has

entrusted an agency to administer a statute that demands inherently fact-intensive inquiries, as in

this case, the agency's conclusions may be set aside only if the record contains evidence "so

compelling that no reasonable factfinder" could reach the same conclusion.  *See INS v. Elias-*

*Zacarias*, 502 U.S. 478, 483-84 (1992); *accord Nucor Corp. v. United States*, 612 F. Supp. 2d

1264, 1287 (Ct. Int'l Trade 2009).

"{T}he Court will not disturb an agency determination if its factual findings are

reasonable and supported by the record as a whole, even if there is some evidence that detracts

from the agency's conclusion."  *Shandong Huarong Gen. Corp. v. United States*, 159 F. Supp. 2d

714, 718 (Ct. Int'l Trade 2001); s*ee also Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d

1323, 1326 (Ct. Int'l Trade 2006) ("{T}he Court may not substitute its judgment for that of the

{agency} when the choice is between two fairly conflicting views, even though the court would

justifiably have made a different choice had the matter been before it *de novo*." (citations and

internal quotation marks omitted)).  It is not necessary for Commerce to provide an explicit

explanation when its path is reasonably discernible. *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369-70 (Fed. Cir. 1998) (citing *Ceramica Regiomontana, S.A. v. United States*, 810 F.2d 1137, 1139 (Fed. Cir. 1987)).

When determining the lawfulness of an agency's statutory construction, the Court is guided by the two-pronged test established in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  First, the Court examines "whether Congress has directly spoken to the precise question at issue," and if so, then the Court and the agency must comply with the clear intent of Congress.  *Id*. at 842-43; *Corus Staal BV v. United States*, 395 F.3d 1343, 1346 (Fed. Cir. 2005).  However, when "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."  *Chevron*, 467 U.S. at 843.

The statutory interpretations made by Commerce during antidumping proceedings are entitled to judicial deference under *Chevron* and "{a}ny reasonable construction of the statute is a permissible construction."  *Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004); *see Corus Staal*, 395 F.3d at 1346.  In the absence of unambiguous statutory language to the contrary, Commerce's interpretation governs.  *United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009); *IPSCO, Inc. v. United States*, 965 F.2d 1056, 1061 (Fed. Cir. 1992) (quoting *Chevron*, 467 U.S. at 844).

## II.   Commerce's Weight-Averaging Of DKSC's Reported Steel Plate Costs Across CONNUMs Is Supported By Substantial Evidence And In Accordance with Law

### A.   Legal Framework

The statute directs Commerce in antidumping proceedings to determine whether subject merchandise is being, or is likely to be, sold at less than fair value by comparing the export price (or constructed export price) and the merchandise's normal value.  19 U.S.C. § 1675(a)(2)(A).

The statute further directs that "a fair comparison shall be made between the export price or constructed export price and normal value." 19 U.S.C. § 1677b(a); *see Torrington Co. v. United States*, 68 F.3d 1347, 1352 (Fed. Cir. 1995) (explaining that the statutory framework seeks "to produce a fair . . . comparison between foreign market value and United States price"). To this end, as DKSC acknowledges, DKSC Br. 12, Commerce identifies the subject merchandise's commercially significant physical characteristics and uses them to establish control numbers or CONNUMs for sales comparison purposes.

In calculating normal value for its antidumping comparisons, Commerce will consider only those sales in the comparison market that are made in the "ordinary course of trade." 19 U.S.C. § 1677b(a). The statute at 19 U.S.C. § 1677(15) provides that sales are in the "ordinary course of trade" if they are made under conditions and practices that, for a reasonable period of time prior to the date of sale, have been normal for sales of the foreign like product. The statute further authorizes Commerce to disregard sales if they have been made at less than the "cost of production" of the product. *See* 19 U.S.C. §§ 1677b(b), 1677(15)(A).

The statute defines the cost of production as the amount equal to the sum of "the cost of materials and of fabrication or other processing of any kind employed in producing the foreign like product, during a period which would ordinarily permit the production of that foreign like product in the ordinary course of business{.}" 19 U.S.C. § 1677b(b)(3)(A). Commerce relies on a company's normal books and records for purposes of calculating cost of production (and constructed value) if they satisfy two conditions: (1) the books and records are kept in accordance with the company's home country's generally accepted accounting principles, and (2) the books and records reasonably reflect the cost to produce and sell the merchandise in question. *See* 19 U.S.C. § 1677b(f)(1)(A).

When the costs reported in a company's books are not reasonable—for example, if cost differences among products do not represent differences in their physical characteristics—Commerce may revise the costs.  Decision Memorandum at 21.  It is thus normal for Commerce to adjust costs to address distortions when it encounters cost differences that are attributable to factors beyond differences in the products' physical characteristics.  *See, e.g.*, *Thai Plastic Bags Indus. Co. v. United States*, 746 F.3d 1358, 1366-67 (Fed. Cir. 2014); *NEXTEEL Co. v. United States*, 355 F. Supp. 3d 1336, 1361-62 (Ct. Int'l Trade 2019).

### B.    Relevant Procedural Background

Upon initiating this investigation, Commerce stated that it would provide all parties with an opportunity to comment on the appropriate physical characteristics of wind towers relied upon in response to Commerce's questionnaire.  *Utility Scale Wind Towers from Canada, Indonesia, the Republic of Korea, and the Socialist Republic of Vietnam,* 84 Fed. Reg. 37,992, 37,993-94 (Dep't of Commerce Aug. 5, 2020).  Shortly thereafter, Commerce issued a list of proposed product characteristics and provided parties with an opportunity to comment.  Proposed Product Characteristics and Requests for Comments Letter (Aug. 8, 2019) (P.D. 50).  The petitioner,[4] DKSC, and Marmen[5] submitted comments and rebuttal comments.  DKSC Product Characteristics Letter (Aug. 19, 2019) (P.D. 57); Petitioner Product Characteristics Letter (Aug. 20, 2019) (P.D. 64-65; C.D. 31-33); Marmen Product Characteristics Letter (Aug. 19, 2019) (P.D. 58-61); DKSC Rebuttal Product Characteristics Letter (Aug. 29, 2019) (P.D. 72); Petitioner Rebuttal Product Characteristics Letter (Aug. 29, 2019) (P.D. 80; C.D. 35); Marmen

----

[4] The petitioner is the Wind Tower Trade Coalition.

[5] Marmen, Inc., Marmen Energie Inc., and Marment Energy Co. (collectively, Marmen) is a Canadian producer of wind towers, and the respondent in the antidumping duty investigation of wind towers from Canada.

Rebuttal Product Characteristics Letter (Aug. 29, 2019) (P.D. 76); *see also* Preliminary Decision Memorandum at 2.  After consideration of the provided comments, Commerce identified and selected eleven physical characteristics that were the most significant in differentiating the costs between wind towers.  Product Characteristics Letter (Sept. 17, 2019) (P.D. 94); Decision Memorandum at 21.

In the order of importance, the physical characteristics are:  (1) Type (*i.e.*, Tower or Section), (2) Weight of Tower/Section, (3) Height of Tower/Section, (4) Total Sections, (5) Type of Paint Coating, (6) Metalizing, (7) Electrical Conduit – Bus Bars, (8) Electric Conduit – Power Cables, (9) Elevators, (10) Number of Platforms, and (11) Other Internal Components (*i.e.*, whether other components exist).  *See* Product Characteristics Letter at Attachment I (P.D. 94). These eleven physical characteristics define the unique products, *i.e.*, CONNUMs, for sales comparison, and the level of detail within each physical characteristic reflect the importance Commerce places on comparing the most similar products in a price-to-price comparison. Decision Memorandum at 21.  Commerce also selected additional product characteristics to identify sales and conduct verification.  Product Characteristics Letter (P.D. at 94).  As Commerce explained, the respondent's reported costs should reflect meaningful cost differences attributable to these different physical characteristics.  Decision Memorandum at 21-22.

Commerce instructed DKSC to use the selected product characteristics in completing its response to the questionnaire.  *Id.*  The questionnaire also provided DKSC with an opportunity to add any product characteristics not selected by Commerce and "describe in the narrative response why you believe that Commerce should use this information to define identical and similar merchandise."  Commerce Questionnaire at B-7, C-5 (Aug. 23, 2019) (P.D. 70). Significantly, in its questionnaire response, DKSC did not report any additional product

characteristics. *See* DKSC Section B-D Questionnaire Response (Oct. 16, 2019) (P.D. 105-106; C.D. 44).

### C.   Commerce's Weight-Averaging DKSC's Reported Steel Plate Costs Across CONNUMs Is In Accordance With Law

In accordance with 19 U.S.C. § 1677b(b)(2)(A)(ii), Commerce requested cost of production information from DKSC at the outset of the investigation.  At the preliminary and final determinations, Commerce applied its standard methodology of using annual costs to calculate the weighted-average cost of production.  *Utility Scale Wind Towers from the Republic of Korea*, 85 Fed. Reg. 8,560 (Dep't of Commerce Feb. 14, 2020), and accompanying Preliminary Decision Memorandum at 17 (Feb. 5, 2020) (Preliminary Decision Memorandum); Decision Memorandum at 22.  To do so, Commerce relied on DKSC's cost of production data. Preliminary Decision Memorandum at 17.  However, the record demonstrated that the significant steel plate cost differences among the CONNUMs resulted primarily from factors unrelated to differences in the physical characteristics of the products associated with various CONNUMs. *See* Preliminary Decision Memorandum at 18; Decision Memorandum at 21-22.  Thus, Commerce weight-averaged or smoothed DKSC's reported steel plate costs for all CONNUMs to mitigate unreasonable differences in material costs that were unrelated to the wind tower's physical characteristics.  Preliminary Decision Memorandum at 18; Decision Memorandum at 22.

Commerce's determination to weight-average DKSC's reported steel plate costs is supported by substantial record evidence and lawful.  Commerce determined that, based on the record, although DKSC's books and records met the first criterion under 19 U.S.C. § 1677b(f)(1)(A) for using DKSC's information without an adjustment, they did not "reasonably reflect the costs associated with the production and sale of the merchandise."  *See* Decision

Memorandum at 21-22; *see also Dillinger France S.A. v. United States*, 350 F. Supp. 3d 1349, 1374 (Ct. Int'l Trade 2018) (citing 19 U.S.C. § 1677b(f)(1)(A)).  Specifically, Commerce explained that a respondent's reported production costs should reflect meaningful cost differences attributable to different physical characteristics of the products, but DKSC's reported costs did not.  *Id.* at 21-22.  Indeed, the record evidence did not reveal that cost fluctuations among CONNUMs were explained by their physical characteristics.  *Id*. at 22.

Commerce determined that a project destined for the Japanese market and a project destined for the U.S. market shared "virtually the same" steel plate costs regardless of physical characteristics, such as grade, thickness, width, or length of the steel plate.  *Id.*  The cost differences of the steel plates were, instead, attributable to the timing of the steel plate purchases that resulted in fluctuations in prices.  *Id.*; *see also* Final Calculation Memorandum at 1-2 (July 1, 2020) (P.D. 327; C.D. 230).  When faced with cost fluctuations beyond the physical characteristics, as in this case, Commerce's practice is to adjust costs to address distortions.  *See* Decision Memorandum at 22.

The statute does not direct Commerce to allocate the cost of the materials by the period of time in which they were purchased or by production projects conceived by the managerial decisions of a company.  *See* Notification of Reporting Issues at 2-3 (Sept. 6, 2019) (P.D. 84) ("{DKSC}'s cost accounting system tracks all activities on a project-specific basis . . . . Therefore, {DKSC} notifies the Department that it intends to report its costs of manufacturing on a project-specific basis.").  Instead, Commerce calculates the cost of production and constructed value by the sum of "the cost of materials and fabrication . . . employed in producing the foreign like product, during a period which would ordinarily permit the production . . . in the ordinary course of business."  19 U.S.C. § 1677b(b)(3)(A) and 1677b(e)(1).  Thus, upon determining that

DKSC's reported costs did not reflect meaningful differences attributable to the physical characteristics defining the CONNUMs for product comparison purposes, Commerce followed its practice and corrected that distortion. *Id.* Accordingly, Commerce weight-averaged, or smoothed, DKSC's reported plate costs across the reported CONNUMs. *Id.*

DKSC argues that an analysis of DKSC's steel plate prices was "not relevant" to Commerce's determination of whether DKSC's normal books and records reasonably reflected differences in the physical characteristics of wind towers. DKSC Brief at 14. DKSC also argues that Commerce erred in analyzing the cost differences of the steel plate instead of cost differences from the physical differences of wind towers. *Id.* DKSC's argument is meritless.

In the final cost calculation memorandum, Commerce explains the relevance of the steel plate purchase analysis as it related to its determination that steel plate cost fluctuations were unrelated to the physical characteristics of the plate or the merchandise made from it. *See* Final Calculation Memorandum at 1-2. Specifically, Commerce identified purchases of steel plate of varying dimensions (*i.e.*, thickness, width, and length of the input plate) within the same time period (*i.e.*, September 2018). *Id.* The plates Commerce selected for its purchase analysis were incorporated into two CONNUMs reported in DKSC's cost database. *Id.* Those CONNUMs reflected different reported ranges for both the height and weight characteristic. *Id.* Because Commerce's analysis was performed within the same month, it reflected a "like for like" comparison that mitigated any distortions related to the timing of the steel plate purchases or any other factors that can distort such comparisons.

As explained further below, the analysis showed that the purchase price for input steel plates in the selected month were consistent, despite the fact that the plates were incorporated into finished wind towers with different physical characteristics (*i.e.*, weight and height). *Id.* at

Attachment 1.  And while the material purchase prices in Commerce's analysis did not vary, the reported per-unit costs for the two relevant CONNUMs reflected significant variations.  *Id*. at Attachment 1.  Based on this analysis, Commerce determined that the record evidence demonstrated that the timing of purchases was the significant factor driving the resulting steel plate cost differences between products, rather than the finished wind tower's weight and/or height.  Decision Memorandum at 21-22.  As such, Commerce concluded that material cost differences DKSC reported in the cost database were not attributable to physical characteristics defining the CONNUMs.  *Id.*

Further, contrary to DKSC's argument, Commerce applies its practice of adjusting unreasonable cost reporting both to finished products CONNUMs *and* to individual inputs for such products.  *See, e.g.*, *Pipe & Tube from Turkey*, 82 Fed. Reg. 49,179, at Decision Memorandum at cmt. 2 (reallocating costs for zinc input); *Pasta from Italy*, 83 Fed. Reg. 63,627, at Decision Memorandum at 3-11 (smoothing costs for semolina, an input for pasta).  When there is an absence of meaningful physical differences in the input—*e.g.*, the semolina used in finished products comprising different pasta types—Commerce will smooth costs for that input.

For example, in *Pasta from Italy*, Commerce found that respondents reported significantly different costs for the semolina input, resulting in variation in direct material costs between CONNUMs.  *See* 83 Fed. Reg. 63,627; Decision Memorandum at 8-9.  Although Commerce explained that the CONNUMs had similarities in the end products, the crux of the issue was that there were disparities in the reported semolina costs for the different products, despite the fact that essentially the same semolina was used.  *See id*.  As Commerce described, "the differences in semolina costs between nearly identical CONNUMs were due to reasons not related to the product's physical characteristics."  *Id.* at 9.  Accordingly, Commerce adjusted (by

weight-averaging) the respondents' submitted input costs to "smooth" the cost differences unrelated to physical characteristics of pasta and to avoid distortions in the final calculations. *See id.* at 9-11.

Likewise, in *Pipe & Tube from Turkey*, Commerce highlighted differences in the end products that were obscured by the way in which the respondent recorded the costs for its zinc input in its accounting system.  *See* 82 Fed. Reg. 49,179.  Commerce found that the respondent's methodology for reporting zinc costs did not consider necessary physical characteristics.  *See id.* Thus, Commerce found that the respondent's zinc cost allocation did not reasonably reflect the costs associated with the production and sale of the merchandise, and Commerce made an adjustment to the costs for the individual zinc input to avoid distortion.  *Id.*

Similarly, in this case, Commerce determined that the steel plate input caused price differences in CONNUMs, which were unrelated to differences in the product's physical characteristics.  Decision Memorandum at 21-22.  Accordingly, Commerce reasonably concluded that the reported differences in costs were based on the timing of the raw material purchases, and not the "costs associated with the production and sale of the merchandise."  *See id.*  In keeping with its practice of adjusting distortions when cost differences in products are attributable to factors other than differences in physical characteristics, Commerce applied cost smoothing to the steel plate input.  *Cf. NEXTEEL*, 355 F. Supp. 3d at 1361 (explaining that steel input costs varied by time); *see also Dong-A Steel Co. v. United States*, 337 F. Supp. 3d 1356, 1371 (Ct. Int'l Trade 2018) ("The court finds that it was reasonable for Commerce to use annual average costs in order to even out fluctuations in the production costs over short periods of time for goods that only differed based on one being painted and one not being painted.  *See* 19 U.S.C. § 1677b(f)(1)(A).").  Thus, DKSC's argument that Commerce's analysis of steel plate

prices was "not relevant" to whether DKSC's normal books and records reasonably reflected differences in the physical characteristics of wind towers lacks merit. *See also Thai Plastic Bags*, 746 F.3d at 1368 ("Commerce's methodology is 'presumptively correct,' and . . . {plaintiff} has not shown that Commerce lacked authority to adjust costs based on differences in physical characteristics.").

### D. Substantial Evidence Supports Commerce's Finding That The Timing Of DKSC's Steel Plate Purchases Caused Material Cost Differences Between Products

DKSC next argues that Commerce unreasonably concluded that timing, rather than differences in physical characteristics, explained the observed differences in DKSC's steel plate costs. *See* DKSC Br. 11-17. According to DKSC, Commerce's determination is unreasonable and inconsistent with the physical characteristics that Commerce identified as the most significant in differentiating the costs between products. *See id.*

In the preliminary determination, Commerce identified unreasonable differences in material costs that appeared unrelated to the product physical characteristics. Preliminary Decision Memorandum at 18. To mitigate the unreasonable cost differences, Commerce weight-averaged the reported steel plate costs for all reported CONNUMs. Preliminary Calculation Memorandum at 2 (Feb. 6, 2019) (P.D. 183; C.D. 268). Each CONNUM represented a unique product produced by DKSC. Specifically, Commerce identified a significant difference in steel plate costs of up to [ ] percent when comparing steel plate costs for CONNUMs sold to third countries with steel plate costs for CONNUMs sold to the United States. *Id.* at Attachment 3.

Commerce provided its detailed analysis in its Preliminary Calculation Memorandum, where it identified [

13

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████ ].  Preliminary Calculation Memorandum at Attachment 3 (P.D. 268;

C.D. 183).  After issuing the preliminary determination, Commerce received from DKSC a

supplemental section D response that provided additional information related to the company's

steel input purchases.  Second Supplemental D Questionnaire Response (P.D. 278, C.D. 190).

Commerce also received additional steel plate cost information during verification.  Final

Calculation Memorandum at 1-2 (P.D. at 327; C.D. 230).

In the final determination, Commerce reviewed the additional information related to raw

material input prices.  Based on the evidence, Commerce determined that fluctuations in steel

plate costs were not a result of differences in physical characteristics, but that the *timing* of steel

plate purchases was the significant factor of the resulting material cost differences between

products.  Decision Memorandum at 22.

DKSC now argues that Commerce failed to conduct any analysis of cost differences

between the selected product characteristics and, instead, compared only costs of steel plate

inputs.  DKSC Br. at 14.  However, as described above, Commerce provided a summary of its

analysis in the Calculation Memorandum, where Commerce analyzed purchase prices for

varying physical characteristics/dimensions of the steel plate inputs in a given month.  The steel

plates analyzed were incorporated into wind towers that had different product characteristics

(*e.g.*, height and weight).  Final Calculation Memorandum at Attachment 1.

In its analysis, Commerce compared steel plate purchases made during the period of

investigation.  To do so, Commerce identified individual wind towers projects produced for sales

---

[6] KRW refers to Korean Won.

to the [███████████████] during the period of the investigation, and compared the cost

of the steel plate of varying dimensions (*i.e.*, Thickness, Width, and Length) and steel grade

within the same time period.  *Id*.  Each distinct project presented in Commerce's analysis

represented varying product characteristics of the finished wind tower, notably height and weight

(*i.e.*, the second and third most important characteristics as defined by Commerce for matching

purposes).[7]  The analysis demonstrated that the plate purchases on a per-ton basis were virtually

the same during the month.  However, the reported plate costs for the two CONNUMs in the cost

file reflected significant variations (*i.e.*, KRW [█████]/MT[8] vs. KRW [█████]/MT) in the

database.  Commerce continued to find that the steel plate cost fluctuations were related to

timing differences associated with management's purchasing and assignment decisions, rather

than the costs associated with production of the merchandise, and, thus, were unrelated to the

physical characteristics of the wind towers.  *Id*. at 1-2.  This analysis demonstrated that the

significant cost fluctuations in steel plate costs were not due to differences in physical

characteristics, but the *timing* of steel plate purchases.  Contrary to DKSC's assertion, Commerce

did consider in its analysis the finished product characteristic of the finished wind towers into

which the plates were incorporated (*i.e.*, that the related CONNUMs relevant to the purchases

differed in terms of height/weight).  As a result of its analysis, Commerce continued to weight

average the reported steel costs for all CONNUMs in its final determination.

Importantly, DKSC has repeatedly admitted that the cost of steel plate fluctuated before

---

[7] Purchases related to the project sold to [█████████] with the Project Name
[███████████████████] were included in CONNUM [████████████
██].  Final Calculation Memorandum at Attachment 1.  Purchases related to the third country
project ████████████████████████████ were included in
CONNUM [███████████████].  *Id*.

[8] MT refers to metric ton.

and during the period of investigation, which bolsters Commerce's determination that the

primary factor driving the plate cost differences is due to the timing of the raw material

purchases, not the physical differences of the input.  *See* Decision Memorandum at 22.  In a

supplemental questionnaire response, Commerce explicitly asked DKSC to explain the reported

difference in steel plate costs:

> <u>Commerce's Question</u>: It appears that all CONNUMs sold in the third country have
> [████████████] steel plate cost than CONNUMs sold in the US.  Please
> explain what caused such cost differences.
>
> <u>DKSC Response</u>: For DKSC's sales of wind towers to Japan, the raw material
> orders were placed in July 2017—*i.e.*, one year prior to the start of the POI—for
> these specific projects sold during the POI. Raw material prices are not fixed, and
> they fluctuate frequently due to external factors such as changes in iron ore prices.
> At the time the orders were placed, raw material prices were generally low. For
> DKSC's sales of wind towers to the United States during the POI, raw material
> orders were placed in September 2018 (during the POI) when raw materials prices
> were high. **Due to the fluctuating raw material prices during the POI**, DKSC's
> reported CONNUMs sold in the third country show differing plate costs from
> CONNUMs sold in the U.S. market.

Second Supplemental D Questionnaire Response (Feb. 12, 2020) (P.D. 278; C.D. 190) at

S6-2. (emphasis added).

DKSC further admitted that "the timing of purchases of raw materials resulted in

different unit costs reported in the steel plate field for CONNUMs sold in the U.S. and third

country." *Id.* at S6-5.  Additionally, at verification, DKSC conceded to Commerce officials that

prices of steel plate, used as an input for wind towers sold during the period of investigation,

fluctuated depending on the time of purchase.  Verification Report at 18-19.  And, in its brief,

DKSC acknowledges that the administrative record "contains some evidence that the timing of

steel plate purchases did have some impact on pricing."  DKSC Br. at 16.  Thus, it is uncontested

that the price of steel plate used to produce wind towers fluctuated during the period of

investigation, and the substantial evidence on the record supports Commerce's determination that

the price fluctuation was due to timing.

DKSC also challenges Commerce's decision not to select the grade of steel plate as a physical characteristic to be included in the CONNUM.  DKSC Br. at 16.  As explained above, Commerce provided all parties with an opportunity to comment on Commerce's selection of physical characteristics.  Product Characteristics Letter; Decision Memorandum at 21. Commerce selected the physical characteristics, in order of importance, in accordance with the comments it received from interested parties.  Commerce then provided DKSC an opportunity to report physical characteristics beyond those Commerce selected for the investigation, *see* Commerce Questionnaire at B-7, C-5, but DKSC declined to volunteer the additional steel plate grade cost information, despite its knowing that such costs fluctuated over the period of investigation.  (P.D. 68).  And, whatever the grade of the steel plate, substantial record evidence demonstrates that timing created significant cost fluctuations in the cost of the steel plate used as an input for the production of wind towers.  Accordingly, Commerce reasonably eliminated the distortion by weight-averaging, or *smoothing*, the reported steel plate input costs for all reported CONNUMs.

Notwithstanding Commerce's reliance on record evidence in its analysis, DKSC claims that Commerce simply *assumed* that timing explained the differences in DKSC's plate costs without applying its own identification of the most significant physical characteristics differentiating costs between products.  *See* DKSC Br. at 15.  As we have demonstrated, Commerce considered the effect of physical characteristics in explaining the cost variance across CONNUMs, and rooted its analysis in record evidence indicating that physical characteristics did not explain the variance.  *See* Decision Memorandum at 21-22; Final Calculation Memorandum at 1-2, Attachment 1.  DKSC fails to identify any compelling record evidence demonstrating that

17

differences in physical characteristics account for the differing production costs between products. To the contrary, Commerce's determination that the cost variance it observed is not explained by the product characteristics, but by the timing of steel plate purchases, is supported by substantial evidence.

### III.    Commerce's Calculation of DKSC's CV Profit Is Supported By Substantial Evidence And In Accordance With Law

Commerce's decision to calculate DKSC's constructed value profit based on profit earned by SeAH Steel Holdings Corporation (SeAH Steel Holdings) is supported by substantial evidence and in accordance with law. Although the record contained financial statements of other companies, Commerce reasonably determined that the financial statement of SeAH Steel Holdings, a Korean producer of comparable merchandise with sales in the Korean market, was the best available information on the record for determining constructed value profit.

Pursuant to 19 U.S.C. § 1673b(a)(4), Commerce determined that there were no above-cost sales of wind towers in the Korean market. Preliminary Decision Memorandum at 19. In calculating dumping margins, Commerce normally compares the export price or constructed export price (*i.e.*, price in the United States market) of the merchandise under investigation to the normal value (*i.e.*, price in the home market or a third-country market). 19 U.S.C. §§ 1677(35), 1677b(a)(1)(A)-(C). In other words, Commerce normally would compare the price of wind towers in the United States to the price of wind towers in Korea or in a third country (*i.e.*, a country other than Korea or the United States). Because normal value could not be determined on this basis—because there were no above-cost sales of wind towers in the comparison market during the period of investigation—Commerce relied on constructed value to determine normal value. 19 U.S.C. § 1677b(a)(4). Decision Memorandum at 24.

Section 1677b(e) instructs Commerce to calculate the "constructed value of imported

merchandise" based on the sum of (1) the cost of materials and fabrication or other processing in

producing merchandise and (2) the actual amounts incurred and realized by the specific exporter

or producer being examined in the investigation or review for selling, general, and administrative

costs and for profits, in connection with the production and sale of a foreign like product, in the

ordinary course of trade, for consumption in the foreign country.  This statutorily preferred

method contains a preference for profit to reflect the production and sale in the foreign country

of the foreign like product (the merchandise under consideration).

     If the preferred method is unavailable, the statute permits Commerce to

calculate selling, general and administrative expenses, and profit under one of the following

alternatives:

> (i) the actual amounts incurred and realized by the specific
> exporter or producer being examined in the investigation or review
> {… } for profits, in connection with the production and sale, for
> consumption in the foreign country, of merchandise that is in the
> same general category of products as the subject merchandise,

> (ii) the weighted average of the actual amounts incurred and
> realized by exporters or producers that are subject to the
> investigation or review (other than the exporter or producer
> described in clause (i)) { . . .}for profits, in connection with the
> production and sale of a foreign like product, in the ordinary
> course of trade, for consumption in the foreign country, or

> (iii) the amounts incurred and realized {…} for profits, based on
> any other reasonable method, except that the amount allowed for
> profit may not exceed the amount normally realized by exporters
> or producers (other than the exporter or producer described in
> clause (i) in connection with the sale, for consumption in the
> foreign country, of merchandise that is in the same general
> category of products as the subject merchandise; {(*i.e.,* the "profit
> cap")}.

19 U.S.C. § 1677b(e)(2)(B).  The statute does not establish a hierarchy for selecting among the

alternatives for calculating constructed value profit.  *See* Statement of Administrative Action for

Uruguay Round Agreements Act (SAA), H.R. Rep. No. 103-316, Vol. I, at 840 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4176 ("At the outset, it should be emphasized that, consistent with the Antidumping Agreement, new section {1677b}(e)(2)(B) does not establish a hierarchy or preference among these alternative methods.  Further, no one approach is necessarily appropriate for use in all cases."); *see also* 19 U.S.C. § 3512(d) (adopting the SAA as "an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements Act . . . in any judicial proceeding in which a question arises concerning such interpretation or application").

Moreover, as explained in the SAA, "the selection of an alternative will be made on a case-by-case basis, and will depend, to an extent, on available data."  SAA at 840.  Accordingly, Commerce has discretion to select from any of the three alternative methods, depending on the information available on the record.  By its express terms, the profit data used under "any reasonable method" pursuant to alternative (iii) may, but do not have to, come from a foreign country (*i.e.*, the exporting country) or be a foreign like product.

In the preliminary determination, Commerce applied "a reasonable method" under alternative (iii).  *See* Preliminary Decision Memorandum at 19-20.  Commerce determined that alternatives (i) and (ii) were unavailable because DKSC's other products were not in the same general category of wind towers and because there were no other exporters or producers subject to this investigation, respectively.  *Id.*  In employing "any reasonable method" under alternative (iii), Commerce recognized a statutory preference for profit data that reflect (1) production and sales in the foreign country, and (2) the subject merchandise.  *Id.*

Thus, Commerce relied on the financial statement of a Korean producer of comparable merchandise, submitted in the petition for the initiation of this investigation, to calculate

constructed value profit.  *Id*.  However, shortly after the preliminary determination, Commerce solicited additional profit and selling expense information from interested parties for Commerce's consideration in its calculation of constructed value in the final determination. Constructed Value Letter (Feb. 5, 2020) (P.D. 263); Preliminary Decision Memorandum at 20. In response to Commerce's request, DKSC and petitioner submitted several sources of profit and selling expense information.  DKSC CV Profit and Selling Expense Comments (Feb. 26, 2020) (P.D. 290-297); Petitioner's CV Profit and Selling Expense Comments (Jan. 6, 2020) (P.D. 240-244).  In total, the record contained ten audited financial statements of various companies and a public calculation memorandum.  Decision Memorandum at 25.

In its final determination, Commerce continued to employ the "any reasonable method" alternative and followed the *Pure Magnesium from Israel* analysis in evaluating profit data submitted by DKSC and petitioners.  66 Fed. Reg. 49,349.  In *Pure Magnesium from Israel*, Commerce weighed several factors to determine the most appropriate profit rate under the "most reasonable method" alternative.  Among the factors reviewed, Commerce specifically considered three criteria:  (1) the similarity of the potential surrogate companies' business operations and products to the respondent's; (2) the extent to which the financial data of the surrogate company reflects sales in the United States as well as the home market; and (3) the contemporaneity of the surrogate data to the POI."  Decision Memorandum at 26.  Guided by the *Pure Magnesium from Israel* analysis in evaluating the submissions by DKSC and petitioner, Commerce weighed several factors and determined that the financial data of SeAH Steel Holdings were the best available information on the record for calculating constructed value profit.  Specifically, Commerce determined that the consolidated financial statement of SeAH Steel Holdings was the only source on the record that included a full twelve months of financial data, and reflected

profits on the production and sale of comparable merchandise in the Korean market. Decision Memorandum at 27.

DKSC argues that it was not reasonable for Commerce to rely on SeAH Steel Holdings's financial statement because a high percentage of sales were made outside Korea and a high percentage of profits were earned in non-steel activities. DKSC Br. at 22. DKSC further argues that Commerce's reliance on SeAH Steel Holdings's financial data results in a constructed value profit and selling expense that did not reflect the sales experience of a comparable producer in the Korean market. DKSC Br. at 24. DKSC asserts that Commerce should instead have selected the unconsolidated financial statements of SeAH Steel Corporation to calculate profit and selling expense, and contends that SeAH Steel Corporation's financial statements are preferrable because it is a producer of comparable merchandise with sales in the Korean market. DKSC Br. at 25.

Commerce's final determination was reasonable. Commerce found the unconsolidated financial statement of SeAH Steel Corporation did not reflect a full year of financial results. Decision Memorandum at 27. And although DKSC believes that "the third factor of 'contemporaneity' is immaterial," DKSC Br. at 24, Commerce reasonably determined that, given the period of investigation spanned for one year, four months of financial data is an incomplete and less preferrable alternative to financial data that includes the complete year of sales. This determination falls squarely within Commerce's "broad discretion to determine the best available information for an antidumping {investigation}." *See QVD Food Co. v. United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011) (explaining that Commerce has broad discretion because "best available information" is not defined by statute).

Additionally, Commerce has a well-established methodology for calculating the cost of

manufacture of subject merchandise in less-than-fair-value investigations and antidumping duty administrative reviews based on cost over the entire period of investigation or review (*i.e.*, an annual basis).  This yearly-based methodology results in normalized, weighted-average production cost that can then be compared to sales prices covering the same extended period of time.  Accordingly, it was reasonable for Commerce to determine that the financial statement of SeAH Steel Holdings was the appropriate source to use in calculating profit, because it was the only data on the record that included a full twelve months of financial data for a producer of comparable merchandise with sales in the Korean market, and thus normalized results for an extended period of time.

DKSC does not deny that SeAH Steel Holdings is a Korean producer of comparable merchandise with sales in the Korean market, or that SeAH Steel Holdings's financial statement is contemporaneous with the period of investigation.  Instead, DKSC seeks to distinguish SeAH Steel Corporation by arguing that SeAH Steel Holdings has less of a percentage of comparable merchandise sales in the Korean market.  Although SeAH Steel Holdings's data include activities from business operations other than comparable merchandise, as Commerce acknowledged, Commerce found that the data represented the best option from among the sources on the record.  Using financial data that represented only a four-month period is not indicative of a normalized profit, especially considering that wind towers can take more than four months to produce.  Supplemental Questionnaire Response at SD-14 (Dec. 10, 2019) (P.D. 215; C.D. 143) ("Tower projects are long term projects that require more than six months for the production time in order to produce each order tower set by section.").  Consequently, Commerce is not required to determine the levels of each prong of the *Pure Magnesium from Israel* analysis, and "there is not a rule that Commerce" must select the financial data of the

company with the highest percentage of sales of comparable merchandise in the Korean market.

Instead, Commerce is tasked with reviewing the financial data under the statute's "any

reasonable method" alternative (iii) and in doing so, Commerce looks to the analysis provided by

*Pure Magnesium from Israel* as a guide.

       Commerce found that the SeAH Steel Holdings's financial statement provided the only

financial data that reflected the "profits on the production and sale of comparable merchandise

that is produced and sold in the Korean market" and provided a complete twelve months of

financial data.  Thus, Commerce's determination that SeAH Steel Holdings's profit data were the

best available information for calculating CV profit is reasonable, supported by substantial

evidence, and in accordance with law.  Accordingly, Commerce's determination should be

sustained.

## CONCLUSION

       For these reasons, we respectfully request that this Court sustain Commerce's final

determination in its entirety and enter judgment in favor of the United States.

                    Respectfully submitted,

                    BRIAN M. BOYNTON
                    Acting Assistant Attorney General

                    JEANNE E. DAVIDSON
                    Director

                    /s/ Reginald T. Blades, Jr.
                    REGINALD T. BLADES, JR.
                    Assistant Director

                    /s/ Ashley Akers
OF COUNSEL:              ASHLEY AKERS
JESUS N. SAENZ          Trial Attorney
Attorney                Department of Justice
Office of the Chief Counsel     Civil Division
    for Trade Enforcement and Compliance    Commercial Litigation Branch

U.S. Department of Commerce                   P.O. Box 480
Washington, D.C.                              Ben Franklin Station
                                              Washington, D.C. 20044
                                              Telephone: (202) 353-0521
                                              E-mail: Ashley.Akers@usdoj.gov


July 14, 2021                                 Attorneys for Defendant

25

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the word limitation specified in the Court's March 5, 2021 order, ECF No. 21.  This brief contains 7,295 words.  In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.


/s/ Ashley Akers

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE LEO M. GORDON, SENIOR JUDGE

| | |
|---|---|
| DONGKUK S&C CO. LTD., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Court No. 20-3686 |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| WIND TOWER TRADE COALITION, ) | |
| ) | |
| Defendant-Intervenor. ) | |

## <u>ORDER</u>

Upon consideration of plaintiff's motion for judgment upon the agency record, defendant's and defendant-intervenor's responses thereto, plaintiff's reply, the administrative record, and all other pertinent papers, it is hereby

ORDERED that plaintiff's motion is DENIED; and it is further

ORDERED that the Department of Commerce's determination is sustained; and it is further

ORDERED that judgment shall enter in favor of the United States.

_____
                                      SENIOR JUDGE

Dated:_____, 2021
        New York, NY