NON-CONFIDENTIAL VERSION

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| DONGKUK S&C CO., LTD.,<br><br>       Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>       Defendant,<br><br>and<br><br>WIND TOWER TRADE COALITION,<br><br>       Defendant-Intervenor. | Before: Hon. Leo M. Gordon,<br>     Senior Judge<br><br>Court No. 20-03686<br><br><u>NON-CONFIDENTIAL VERSION</u><br><br>Business Proprietary Information<br>Removed from Pages 6 and 7 |

## WIND TOWER TRADE COALITION'S RESPONSE BRIEF

Alan H. Price, Esq.
Daniel B. Pickard, Esq.
Robert E. DeFrancesco, III, Esq.
Laura El-Sabaawi, Esq.
Stephanie M. Bell, Esq.

WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

*Counsel to the Wind Tower Trade Coalition*

**Dated: July 28, 2021**

Ct. No. 20-03686                                                   NON-CONFIDENTIAL VERSION

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ................................................................................................... 1

II.  RULE 56.2 STATEMENT ..................................................................................... 1

III. ARGUMENT ........................................................................................................... 2

   A.   Standard of Review ....................................................................................... 2

   B.   Commerce's Decision to Weight Average Dongkuk's Steel Plate
        Input Costs Is Supported by Substantial Record Evidence ......................... 2

   C.   Commerce's Selection of SeAH's Consolidated Financial Statements
        to Calculate CV Profit and Selling Expenses Is Supported by
        Substantial Evidence ..................................................................................... 8

IV.  CONCLUSION ..................................................................................................... 12

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Apex Frozen Foods Pvt. Ltd. v. United States,*
    37 F.Supp.3d 1286, 1301 (Ct. Int'l Trade 2014)..........................................................10

*Atar S.R.L. v. United States,*
    730 F.3d 1320, 1326 (Fed. Cir. 2013)..........................................................................11

*Consol. Edison Co. of New York v. NLRB,*
    305 U.S. 197 (1938)................................................................................................7, 8, 9

*Dong-A Steel Co. v. United States,*
    475 F.Supp.3d 1317 (Ct. Int'l Trade 2020) ...................................................................7

*Downhole Pipe & Equip., L.P. v. United States,*
    776 F.3d 1369 (Fed. Cir. 2015)....................................................................................12

*Home Prods. Int'l, Inc. v. United States,*
    33 CIT 1781, 1787, 675 F.Supp.2d 1192, 1197 (2009)............................................9, 10

*Mid Continent Steel & Wire, Inc. v. United States,*
    940 F.3d 662 (Fed. Cir. 2019)........................................................................................8

*Nippon Steel Corp. v. United States,*
    458 F.3d 1345 (Fed. Cir. 2006)......................................................................................8

*Pastificio Lucio Garofalo, S.p.A. v. United States,*
    35 CIT 630, 783 F.Supp.2d 1230 (2011) .......................................................................8

*Risen Energy Co. v. United States,*
    477 F.Supp.3d 1332, 1347 n.23 (Ct. Int'l Trade 2020) ...............................................10

*Sandvik Steel Co. v. United States,*
    164 F.3d 596, 599 (Fed. Cir. 1998)................................................................................5

*Thai I-Mei Frozen Foods Co. v. United States,*
    616 F.3d 1300, 1308 (Fed. Cir. 2010).......................................................................9, 11

**Statutes**

19 U.S.C. § 1677b(a)(4) ........................................................................................................2

19 U.S.C. § 1677b(a)(6)(C)(ii) ..............................................................................................2

Ct. No. 20-03686 NON-CONFIDENTIAL VERSION

19 U.S.C. § 1677a ........................................................................................................................ 2

19 U.S.C. § 1677b(a) ................................................................................................................... 2

19 U.S.C. § 1677b(b) ................................................................................................................... 2

19 U.S.C. § 1677b(e) ................................................................................................................... 2

19 U.S.C. § 1677b(f)(1) ............................................................................................................... 2

19 U.S.C. § 1677f-1(d) ................................................................................................................ 2

**Regulations**

19 C.F.R. § 351.411 ..................................................................................................................... 2

**Administrative Materials**

Issues and Decision Memorandum for the Final Results of Antidumping Duty Administrative Review and New Shipper Review of Certain Cut-to-length Carbon-Quality Steel Plate Products from the Republic of Korea (Dep't of Commerce Sept. 6, 2016) ............................................................................................... 3

Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Welded Line Pipe from the Republic of Korea (Dep't of Commerce Oct. 5, 2015) .................................................................................. 3

Issues and Decision Memorandum accompanying for the Antidumping Duty Administrative Review on Stainless Steel Bar from the United Kingdom – March 1, 2005, through February 28, 2006 (Dep't of Commerce Aug. 6, 2007) ...................... 3

Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Utility Scale Wind Towers from Canada (Dep't of Commerce June 29, 2020) ........................................................................... 6

Ct. No. 20-03686 NON-CONFIDENTIAL VERSION

I. **INTRODUCTION**

On behalf of the Wind Tower Trade Coalition ("WTTC"), we respectfully submit the following response to the March 25, 2021 motion for judgment upon the agency record and opening brief filed by Dongkuk S&C Co., Ltd. ("Dongkuk"). *See* Mem. in Supp. of Mot. for J. Upon the Agency R. (Mar. 25, 2021), ECF No. 22 ("Dongkuk Br."). For the reasons discussed below and in the brief of Defendant United States, Plaintiff's motion should be denied, and judgment should enter for Defendant United States.

II. **RULE 56.2 STATEMENT**

Dongkuk challenges the U.S. Department of Commerce's ("Commerce") final determination in the antidumping duty investigation of utility scale wind towers from Korea. *See Utility Scale Wind Towers from the Republic of Korea*, 85 Fed. Reg. 40,243 (Dep't of Commerce July 6, 2020), and accompanying Issues and Decision Memorandum, available at https://enforcement.trade.gov/frn/summary/korea-south/2020-14438-1.pdf (last visited on July 28, 2021) ("IDM"). Specifically, Dongkuk challenges:

1. Whether Commerce's decision to weight average Dongkuk's reported steel plate costs to account for significant cost differences unrelated to differences in physical characteristics of products is supported by substantial evidence.

2. Whether Commerce's use of SeAH's consolidated financial statements to calculate Dongkuk's constructed value ("CV") profit and selling expenses is supported by substantial evidence.

1

III. **ARGUMENT**

A. **Standard of Review**

WTTC incorporates by reference the standard of review provided by Defendant United States. *See* Def.'s Resp. to Pl.'s Mot. For J. Upon the Agency R. (July 14, 2021), ECF No. 27 at 2-4 ("Def. Br.").

B. **Commerce's Decision to Weight Average Dongkuk's Steel Plate Input Costs Is Supported by Substantial Record Evidence**

Contrary to Dongkuk's arguments, Commerce's decision to weight average Dongkuk's reported steel plate costs for all reported CONNUMs is supported by substantial evidence and otherwise in accordance with law. *See* IDM at 20-22.

Commerce determines antidumping duty margins by comparing the prices at which companies sell subject goods in their home or a third-country market against the prices they charge in the United States, so long as those market prices are above the goods' cost of production. *See, e.g.*, 19 U.S.C. § 1677f-1(d); *see also id.* §§ 1677a, 1677b(a), 1677b(b). Commerce normally relies on the costs recorded in a company's normal books and records to determine the cost of production. *Id.* § 1677b(f)(1). Commerce also normally relies on such costs in adjusting its calculations to account for physical differences in the merchandise sold in the home and U.S. markets (a "DIFMER adjustment") and, where necessary, to calculate CV.[1] *See, e.g., id.* §§ 1677b(a)(4), 1677b(a)(6)(C)(ii), 1677b(e); 19 C.F.R. § 351.411. However, Commerce will deviate from the costs in a company's normal books and records if they do not reasonably reflect the cost to produce the subject merchandise. *See, e.g.*, 19 U.S.C. § 1677b(f)(1).

---

[1] Where there are no sales of subject goods in the home market, or the sales in the home market are all below-cost or otherwise unsuitable for comparison with U.S. prices, Commerce will construct a value for comparison with U.S. prices, based on the costs to produce subject goods and other factors. 19 U.S.C. §§ 1677b(a)(4), -1677b(e).

2

One situation in which Commerce will deviate from a company's books and records is where the respondent reports significantly differing production costs for similar goods, and the reported costs vary in a way not explained by the goods' physical characteristics. *See, e.g.*, Issues and Decision Memorandum for the Final Results of Antidumping Duty Administrative Review and New Shipper Review of Certain Cut-to-length Carbon-Quality Steel Plate Products from the Republic of Korea (Dep't of Commerce Sept. 6, 2016), available at https://enforcement.trade.gov/frn/summary/korea-south/2016-21857-1.pdf (last visited July 28, 2021) at 4-7. For example, a company might produce goods using multiple processes, or using inputs purchased at different times. In such cases, the costs to produce the goods could vary due to cost differences in the processes used or changing input prices, rather than from differences in the physical characteristics of the goods produced. *See, e.g., id.* at 5; *see also* Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Welded Line Pipe from the Republic of Korea (Dep't of Commerce Oct. 5, 2015), available at https://enforcement.trade.gov/frn/summary/korea-south/2015-25980-1.pdf (last visited on July 28, 2021) at 38-40; Issues and Decision Memorandum accompanying for the Antidumping Duty Administrative Review on Stainless Steel Bar from the United Kingdom – March 1, 2005, through February 28, 2006 (Dep't of Commerce Aug. 6, 2007), available at https://enforcement.trade.gov/frn/summary/uk/E7-15204-1.pdf (last visited July 28, 2021) at 3-7.

Commerce's finding to this effect in the underlying investigation – that there were significant differences in per-ton plate costs between CONNUMs that were not attributable to the physical characteristics of the goods – and its resulting decision to weight average Dongkuk's reported per-ton costs for steel plate for all CONNUMS (*i.e.*, "cost smoothing") was supported by substantial evidence, contrary to Dongkuk's assertions otherwise. *See* IDM at cmt. 7. Defendant-

3

Intervenor agrees with and incorporates by reference Defendant's responses to Dongkuk's arguments with regard to the steel plate cost smoothing. *See* Def. Br. at 4-18.

In addition, Defendant-Intervenor notes that Dongkuk failed to exhaust its administrative remedies with respect to one of its main arguments. Specifically, Dongkuk argues that Commerce erred in basing its cost smoothing decision on "steel plate" cost differences that were unrelated to the product's physical characteristics, when "steel plate was not one of the physical characteristics identified by Commerce for defining the CONNUMs." Dongkuk Br. at 13. Because Commerce did not indicate that the type of steel plate used was a physical characteristic that should have been incorporated in the CONNUM, Dongkuk argues, "{a}ny analysis by Commerce of {Dongkuk's} steel plate material input prices thus was not relevant to a determination of whether the costs in {Dongkuk's} normal books and records reasonably reflected differences in the physical characteristics of the completed wind towers." *Id.* at 14 (emphasis omitted).

While Dongkuk argued generally in its administrative case brief that Commerce should not smooth its steel plate costs for the final determination, it did not argue that Commerce should not do so because Commerce allegedly assessed the wrong physical characteristics in making its determination, as it does on appeal (*e.g.*, "Commerce analyzed the cost differences of the steel plate material inputs instead of the cost differences resulting from the wind tower physical characteristics listed {in the CONNUM}"). *Id. See* Dongkuk's Case Brief, CD 222, PD 311 (Apr. 29, 2020) at 5-19. It was clear during the briefing stage at the agency, from Commerce's preliminary determination and calculations, that the agency had assessed the cost differences of the steel plate material inputs in making its cost smoothing determination. *See, e.g.*, Memorandum pertaining to Cost of Production and Constructed Value Calculation Adjustments for the Preliminary Determination – Dongkuk S&C Co., Ltd., CD 183, PD 268 (Feb. 4, 2020) at 2

("{Dongkuk} reported significant steel plate cost differences between control numbers (CONNUMs). We analyzed such differences and found based on record evidence that the differences in steel plate costs between CONNUMs do not appear to be related to differences in the physical characteristics of the products"). Because Dongkuk had the opportunity to raise this argument in its administrative case brief but failed to do so, the Court should consider that Dongkuk has waived its right to raise this argument on appeal. 28 U.S.C. § 2637(d). *See Sandvik Steel Co. v. United States*, 164 F.3d 596, 599 (Fed. Cir. 1998).

Even if the Court were to find that Dongkuk has not waived this argument, the argument is unpersuasive. In addition to Defendant's response, including that Commerce explained the relevance of the steel plate purchase analysis as it related to its determination that cost fluctuations were unrelated to the physical characteristics of the plate or the subject merchandise, Def. Br. at 10, the WTTC notes that there is no statutory basis or other authority requiring that any adjustments to recorded input costs depend on the incorporation of the input, or any of its attributes, into the CONNUM. Indeed, Dongkuk cites none. In addition to the cases cited by Defendant regarding Commerce's practice of adjusting unreasonable cost reporting both to finished products CONNUMs and to individual inputs for such products, *see id.* at 11, Defendant-Intervenor adds that the agency recently adhered to this practice in another case involving the same subject merchandise at issue here. In *Utility Scale Wind Towers from Canada*, Commerce concluded that significant steel plate cost differences between CONNUMs were unrelated to the product's physical characteristics and it therefore weight averaged most reported steel plate costs,[2] as it did

---

[2] While the respondent, Marmen, has appealed Commerce's determination to smooth its plate costs in the Canadian wind towers investigation in Court No. 20-00169, Marmen has not argued that Commerce improperly focused on the steel plate input itself, rather than the subject merchandise, in assessing any differences in physical characteristics. In that case as well, Commerce assessed whether the steel plate cost differences reflected physical differences in the

in the underlying case. Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Utility Scale Wind Towers from Canada (Dep't of Commerce June 29, 2020), available at https://enforcement.trade.gov/frn/summary/canada/2020-14530-1.pdf (last visited on July 28, 2021) at cmt. 1 ("*Wind Towers Canada* IDM").

Next, Dongkuk states that "the complete record of the investigation and the analysis undertaken by Commerce do not demonstrate that the costs of different CONNUMs was not due to differences in the physical characteristics of the finished wind towers, but rather due to timing of steel plate purchases." Dongkuk Br. at 16. In addition to Defendant's response to this argument, *see* Def. Br. at 13-18, and Dongkuk's own statement that "the administrative record contains some evidence that the timing of steel plate purchases did have some impact on pricing," Dongkuk Br. at 16, the WTTC identified in its rebuttal brief a particularly compelling example of the cost differences related to timing rather than to physical characteristics, which it briefly summarizes here.

A comparison of [                                                    ] with [                                                                    ] reveals a [     ] difference in plate costs. *See* WTTC Rebuttal Brief, CD 226, PD 316 (Apr. 29, 2020) at 7-8; Dongkuk's Responses to the Department's November 14 and 20 Supplemental Questionnaires, CD 137-151, PD 213-215 (Dec. 9, 2019) at Exhibit SD-14, COP02 "cost database." There was a substantial cost differential even though the [

                                                                        ]. In addition, evidence showed that Dongkuk

[                                                                    ], demonstrating

---

steel plate itself. *See Wind Towers Canada* IDM at 5 ("The record evidence indicates that the Marmen Group's steel suppliers do not charge different prices for plates of different grade, thickness, width, or length.").

6

their interchangeability.  Thus, physical differences in the plate utilized for the towers did not explain the substantial difference in the plate costs for these two towers.  What did explain the difference was the timing of the plate purchases.  As the WTTC noted, steel plate for the [

] was purchased in [                                                                ], while steel plate for the [         ] was purchased at the earliest in [

].  *See* WTTC Rebuttal Brief at 8-11.  In addition to other evidence, this [

] in plate costs constitutes substantial evidence that cost differentials resulted from timing, not differences in physical characteristics.

Finally, to the extent that Dongkuk alleges that Commerce's analysis of cost differences was required to take a particular format or assess only certain specific physical characteristics, *see* Dongkuk Br. at 14-15, such an assertion lacks merit.  As the Court explained last year in upholding Commerce's decision to smooth a respondent's hot-rolled coil input costs as the result of a finding that the cost differences were unrelated to physical characteristics:

> {T}he Government accurately and compellingly points out that {the Plaintiff} provides no authority or statutory basis explicitly requiring Commerce to justify a finding of cost differences with a robust quantitative analysis, or indeed any quantitative analysis at all . . . .  The Government also notes that Commerce's determinations of applicable adjustments (as evidenced here with regard to cost adjustments) are consistent with practices previously sustained by the courts, including a holding that 'Commerce's methodology is "presumptively correct" . . . {insofar as plaintiff} has not shown that Commerce lacked authority to adjust costs based on differences in physical characteristics.' {Government's Brief} at 36 (quoting *Thai Plastic Bags Industries Co. v. United States*, 746 F.3d 1358, 1368 (Fed. Cir. 2014)).

*Dong-A Steel Co. v. United States*, 475 F.Supp.3d 1317 (Ct. Int'l Trade 2020).

In sum, the Court should reject Dongkuk's challenge to Commerce's decision to smooth its plate costs.  To comply with the substantial evidence standard, Commerce's decisions must rest on "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938). To show inconsistency with this standard, it is not enough for Dongkuk to present an alternative reading of the record, even if it were one that a reasonable mind would accept. "Reasonable minds may differ, but a determination does not fail for lack of substantial evidence on that account." *See, e.g., Pastificio Lucio Garofalo, S.p.A. v. United States*, 35 CIT 630, 632, 783 F.Supp.2d 1230, 1233 (2011) (quoting *Siderca S.A.I.C. v. United States*, 29 CIT 1030, 1048, 391 F.Supp.2d 1353, 1369 (2005)). Rather, Dongkuk must show that the record could <u>only</u> support a conclusion other than that reached by the agency. *See Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d 662, 669 (Fed. Cir. 2019); *see also Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351-52 (Fed. Cir. 2006). This it has not done.

### C. Commerce's Selection of SeAH's Consolidated Financial Statements to Calculate CV Profit and Selling Expenses Is Supported by Substantial Evidence

Commerce's selection of SeAH Steel Holdings Corporation's ("SSHC") consolidated financial statements, rather than SeAH's unconsolidated financial data, to calculate CV profit/selling expenses is supported by substantial evidence, *see* IDM at cmt. 8, and Dongkuk's arguments to the contrary should be rejected.

Defendant-Intervenor agrees with and incorporates by reference the discussion regarding the legal standard for selection of a CV profit/selling expenses source as outlined in Defendant's Brief, Def. Br. at 18-20, as well as its argument in support of its selection of SSHC's consolidated financial statements pursuant to that legal framework. *Id.* at 20-24. While the WTTC submitted various alternative data for use as a CV profit/selling expenses source and argued in favor of that alternative information, *see* WTTC Rebuttal Br. at 14-16, the WTTC also argued at the agency level that the consolidated financial statements of SSHC were an appropriate CV profit/selling

8

expenses source, while SeAH's unconsolidated quarterly financial statement did not provide a reasonable basis for comparison to Dongkuk for the purposes of calculating CV. *See id.* at 16-17.

Dongkuk argues, in effect, that no "reasonable mind might accept {the record evidence} as adequate to support" Commerce's selection of SSHC's consolidated financial statement as the source to value CV profit/selling expenses. *See Consol. Edison Co.*, 305 U.S. at 229; Dongkuk Br. at 10, 21-25. Dongkuk bases its argument on SSHC's consolidated statement's reflection of operations outside of Korea and for non-subject merchandise production,[3] in addition to its inclusion of data reflecting wind tower production within Korea. *See* Dongkuk Br. at 22. *See also* Dongkuk's Case Brief at 33 ("{Dongkuk} does not dispute that SeAH Steel Corporation is a Korean producer of comparable merchandise or that its financial data are contemporaneous with the POI"). However, as outlined by Defendant, the agency reasonably determined that SSHC's consolidated statement was superior to SeAH's unconsolidated statement because it was "the only data on the record that included a full twelve months of financial data" (including a greater overlap with the period of investigation ("POI") than SeAH's four-month data), and because the SSHC statement reflected operations for subject merchandise within the foreign market (*i.e.*, Korea). Def. Br. at 22-24.

In addition to the points raised by Defendant, the WTTC wishes to note several additional points to the Court. First, Dongkuk cites *Home Products International, Inc. v. United States* to support its assertion that Commerce's reasonable practice is to rely on less contemporaneous data when the financial data offered more compelling specificity. Dongkuk Br. at 24; *Home Prods.*

---

[3] The Court of Appeals for the Federal Circuit ("CAFC") has previously noted that the "any other reasonable method" statutory provision relied upon here to select a source of CV profit contains "no limitation that the data relate to foreign like products." *Thai I-Mei Frozen Foods Co. v. United States*, 616 F.3d 1300, 1308 (Fed. Cir. 2010).

*Int'l, Inc. v. United States*, 33 CIT 1781, 1787, 675 F.Supp.2d 1192, 1197 (2009). To the extent Dongkuk intends to argue that Commerce has an established practice from which it unreasonably departed in this case, Dongkuk made no such showing. A single, 12-year old case does not establish a binding, consistent practice by the agency. *See, e.g.*, *Apex Frozen Foods Pvt. Ltd. v. United States*, 37 F.Supp.3d 1286, 1301 (Ct. Int'l Trade 2014); *Risen Energy Co. v. United States*, 477 F.Supp.3d 1332, 1347 n.23 (Ct. Int'l Trade 2020).

Moreover, even if the facts of *Home Products* established a binding agency practice, it is inapposite here. In that case, when choosing among surrogate value sources in a non-market economy context, Commerce selected financial statements as the surrogate profit source that were less contemporaneous with the POI than other statements on the record. *Home Prods.*, 33 CIT at 1786-87, 675 F.Supp.2d at 1196-97. The agency did so in that instance because the more contemporaneous financial statements did not include publicly available profit and loss statements, *id.* – a key portion of the statement for valuing respondents' profit. It is not just that the less contemporaneous data "offered more compelling specificity" as Dongkuk suggests. Dongkuk Br. at 24. The more contemporaneous data were critically incomplete. There is no such allegation to be made in this case with regard to SSHC's consolidated financial statements. To the contrary, SSHC's consolidated financial statements were complete and reflected data for an entire 12 months.

Next, in arguing that Commerce was effectively required to rely on SeAH's unconsolidated financial statements as the allegedly only reasonable option on the record, Dongkuk fails to note an important fact regarding these statements. In addition to SeAH's statements covering only the four months from September 1, 2018 through December 31, 2018, SeAH was not incorporated until September 1, 2018, and its financial statements would thus naturally reflect lower profit levels

due to the startup costs of incorporation. *See* Dongkuk's CV Profit and Selling Expense Comments and Information, PD 290-297 (Feb. 26, 2020) at Exhibit CV-6-B; WTTC Rebuttal Brief at 17.

Next, with regard to the applicable standard of review, Dongkuk has made arguments solely focused on the "substantial evidence" standard and does not reference the legal framework outlined by *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See generally* Dongkuk Br. However, Defendant-Intervenor notes that, in analyzing a similar challenge to the selection of a CV profit/selling expenses source under 19 U.S.C. § 1677b(e)(2)(B)(iii), the CAFC has previously explained:

> Here, we are reviewing Commerce's application of a statute that clearly confers authority on it to use 'any other reasonable method' for determining amounts incurred for profits. 19 U.S.C. § 1677b(e)(2)(B)(iii). Thus, we are squarely within the territory of *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 . . . (1984), and the deference it affords an agency's 'construction of a statutory scheme it is entrusted to administer.'"

*Thai I-Mei Frozen Foods*, 616 F.3d at 1305. *See also Atar S.R.L. v. United States*, 730 F.3d 1320, 1326 (Fed. Cir. 2013) (holding that *Chevron* deference applies when assessing Commerce's interpretation of the CV profit cap under the same statute, 19 U.S.C. § 1677b(e)(2)(B)(iii)). While that case dealt specifically with whether Commerce had the authority to exclude sales outside of the ordinary course of trade from its CV profit/selling expenses source (which the CAFC found that it had), *id.*, this case similarly involves the agency's authority to interpret and apply the ambiguous statutory provision. Thus, while the agency's decision still must be rational and reasonable, it is entitled to deference under the *Chevron* doctrine.

Finally, in arguing that Commerce was required to rely on SeAH's unconsolidated financial statements, rather than SSHC's consolidated statements, to value CV profit/selling expenses, Dongkuk is effectively asking the Court to impermissibly reweigh the evidence that was before the agency. The Court should decline this request. The Court may not supplant a reasonable

Ct. No. 20-03686                                                                                          NON-CONFIDENTIAL VERSION

determination by Commerce and "reweigh the evidence of or to reconsider questions of fact anew." *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1377 (Fed. Cir. 2015) (quoting *Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB*, 975 F.2d 807, 815 (Fed. Cir. 1992)). As such, the Court should sustain Commerce's decision to rely on SSHC's consolidated financial statements, which are contemporaneous with the POI and reflect operations on the subject merchandise in the relevant foreign country, to value CV profit/selling expenses in the underlying investigation.

## IV.     CONCLUSION

For the reasons detailed above, WTTC respectfully submits that this Court should affirm the final results of Commerce's antidumping duty investigation into Korean wind towers as to the smoothing of Dongkuk's costs and the selection of SeAH's consolidated financial statements to calculate Dongkuk's CV profit/selling expenses.

Respectfully submitted,

/s/ Alan H. Price
Alan H. Price, Esq.
Daniel B. Pickard, Esq.
Robert E. DeFrancesco, III, Esq.
Laura El-Sabaawi, Esq.
Stephanie M. Bell, Esq.

**WILEY REIN LLP**
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

*Counsel to the Wind Tower Trade Coalition*

Dated: July 28, 2021

CERTIFICATE OF COMPLIANCE

Pursuant to Scheduling Order (Mar. 5, 2021), ECF No. 21, the undersigned certifies that this brief complies with the word limitation requirement. The word count for Wind Tower Trade Coalition's Response Brief, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 3,588 words.

*/s/ Alan H. Price*
(Signature of Attorney)

Alan H. Price
(Name of Attorney)

Wind Tower Trade Coalition
(Representative Of)

July 28, 2021
(Date)