UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE LEO M. GORDON, JUDGE

| | |
|---|---|
| DONGKUK S&C CO. LTD., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> UNITED STATES, ) <br> ) <br> Defendant, ) <br> ) <br> and ) <br> ) <br> WIND TOWER TRADE COALITION, ) <br> ) <br> Defendant-Intervenor. ) <br> ) | **PUBLIC VERSION** <br><br> Business Proprietary Information is contained at pages 6, 7, and 8. <br><br> Consol. Court No. 20-03686 |

**PLAINTIFF DONGKUK S&C CO. LTD.'S REPLY TO DEFENDANT'S AND DEFENDANT-INTERVENOR'S RESPONSES TO DKSC'S MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

Robert G. Gosselink
Jarrod M. Goldfeder
MacKensie R. Sugama
**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE, Suite 500
Washington, D.C.  20003
(202) 223-3760

Counsel to Plaintiff Dongkuk S&C Co., Ltd.

Dated: September 3, 2021

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................................... ii

I.     ARGUMENT ..................................................................................................................... 2

    A.   Commerce's Decision to Calculate a Single Weighted-Average Steel Plate Cost for All Merchandise Under Consideration Is Not Supported by Substantial Evidence ............. 2

        1.   Record Evidence Does Not Demonstrate That Cost Differences Are Unrelated to the Relevant Physical Characteristics of the CONNUMs ................................................ 3

        2.   Commerce's Comparison Analysis Did Not Actually Compare the Cost Differences of Different Steel Plate ................................................................................ 7

    B.   Commerce's Selection of SeAH's Consolidated Statements for Calculating CV Financial Ratios Was Unreasonable Because the Data Do Not Reflect the Home Market Profit Experience of a Comparable Producer ....................................................... 9

II.    CONCLUSION ............................................................................................................... 14

# TABLE OF AUTHORITIES

## Cases

Burlington Truck Lines, Inc. v. United States, 371 U.S. 156 (1962) ........................................ 12

Dorbest v. United States, 30 C.I.T. 1671, 462 F. Supp. 2d 1262 (2006) ....................................... 7

Geum Poong Corp. v. United States, 193 F. Supp. 2d 1363 (Ct. Int'l Trade 2002).......... 10, 13, 14

Goldlink Indus. Co. v. United States, 30 C.I.T. 16, 629, 431 F. Supp. 2d. 1323 (2006)................ 7

Home Products International, Inc. v. United States, 675 F. Supp. 2d 1192 (Ct. Int'l Trade 2009) .......................................................................................................................... 12

Mid Continent Steel & Wire, Inc. v. United States, 940 F.3d 662 (Fed. Cir. 2019) ................ 9, 11

Nippon Steel Corp. v. United States, 458 F. 3d 1345, 1351-52 (Fed. Cir. 2006) .......................... 9

SeAH Steel Corporation v. United States, Slip Op. 21-83, at 54 (Ct. Int'l Trade April 14, 2021) .......................................................................................................................... 12

Universal Camera Corp. v. NLRB, 340 U.S. 474 (1951) ......................................................... 13

U.S. Steel Corp. v. United States, 637 F. Supp. 2d 1199 (Ct. Int'l Trade 2009)........................... 4

## Statutes

19 U.S.C. § 1677b(e)(2)(B)(i)-(iii) ............................................................................................ 9

## Administrative Determinations

Utility Scale Wind Towers form the Republic of Korea, 85 Fed. Reg. 40243 (Dep't of Commerce July 6, 2020) and accompanying Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Utility Scale Wind Towers from the Republic of Korea, (Dep't of Commerce June 29, 2020) ................................................... 1

Pasta from Italy, 83 Fed. Reg. 63,627 (Dep't Commerce Dec. 11, 2018) .................................. 4-5

Certain Steel Nails from the Republic of Korea; 2016-2017, 84 Fed. Reg. 4,770 (Dep't of Commerce Feb. 19, 2019)......................................................................................................... 5

Circular Welded Carbon Steel Pipes and Tubes from Thailand, 82 Fed. Reg. 46961 (Dep't Commerce, Oct. 10, 2017) ......................................................................................................... 5

Certain Steel Nails from the Sultante of Oman, 83 Fed. Reg. 4,030 (Dep't Commerce, Jan. 29, 2018), Issues and Decision Memorandum...................................................................... 12

Pure Magnesium from Israel, 66 Fed. Reg. 49,349 (Dep't of Commerce Sept. 27, 2001) ....... 9-13

Certain Color Television Receivers from Malaysia, 69 Fed. Reg. 51,989 (Dep't of Commerce Apr. 16, 2004) ................................................................................................. 10, 12, 13

Mattresses from Cambodia, 86 Fed. Reg. 15,894 (Dep't of Commerce Mar. 25, 2021) and accompanying Issues and Decision Memorandum (Mar. 18, 2021) ........................................ 12

**PLAINTIFF DONGKUK S&C CO. LTD.'S REPLY TO DEFENDANT AND DEFENDANT-INTERVENOR'S RESPONSES TO DKSC'S MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Plaintiff Dongkuk S&C Co. Ltd. ("DKSC" or "Plaintiff"), a producer and exporter of wind towers from Korea, submits this reply to the July 14, 2021, response of Defendant, the United States, and the July 28, 2021, response of Defendant-Intervenor, the Wind Tower Trade Coalition, both of which respond to the claims raised by Plaintiff in its Rule 56.2 motion for judgment on the agency record.  See Def.'s Resp. Pl's. Mot. J. Upon Agency R. Confidential Document, July 14, 2021, ECF No. 27 ("Def.Resp.Br."), Wind Tower Trade Coalition's Resp. Br., July 28, 2021, ECF No. 31 ("Def-Inv.Resp.Br.").  Plaintiff contests various aspects of the U.S. Department of Commerce's final determination in the less-than-fair-value investigation of wind towers from Korea.  See Pl's. Rule 56.2 Mot. J. Agency R., March 25, 2021, ECF No. 22; Mem. Supp. Mot. J. Upon Agency R. Confidential Version, March 25, 2021, ECF No. 22 ("Plaintiff's Brief"); see also Utility Scale Wind Towers from the Republic of Korea, 85 Fed. Reg. 40,243 (Dep't of Commerce July 6, 2020), PD 329, and Decision Memorandum, PD 324.

The Court must remand Commerce's determination to calculate a single weighted-average steel plate cost for all subject merchandise sold to the United States and to Japan during the POI.  Substantial record information does not demonstrate that there were significant cost differences among the CONNUMs that resulted from factors unrelated to differences in the CONNUM physical characteristics.  The Court also must remand for Commerce to calculate CV financial ratios using the consolidated financial data of SeAH Holdings Corporation rather than the unconsolidated financial data of SeAH Steel Corporation.  Substantial evidence demonstrates that SeAH's consolidated financial data do not reasonably reflect the experience of companies located in Korea or of companies that manufacture steel pipe products.

1

In their response briefs, Defendant and Defendant-Intervenor fail to address that Commerce never conducted any cost analysis that compared the physical characteristics of DKSC's reported CONNUMs. Nor do they address that Commerce's sole attempt to establish whether *different* steel plate had the same cost was a comparison of *virtually identical* steel plate. Nor do they adequately respond to Commerce's failure to select CV financial ratios that reasonably reflected the manufacturing and sales operations of comparable steel pipe producers in Korea. In sum, Defendant and Defendant-Intervenor do not respond to the critical arguments raised in Plaintiff's brief, ignore vast portions of the administrative record that significantly undermine Commerce's determinations, and fail to establish that Commerce's decisions were based on substantial evidence. For the reasons below, the Court must remand to Commerce with instructions to reverse the challenged determinations in accordance with the Court's findings.

## I. ARGUMENT

### A. Commerce's Decision to Calculate a Single Weighted-Average Steel Plate Cost for All Merchandise Under Consideration Is Not Supported by Substantial Evidence

Commerce's determination to calculate a single weighted-average steel cost for all merchandise under consideration was unsupported by substantial evidence because Commerce never considered the actual CONNUM product characteristics of finished wind towers in determining whether any cost differences between CONNUMs were attributable to factors beyond the differences in the products' physical characteristics. Defendant asserts that Commerce's calculation of a single weighted-average steel plate cost, i.e., "smoothing," was reasonable because Commerce concluded that cost differences reported by DKSC for steel plate material inputs were unrelated to differences in the products' physical characteristics. Def.Resp.Br. at 10. As support, Defendant asserts that (1) because Commerce compared

2

different steel plate during the same time period and found consistent prices, then (2) the differences in steel costs were attributable to the timing of purchases only and were unrelated to differences in physical characteristics, and (3) it therefore was reasonable to "smooth" steel plate costs over the period of investigation.  Id., citing DKSC Cost Calculation Memorandum, at Attachment 1, PD 327, CD 230.  Defendant's argument falls short because Commerce conducted no analysis whatsoever with respect to whether any cost differences among the products were attributable to differences in the CONNUM physical characteristics of the finished wind towers.  Instead, Commerce focused only on the costs of the steel plate inputs used to produce the finished wind tower products.  Defendant's argument also fails because – even if the costs of steel plate were relevant to the CONNUM characteristics of the finished products – Commerce claimed that it compared *different* types of steel plate and found *similar* prices when, in fact, Commerce actually compared *similar* types of steel plate and found *similar* prices.

   1. **Record Evidence Does Not Demonstrate That Cost Differences Are Unrelated to the Relevant Physical Characteristics of the CONNUMs**

Defendant and Defendant-Intervenor assert that Commerce may "smooth" costs when a respondent reports production costs for similar goods and the reported costs vary in a way not explained by the goods' physical characteristics.  Def.Resp.Br. at 11-12; Def-Int.Resp.Br. at 3-4.  DKSC recognizes that Commerce employs various forms of cost adjustments in antidumping cases to ensure correctly reported costs, and agrees that "smoothing" of costs is proper under the right circumstances.  In particular, adjusting costs may be appropriate in cases where the record demonstrates that there are significant cost differences among CONNUMs that are not related to the CONNUM physical characteristics.  In this case, however, the record does not contain such a finding.  Instead, Commerce exclusively focused on a comparison of steel plate acquisition costs – i.e., a factor that is not a CONNUM physical characteristic – to assert that there were no

3

differences in DKSC's wind tower costs. Def.Resp.Br. at 8-10; Def-Int.Resp.Br. at 6-7. In so doing, Commerce failed to establish that any cost differences in DKSC's reported CONNUMs were *not* based on the CONNUM physical characteristics.

Each Commerce proceeding is *sui generis*, and administrative determinations therefore are not legally binding on reviews before the Court. See U.S. Steel Corp. v. United States, 637 F. Supp. 2d 1199, 1218 (Ct. Int'l Trade 2009) (citation omitted). Nonetheless, numerous Commerce proceedings illustrate which physical characteristics are relevant in determining whether there are cost differences based on the physical characteristics of the finished products. In Pasta from Italy, 83 Fed. Reg. 63,627 (Dep't of Commerce Dec. 11, 2018), a case particularly relied on by Defendant, Commerce explained that:

> During a less-than-fair value investigation, Commerce identifies the physical characteristics that are the most significant in differentiating between products. These are the physical characteristics that define unique products, *i.e.*, the CONNUMs, for sales comparison purposes. The level of detail within each physical characteristic (*e.g.*, different shape, wheat species, mill form, and protein content) reflects the importance that Commerce places on establishing normal values (NV) based on the comparison market sales of identical, or the most similar, foreign like product. Thus. . ., a respondent's reported product costs should reflect meaningful cost differences attributable to *these different physical characteristics identified by Commerce in its antidumping questionnaire*.

Id., Decision Memorandum at 8 (emphasis added). In Pasta from Italy, based on a CONNUM-by-CONNUM analysis, Commerce found that the respondent had reported significantly different semolina costs for CONNUMs that had identical CONNUM physical characteristics (i.e., shape, wheat species, mill form, and protein content) except for vitamin enrichment, and that the differences in semolina costs between nearly identical CONNUMs were due to reasons not related to the CONNUM physical characteristics. Id., Decision Memorandum at 9. Pasta from Italy clearly establishes that the relevant "physical characteristics" that must be examined by Commerce for purposes of determining whether cost differences among CONNUMs are related

to the physical characteristics are the CONNUM physical characteristics, not the physical characteristics of material inputs used to produce the CONNUMs.

Commerce adopted the same approach in Certain Steel Nails from the Republic of Korea; 2016-2017, 84 Fed. Reg. 4,770 (Dep't of Commerce Feb. 19, 2019) and concluded that "the costs reported for similar CONNUMs are substantially different based on factors unrelated to the physical characteristics of the products themselves. Therefore, the cost differences are not driven by differences in *the CONNUMs physical characteristics*." Id. Decision Memorandum, at Comment 2 (emphasis added). Similarly, in Circular Welded Carbon Steel Pipes and Tubes from Thailand, 82 Fed. Reg. 46961 (Dep't of Commerce Oct. 10, 2017), Commerce concluded that "the fluctuation in costs between CONNUMs cannot be explained solely by the differences in *the physical characteristics of the CONNUMs*." Id., Decision Memorandum at Comment 2 (emphasis added). In all these cases, Commerce compared the costs of reported CONNUMs and examined whether the costs were related to the CONNUM physical characteristics.

In this investigation, while Commerce claimed that "using the physical characteristics as our guidepost, we analyzed the steel plate costs by grouping CONNUMs by the related height and weight physical characteristics," Decision Memorandum, at 22, Commerce actually did not conduct such an analysis. In its brief, DKSC pointed out that such an analysis does not exist, and Defendant and Defendant-Intervenor do not contest that the administrative record does not contain any comparison of costs by any CONNUM physical characteristics.[1] Instead, Commerce

---

[1] In response to DKSC's bringing to the Court's attention the absence of any alleged analysis by Commerce from the record, Defendant suggests that Commerce instead provided "a summary" of its analysis in Attachment 1 of the DKSC Cost Calculation Memorandum. Def.Resp.Br. at 14. But there is no mention in the DKSC Cost Calculation Memorandum, at Attachment 1, PD 327, CD 230, of any CONNUMs, CONNUM physical characteristics, cost differences among them, or any grouping of CONNUMs by the related height and weight physical characteristics. Defendant thus fails to explain Commerce's missing analysis.

5

focused on whether steel plate of "varying dimensions" had different costs. Def.Resp.Br. at 10, 14. But, as admitted by Defendant and Defendant-Intervenor, the dimensions of steel plate are not the same as, and are unrelated to, the CONNUM physical characteristics of wind towers. See Def.Resp.Brief, at 10-11, Def-Int.Resp.Br. at 4; see also Plaintiff's Brief, at 14.[2]

In its response brief, Defendant-Intervenor tries to supply the support that Commerce's original determination lacked, providing its own analysis of two CONNUMs that had a cost difference even though the [

]. Def-Int.Resp.Br. at 6. Defendant-Intervenor does not mention, however, that these [




]. In

---

[2] Defendant-Intervenor concedes that DKSC raised the issue of the smoothing of steel plate costs in its administrative case brief before Commerce, but claims that DKSC failed to "exhaust its administrative remedies" because DKSC allegedly did not argue that Commerce "assessed the wrong physical characteristics" in making its determination. Def-Inv.Resp.Br. at 4. Defendant-Intervenor is mistaken. Plaintiff acknowledged in its administrative case brief that Commerce in other proceedings has smoothed a respondent's primary raw material costs to ensure that any significant differences in costs between nearly identical control numbers that are due to reasons unrelated to the products' physical characteristics are mitigated in order to avoid distortions in the final calculations, and argued that the present case was distinguishable because of how DKSC reported its costs. DKSC's Case Brief (April 29, 2020) at 15, PD 311, CD 222. DKSC specifically argued that wind towers "can vary significantly *in terms of physical characteristics* and costs depending on the nature of the project," and "that cost differences existed between CONNUMs conforms to their basic nature." Id. at 16 (emphasis added). In addition, DKSC argued that "the record contain{ed} no support for the proposition that steel plate costs would not vary at all, i.e., that steel plate costs should be the same regardless of the model and specifications" and that "assigning a single steel plate cost to all wind towers *ignores the fundamentally different physical characteristics* of the plate consumed." Id. (emphasis added) In this appeal, as in its administrative brief, DKSC is arguing that Commerce may resort to a smoothing cost adjustment only when the fluctuation in costs between CONNUMs "cannot be explained solely by the difference in *the physical characteristics of the CONNUMs*." Id. at 15 (emphasis added) (citation omitted).

6

any event, Defendant-Intervenor's effort to find support for Commerce's determination cannot make up for Commerce's own failure to provide any.

In this case, Commerce admittedly relied on steel plate <u>input</u> costs to try to support its conclusion that the costs that DKSC reported for wind towers were unrelated to differences in the physical characteristics of the finished products. But there is no record evidence of any comparison by Commerce of CONNUM costs by their physical characteristics. <u>See</u> Pl. Br. at 14. In order for the Court to affirm Commerce's determination, the agency must have provided "a reasoned explanation ... that is supported by the administrative record." <u>Dorbest v. United States</u>, 30 C.I.T. 1671, 1677-78, 462 F. Supp. 2d 1262, 1269-70 (2006) (<u>citing</u> <u>Goldlink Indus. Co. v. United States</u>, 30 C.I.T. 616, 629, 431 F. Supp. 2d. 1323, 1334 (2006)). Commerce failed to do so in this case. Based on Commerce's established practice in other proceedings and Commerce's failure to follow a similar approach in the current case, Commerce reached a final determination in this case that was not based on substantial evidence.

### 2. Commerce's Comparison Analysis Did Not Actually Compare the Cost Differences of Different Steel Plate

Record evidence establishes that in the analysis of steel plate costs at Attachment I of Commerce's Final Cost Calculation Memorandum, Commerce compared the costs of *similar* steel plate. As demonstrated in DKSC's brief, the two steel plate types that Commerce examined for wind towers produced for the Japanese market, i.e., steel plate grades [

], are virtually identical. <u>See</u> Plaintiff's Brief, at 16. And the steel plate that Commerce reviewed for wind towers sold to the U.S. market, i.e., steel plate grade [         ], shared the *exact same* yield strength, tensile strength, and dimensional characteristics. <u>See</u> DKSC Cost Calculation Memorandum, at Attachment 1, PD 327, CD 230. Commerce even titled its analysis "Comparison of Timing within <u>Comparable</u> Grades." <u>Id.</u> (emphasis added).

7

DKSC provides below a summary of Verification Exhibit 5 from Commerce's "Verification of the Cost Response of Dongkuk S&C Co., Ltd. in the Antidumping Duty Investigation of Utility Scale Wind Towers from the Republic of Korea," (Apr. 17, 2020), at 6, 16, 18, PD 307, CD 221.

| Market | Grade | Yield Strength |
|---|---|---|
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |

As highlighted above, the steel plate grades that Commerce compared are not different and instead were quite similar. In contrast, for example, steel plate grade [SM400B], has a significantly lower yield strength. *Id.* It is understandable that comparable steel plate grades sold at the same time have comparable prices. It therefore was incorrect for Commerce to conclude that *different* steel plate types had the same costs when Commerce did *not* compare different steel plate types. And it is altogether unreasonable for Commerce to have concluded that differences in steel plate costs were attributable only to timing differences when Commerce did not compare substantially different steel plate types.

Defendant claims that Commerce's analysis was conducted within the same month and therefore reflected a "'like for like' comparison that mitigated any distortions related to the timing of the steel plate purchases." Def.Resp.Br. at 10. But Commerce's analysis does not support Commerce's conclusion that different steel plate types had similar costs because Commerce compared *comparable* steel grade and did not evaluate for cost differences among different steel plate grades. Far from presenting "an alternative reading of the record," Def-Inv.Resp.Br. at 8, DKSC's brief illustrates how the sole evidence relied on by Commerce fails to support Commerce's conclusion that differences in CONNUM costs were not attributable to the

8

different physical characteristics of the products.  See Mid Continent Steel & Wire, Inc. v. United States, 940 F.3d 662,669 (Fed. Cir. 2019); see also Nippon Steel Corp. v. United States, 458 F.3d 1345, 1351-52 (Fed. Cir. 2006).  Furthermore, although Defendant claims that the steel plate types that Commerce examined "for its purchase analysis were incorporated into two CONNUMs reported in DKSC cost database," Def.Resp.Br. at 10, neither Defendant (in its brief) nor Commerce (in the cost calculation memorandum cited by Defendant) ever identifies any CONNUM, any particular CONNUM physical characteristics, or any actual difference in steel plate costs among DKSC's reported CONNUMs.  Commerce provided no quantification of cost differences (or lack thereof) among the CONNUM characteristics reported by DKSC.  Therefore, there is no rational basis for Commerce to have concluded that cost differences between wind tower CONNUMs were unrelated to their CONNUM physical characteristics.

    **B. Commerce's Selection of SeAH's Consolidated Statements for Calculating CV Financial Ratios Was Unreasonable Because the Data Do Not Reflect the Home Market Profit Experience of a Comparable Producer**

Defendant asserts that Commerce's selection of SeAH Steel Holdings Corporation's ("SSHC's") 2018 consolidated financial statements instead of SeAH Steel Corporation's 2018 standalone statements was supported by substantial evidence because the SSHC consolidated data reflect a full year of profits.  Defendant's justification is inadequate and unreasonable. When reviewing financial data for surrogate profit and selling expenses under the "any reasonable alternative method" of 19 U.S.C. §1677b(e)(2)(B)(iii), Commerce is guided by the analysis provided in Pure Magnesium from Israel, 66 Fed. Reg. 49,349 (Dep't of Commerce Sept. 27, 2001).  This analysis requires Commerce to consider: (1) the similarity of the potential surrogate companies' business operations and products to the respondent's; (2) the extent to which the financial data of the surrogate company reflect sales in the United States as well as the

9

home market; and (3) the contemporaneity of the surrogate data to the POI.  Id.  In Certain Color Television Receivers from Malaysia, Commerce included a fourth factor: the extent to which the customer base of the surrogate and the respondent were similar.  See Certain Color Television Receivers from Malaysia, 69 Fed. Reg. 51,989 (Dep't of Commerce Apr. 16, 2004), Decision Memorandum at 58 ("CTVs from Malaysia").

In reviewing Commerce's selection of surrogate companies for calculating CV profit and selling expenses, "{t}he Court's proper role is to determine whether the methodology is in accordance with the law and supported by substantial evidence."  Geum Poong Corp. v. U.S., 26 C.I.T. 991, 995 (Aug. 22, 2002) ("Geum Poong") ("{T}he court must review whether Commerce's choice of methodology is reasonable of itself and in accordance with the law.").  Here, Commerce selected SSHC's consolidated financial statements, which incorporated financial data substantially related to (1) the production of merchandise dissimilar to, and unrelated to, wind towers and (2) activities outside of South Korea.  See Letter from Trade Pacific PLLC, "CV Profit and Selling Expense Comments and Information" (Feb. 26, 2020), at Exhibit CV-6-A, PD 290-297 ("DKSC CV Profit Submission") (establishing that non-Korean, non-steel manufacturing entities represented **92.68** percent of SSHC's total sales); see also Decision Memorandum at 27 (SSHC's financial data "include the results of other business operations," and "include activities from business operations other than comparable merchandise").  Having not selected financial data of a company that had the same customer base of respondent DKSC, Commerce thus chose a surrogate company for which three of the four criteria established in Pure Magnesium from Israel/CTVs from Malaysia were not met.  Yet, Defendant nonetheless asserts instead that it was appropriate for Commerce to conclude that

10

contemporaneity should trump these three other criteria. Def.Resp.Br. at 22. The Court cannot sustain this unreasonable contention.

In Pure Magnesium from Israel, Commerce explained that "{t}he greater the similarity in business operations and products, the more likely that there is a greater correlation in the profit experience of the two companies." See 66 Fed. Reg. 49,349 (Dep't of Commerce Sept. 14, 2001), Decision Memorandum at Comment 8. The goal of the criteria established in Pure Magnesium from Israel was that Commerce would select a company with the most similar profit experience. In previous cases, Commerce has thoroughly assessed the comparability of a surrogate company to the subject merchandise producer by analyzing the use of "the same or similar type of plant facilities, machinery, and equipment" and whether both are "subject to similar levels of capital expenditures and are also subject to similar market conditions." See Mid Continent Steel & Wire, Inc. v. United States, 941 F.3d 530, 543 (Oct. 17, 2019) (noting that Commerce's assessment of CV profit is "tied to the goal of achieving accuracy.").

But Commerce in this case did not conduct any such analysis. Commerce did not adequately compare the financial statements of surrogate companies placed on the record, consider the extent to which the financial data reflected sales in the United States and home market, or assess the extent to which the customer bases of the surrogate and the respondent were similar. Instead, Commerce simply selected SSHC's consolidated statements because they covered "12 months of financial data" despite also "includ{ing} the results of other business operations." Decision Memorandum at 27. Moreover, the SSHC financial statements covered six months outside of the POI and six months within the POI, while SeAH Steel Corporation's *standalone* 2018 financial statements covered four months, all within the POI. Defendant might mock DKSC's statement that "the third factor of 'contemporaneity' is immaterial," Def.Resp.Br.

11

at 22, but DKSC's point was that relative contemporaneity is not a distinguishing factor when both sets of financial data were contemporaneous with the period examined.[3]

Commerce's surrogate CV financial ratio data choice in this case also conflicts with Commerce's practice of selecting less contemporaneous data when the financial data offered more compelling specificity with respect to the Pure Magnesium from Israel/CTVs from Malaysia criteria. See Pl. Br. at 24, 25; see also Mattresses from Cambodia, 86 Fed. Reg. 15,894 (Dep't Commerce Mar. 25, 2021), Decision Memorandum at Comment 2 (Mar. 18, 2021) ("Commerce regularly accepts as contemporaneous a financial statement that overlaps the POI by some amount. Furthermore, Commerce has been reluctant to prefer one financial statement over another for the sole reason that one of them covers more of the POI.").[4] Accordingly, it was

---

[3] Defendant claims that "given the period of investigation spanned for one year, four months of financial data is an incomplete and less preferable alternative to financial data that includes the complete year of sales" and that twelve months of data "normalized results for an extended period of time." Def.Resp.Br. at 23. Commerce provided neither of these explanations, and Defendant's arguments thus constitute post-hoc rationalization that the Court must disregard. See Burlington Truck Lines v. United States, 371 U.S. 156, 168-69, 83 S. Ct. 239, 9 L.Ed. 2d 207 (1962) (reiterating that "courts may not accept … counsel's post hoc rationalizations for agency action"). For its part, Defendant-Intervenor argues that SeAH Steel Corporation was not incorporated until September 2018, and "its financial statements would thus naturally reflect lower profit levels due to the startup costs of incorporation." Def-Int.Resp.Br. at 10-11. Commerce made no such finding, and Defendant-Intervenor's speculation thus should be ignored. In any event, SeAH Steel Corporation was not a startup company, and was spun off from SSHC in September 2018 See DKSC CV Profit Submission, at Exhibit CV-6-A, PD 290-297.

[4] Defendant-Intervenor asserts that Home Products International, Inc. v. United States, 675 F.Supp.2d 1192 (Ct. Int'l Trade 2009), does not establish a binding agency practice of selecting more reliable, albeit less contemporaneous, data. However, numerous agency decisions confirm Commerce's established preference of selecting more accurate financial data that might be less contemporaneous. See e.g., Certain Steel Nails from the Sultanate of Oman, 83 Fed. Reg. 4,030 (Dep't Commerce Jan. 29, 2018), Decision Memorandum at Comment 2 (selecting financial statements that overlapped the period of review by three months, when fully contemporaneous statements also were on the record); see also SeAH Steel Corporation v. United States, Slip Op. 21-83, at 54 (Ct. Int'l Trade April 14, 2021) (affirming Commerce's selection of more precise financial data even though the data were less contemporaneous with the period of review).

not reasonable for Commerce to cite to "contemporaneity" at the expense of the other three Pure Magnesium from Israel/CTVs from Malaysia criteria as justification for its selection of the surrogate CV financial ratios.

Based on the financial data selection standards articulated in Geum Poong, it was not reasonable for Commerce to rely on the consolidated statements of SSHC when 62.68 percent of SSHC's overall sales and 41.03 percent of its overall profits were attributable to distribution sales from its subsidiaries in the United States and when non-steel manufacturing entities represented 92.68 percent of SSHC's total sales.  See DKSC CV Profit Submission, Exhibit CV-6-A pp. 8, PD 290-297.  It is well-settled that for agency action to be based on substantial evidence, the agency must explain why evidence that fairly detracts from the reasonableness of its determination is not outweighed by evidence that supports Commerce's determination.  See, e.g., Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951).  Defendant and Defendant-Intervenor address none of the record evidence highlighted by DKSC that detracts from Commerce's conclusion that SSHC's financial data represented an appropriate source for obtaining CV profit and selling expense information.  Because the data for SSHC were compromised by non-home market sales and because record evidence demonstrates that the preponderance of financial data in SSHC's financial statements did not reflect products similar to the subject merchandise, Commerce's decision to use the consolidated data of SSHC to calculate CV profit and selling expenses was unreasonable and unsupported by substantial evidence.  Commerce's approach severely distorted the profit and selling expenses applied to DKSC because the SSHC data did not come reasonably close to reflecting the operational experience of a wind tower producer in South Korea.  The Court therefore should remand this issue to Commerce with instructions to select surrogate financial data for calculating CV profit and

Case 1:20-cv-03686-LMG   Document 36   Filed 09/03/21   Page 18 of 19

PUBLIC VERSION

selling expenses that correctly "approximate the home market profit experience." Geum Poong, 193 F.Supp.2d at 1370.

## II. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant its Motion for Judgment on the Agency Record and remand this case to Commerce with instructions consistent with the points set forth in this Memorandum.

          Respectfully submitted,

          /s/ Robert G. Gosselink

          Robert G. Gosselink
          Jarrod M. Goldfeder
          MacKensie R. Sugama

          **TRADE PACIFIC PLLC**
          700 Pennsylvania Avenue, SE
          Suite 500
          Washington, D.C.  20003
          (202) 223-3760

          *Counsel to Dongkuk S&C Co. Ltd.*

Dated:  September 3, 2021

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE LEO M. GORDON, JUDGE

| | |
|---|---|
| DONGKUK S&C CO. LTD., | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| UNITED STATES, | ) ) Consol. Court No. 20-03686 |
| Defendant, | ) ) |
| and | ) ) |
| WIND TOWER TRADE COALITION, | ) ) |
| Defendant-Intervenor. | ) ) |

CERTIFICATE OF COMPLIANCE

      The undersigned counsel at Trade Pacific PLLC certifies that the accompanying reply brief complies with the word-count limitation described in the Court's March 5, 2021, Scheduling Order, at 2, ECF No. 21.  Defendant's response brief contained 7,295 words and Defendant-Intervenor's response brief contained 3,588 words.  Plaintiff's reply therefore may not exceed 4,353 words (i.e., 40% of Defendant's and Defendant-Intervenor's 10,883-word response briefs).  This reply brief contains 4,339 words according to the word-count function of the word-processing software used to prepare the brief, excluding the table of contents, table of authorities, and counsel's signature block.

      Respectfully submitted,

/s/ Robert G. Gosselink
Robert G. Gosselink
**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C.  20003
(202) 223-3760

Dated:  September 3, 2021