Slip Op. 21-167

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| DONGKUK S&C CO., LTD., | |
|     Plaintiff, | |
| v. | Before: Leo M. Gordon, Judge |
| UNITED STATES, | |
|     Defendant, | Court No. 20-03686 |
| and | |
| WIND TOWER TRADE COALITION, | |
|     Defendant-Intervenor. | |

**OPINION and ORDER**

[Final Determination remanded in part.]

Dated: December 13, 2021

    Robert G. Gosselink and Jarrod M. Goldfeder, Trade Pacific PLLC, of Washington, D.C., argued for Plaintiff Dongkuk S&C Co., Ltd. With them on the brief was MacKensie R. Sugama.

    Ashley Akers, Trial Attorney, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., argued for Defendant United States. Of counsel on the argument was Kirrin Hough, Attorney, Office of the Assistant Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C. With Ms. Akers on the brief were Brian M. Boynton, Acting Assistant Attorney General, Patricia M. McCarthy, Director, and Reginald T. Blades, Jr., Assistant Director. Of counsel on the brief was Jesus N. Saenz, Attorney, Office of the Assistant Chief Counsel for Trade Enforcement and Compliance.

    Derick G. Holt, Wiley Rein LLP, of Washington, D.C., argued for Defendant-Intervenor Wind Tower Trade Coalition. On the brief were Alan H. Price, Daniel B. Pickard, Robert E. DeFrancesco, Laura El-Sabaawi, and Stephanie M. Bell.

Court No. 20-03686                                                                                          Page 2

Gordon, Judge: This action involves the U.S. Department of Commerce's ("Commerce") final affirmative determination in the antidumping duty investigation of utility scale wind towers ("subject merchandise") from the Republic of Korea. See Utility Scale Wind Towers from the Republic of Korea, 85 Fed. Reg. 40,243 (Dep't of Commerce July 6, 2020) ("Final Determination"), and the accompanying Issues and Decision Memorandum, A-580-902 (Dep't of Commerce June 29, 2020), https://enforcement.trade.gov/frn/summary/korea-south/2020-14438-1.pdf (last visited this date) ("Decision Memorandum").

Before the court is the USCIT Rule 56.2 motion for judgment on the agency record filed by Plaintiff Dongkuk S&C Co., Ltd. ("DKSC"). See Mem. In Supp. of Mot. for J. upon the Agency R. of Pl. Dongkuk S&C Co. Ltd., ECF No. 22[1] ("Pl.'s Br."); see also Def.'s Resp. to Pl.'s Rule 56.2 Mot. for J. upon the Agency R., ECF No. 27 ("Def.'s Resp."); Def.-Intervenor Wind Tower Trade Coal.'s Resp. Br., ECF No. 31 ("Def.-Intervenor's Resp."); Pl. Dongkuk S&C Co. Ltd.'s Reply to Def.'s and Def.-Intervenor's Resps. to DKSC's Mot. for J. upon the Agency R., ECF No. 35. The court has jurisdiction pursuant to Section 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2018),[2] and 28 U.S.C. § 1581(c) (2018). For the reasons set forth below, the court remands in part and sustains in part the Final Determination.

---

[1] All citations to the parties' briefs and the agency record are to their confidential versions unless otherwise noted.
[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2018 edition.

## I. Standard of Review

The court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole.  Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006); see also Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight.").  Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).  Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr. & Richard Murphy, Administrative Law and Practice § 9.24[1] (3d ed. 2021).  Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." 8A West's Fed. Forms, National Courts § 3.6 (5th ed. 2021).

## II. Discussion

### A. Steel Plate Cost Adjustment

Utility scale wind towers are produced for use in utility scale wind turbine electrical power generating systems. Pl.'s Br. at 3. Wind towers are large structures designed to support the nacelle and rotor blades of a wind turbine, and can vary in height and weight, among other physical characteristics. Id. They typically consist of three to five cylindrical or conical sections, with each section consisting of multiple steel plates—the main material input—that are rolled and welded together to form a steel shell. Id. The wind tower sections are usually produced and then shipped to a project site for assembly into a completed wind tower. Id.

At the beginning of the underlying investigation, Commerce identified 11 physical characteristics[3] that are most significant in differentiating the costs between products.

---

[3] Those characteristics are:

| Physical Characteristic | Description |
| --- | --- |
| 1. Type | Whether the product is a complete tower or section |
| 2. Weight | Weight of tower/section |
| 3. Height | Height of tower/section |
| 4. Tower Sections | Number of tower sections for the particular sale |
| 5. Type of Paint | The top paint coat for the tower/section |
| 6. Metalizing | The degree of metalizing of the tower/section |
| 7. Elec. Conduit-Bus Bars | Whether the tower/section contains bus bars |
| 8. Elec. Conduit-Power | Whether the tower/section contains power cables |

(footnote continued)

Court No. 20-03686 Page 5

Decision Memorandum at 21 (citing "Product Characteristics for the Antidumping Duty Investigation of Utility Scale Wind Towers from the Republic of Korea," at Att. I, PD[4] 94 (Dep't of Commerce Sept. 17, 2019)).  These physical characteristics define the unique products, i.e., CONNUMs,[5] for sales comparison purposes and the level of detail within each physical characteristic (e.g., thickness, width, or height, etc.) that reflect the importance that Commerce places on comparing the most similar products in price-to-price comparisons.  Id.  A wind tower's height and weight were two of the most significant physical characteristics.  See id.  However, neither the dimensions, nor the grade, nor any other characteristic of the steel plate used to create the subject merchandise were listed as one of the physical characteristics of the wind towers.  Id.

---

| | | |
|---|---|---|
| | 9. Lift | Whether an elevator is attached to the tower/section |
| | 10. Platform | The number of platforms in the tower/section |
| | 11. Internal Components | Whether there were other internal components |

Pl.'s Br. at 13 (citing "Product Characteristics for the Antidumping Duty Investigation of Utility Scale Wind Towers from the Republic of Korea," at Att. I, PD 94 (Dep't of Commerce Sept. 17, 2019)).

[4] "PD ___" refers to a document contained in the public administrative record, which is found in ECF No. 15-3 unless otherwise noted.  "CD ___" refers to a document contained in the confidential administrative record, which is found in ECF No. 15-2 unless otherwise noted.

[5] A "CONNUM" is a contraction of the term "control number," and is Commerce jargon for a unique product (defined in terms of a hierarchy of specified physical characteristics determined in each antidumping proceeding).  All products whose product hierarchy characteristics are identical are deemed to be part of the same CONNUM and are regarded as "identical" merchandise for purposes of price comparison.  The hierarchy of product characteristics defining a unique CONNUM varies from case to case depending on the nature of the subject merchandise.

Court No. 20-03686 Page 6

In certain circumstances in an antidumping duty investigation, Commerce is to determine whether sales of the foreign like product were made at less than the cost of production of that product. Commerce is to normally calculate costs "based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country ... and reasonably reflect the costs associated with the production and sale of the merchandise." 19 U.S.C. § 1677b(f)(1)(A). A respondent's reported costs "reasonably reflect the costs associated with the production and sale of the merchandise" if they reflect meaningful cost differences attributable to the finished product's different physical characteristics. See Thai Plastic Bags Indus. Co. v. United States, 746 F.3d 1358, 1368 (Fed. Cir. 2014) (explaining that "physical differences in products 'generally account' for major differences in costs" and "[r]eliance on physical characteristics, because of its ability to promote consistency, is a predictable methodology that is administrable across all investigations and administrative reviews").

In reporting the costs incurred in producing the subject wind towers, DKSC included the specific steel plate input costs for each individual wind tower project during the period of investigation ("POI"). Pl.'s Br. at 5. Commerce found, however, that DKSC's reported steel plate costs "were significantly different between [CONNUMs] sold in the Japanese comparison market[6] and those sold in the U.S. market." Decision

---

[6] Upon determining that DKSC's "sales in the home market [were] under the five percent viability threshold," Commerce instructed DKSC to report its sales to Japan as the basis for normal value. Decision Memorandum at 9; see also 19 U.S.C. §§ 1677b(a)(1)(B)(ii), 1677b(a)(1)(C) (normal value may be based on third country sales if "[Commerce] (footnote continued)

Memorandum at 19.  To determine the reason for the cost differences in steel plate in the various wind tower projects, Commerce purportedly analyzed the reported costs "[u]sing the physical characteristics as [its] guidepost" and by "grouping CONNUMs by the related height and weight physical characteristics, and the steel plate cost difference between steel grades and dimensions (i.e., thickness, width, or height) within the same time period." Id. at 22.  As a result, Commerce found that "the overwhelming factor that caused the differences in the steel plate costs was the timing of the steel plate purchases, rather than the physical characteristics of the [wind towers]."  Id.; see also 19 U.S.C. § 1677b(f)(1)(A).  In accordance with its normal practice, Commerce then decided to adjust ("smooth") "costs to address distortions when such cost differences are attributable to factors beyond the physical characteristics." Decision Memorandum at 21.  Here, because of the impact of the timing of the steel plate purchases, Commerce adjusted costs by weight-averaging "the reported steel plate costs for all reported CONNUMs." Id.

DKSC challenges Commerce's determination that DKSC's normal books and records did not reflect the cost to produce the subject merchandise based on the physical characteristics, and Commerce's subsequent decision to adjust those costs by weight-averaging.  In particular, DKSC argues that the record fails to demonstrate that Commerce "analyzed the steel plate costs by grouping CONNUMs by the related height and weight physical characteristics." Pl.'s Br. at 14.  DKSC also maintains that

---

determines that the aggregate quantity (or, if quantity is not appropriate, value) of [home market sales]  is insufficient to permit a proper comparison with the sales of the subject merchandise to the United States," and aggregate quantity (or value) is normally insufficient if "such quantity (or value) is less than [five] percent of the aggregate quantity (or value) of sales of the subject merchandise to the United States").

Court No. 20-03686 Page 8

"Commerce does not appear to have ever compared DKSC's CONNUM costs using any of the eleven enumerated physical characteristics as its guidepost, as it stated it did." Id. Lastly, DKSC contends that because Commerce did not identify steel plate as one of the CONNUM physical characteristics "[a]ny analysis by Commerce of DKSC's steel plate material input prices ... was not relevant to a determination of whether the costs ... reasonably reflected differences in the physical characteristics of the completed wind towers." Id. at 13–14.

To the contrary, Defendant argues that Commerce's analysis (or at least a summary thereof) is contained in the record in the Final Cost Calculation Memorandum. See Def.'s Resp. at 10, 14; see also Cost of Production and Constructed Value Calculation Adjustments for the Final Determination – Dongkuk S&C Co., Ltd. at 1–2, PD 327, CD 230 (Dep't of Commerce June 29, 2020) ("Final Cost Calculation Memorandum"). Defendant maintains that Commerce's analysis identified purchases of steel plate that were incorporated into two CONNUMs with different reported ranges for both the height and weight characteristics. Def.'s Resp. at 10. Defendant also contends that Commerce explained the relevance of its steel plate analysis in regard to its determination that steel plate cost fluctuations were unrelated to the physical characteristics of the subject merchandise. Id. (citing Final Cost Calculation Memorandum at 1–2).

The court disagrees. The only analysis in the Final Cost Calculation Memorandum focused on a cost comparison of "Japanese and U.S. steel plate purchases made in the same month" and found that "the per-unit steel plate prices did not significantly vary due

to the thickness, weight, or height, i.e., the physical characteristics of the steel plate." Final Cost Calculation Memorandum at 1–2. There is nothing in that Memorandum that supports a conclusion that Commerce did in fact group CONNUMs by any of the 11 physical characteristics or otherwise use those characteristics as a "guidepost." Cf. Decision Memorandum at 22. As DKSC points out, Commerce's analysis may not constitute a reasonable application of 19 U.S.C. § 1677b(f)(1)(A). See Pl.'s Br. at 12.

      Lastly, Defendant argues that the analysis nonetheless supports Commerce's determination because "Commerce applies its practice of adjusting unreasonable cost reporting both to finished products CONNUMs and to individual inputs for such products." Def.'s Resp. at 11 (emphasis in original) (citing Pipe & Tube from Turkey, 82 Fed. Reg. 49,179, and Pasta from Italy, 83 Fed. Reg. 63,627). The court must reject this argument as it is a post hoc rationalization by agency counsel and does not reflect Commerce's rationale as set forth in the Decision Memorandum. See Motor Vehicle Mfrs. Ass'n v. State Farm Ins., 463 U.S. 29, 50 (1983) ("courts may not accept appellate counsel's post hoc rationalization for agency action" (citing Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962))). Commerce made no reference to its "practice" of adjusting costs based solely on an analysis of individual inputs, nor did Commerce rely on Pasta from Italy in reaching its determination on this issue. See Decision Memorandum at 21–22 (making no reference to Pasta from Italy, and citing only, without any discussion, Pipe & Tube from Turkey).

      Here, the record fails to demonstrate how Commerce's analysis could lead a reasonable mind to conclude that DKSC's reported costs did not reflect the cost to

Court No. 20-03686 Page 10

produce and sell the subject merchandise. Accordingly, this issue is remanded to Commerce for further consideration.[7]

### B. CV Profit and Selling Expenses

Plaintiff also challenges Commerce's selection of surrogate data for the calculation of constructed value. See Pl.'s Br. at 19–25. Plaintiff noted at oral argument that it is undisputed that "Commerce compared US prices to CV after finding that all reported Japanese market sales failed the sales below cost test;" and "that occurred only because of Commerce's unsupportable cost smoothing methodology …." See Oral Argument at 25:20–25:50, ECF No. 44 (Dec. 1, 2021). Given that the court is remanding Commerce's steel plate cost smoothing determination, see Section A supra, and that Commerce's reconsideration of that issue may impact Commerce's calculation of constructed value, the court will hold in abeyance consideration of Plaintiff's challenge to Commerce's selection of surrogate data used to calculate constructed value pending the filing of remand results.

---

[7] DKSC argues in the alternative that, even if Commerce's steel plate analysis were relevant, the analysis does not support Commerce's finding that "the significant cost fluctuations found in the steel plate consumption costs for different CONNUMs was not due to differences in physical characteristics, but rather due to timing of the steel plate purchases." Pl.'s Br. at 16 (citing Final Cost Calculation Memorandum at 1). Because the issue is remanded to Commerce and the agency may address this argument on remand, the court does not need to reach this argument.

Court No. 20-03686                                                                                                      Page 11

### III. Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that Commerce's determination as to an adjustment for steel plate costs is remanded to Commerce for further explanation, and if appropriate, reconsideration of its cost analysis under 19 U.S.C. § 1677b(f)(1)(A); it is further

**ORDERED** that Commerce shall file its remand results on or before March 15, 2022; and it is further

**ORDERED** that, if applicable, the parties shall file a proposed scheduling order with page limits for comments on the remand results no later than seven days after Commerce files its remand results with the court.

                                                                    /s/ Leo M. Gordon
                                                                    Judge Leo M. Gordon

Dated: December 13, 2021
       New York, New York