# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE LEO M. GORDON, JUDGE

| | |
|---|---|
| DONGKUK S&C CO. LTD., ) | |
| ) | **NON-CONFIDENTIAL** |
| Plaintiff, ) | **VERSION** |
| ) | |
| v. ) | Business Proprietary Information |
| ) | has been redacted on pages 5 and 7 |
| UNITED STATES, ) | to 14. |
| ) | |
| Defendant, ) | |
| ) | Consol. Court No. 20-03686 |
| and ) | |
| ) | |
| WIND TOWER TRADE COALITION, ) | |
| ) | |
| Defendant-Intervenor. ) | |
| ) | |

### PLAINTIFF DONGKUK S&C CO. LTD.'S COMMENTS IN OPPOSITION TO THE FINAL RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND

Robert G. Gosselink
Jarrod M. Goldfeder
MacKensie R. Sugama
**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE, Suite 500
Washington, D.C.  20003
(202) 223-3760

Counsel to Plaintiff Dongkuk S&C Co., Ltd.

Dated: May 18, 2022

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ......................................................................................... i

TABLE OF AUTHORITIES ................................................................................... ii

I.    INTRODUCTION ....................................................................................... 1

II.   COMMERCE DID NOT COMPLY WITH THE COURT'S INSTRUCTIONS ............... 1

III.  COMMMERE WRONGLY ASSUMES THAT STEEL PLATE INPUT DIMENSIONS DICTATE WIND TOWER PHYSICAL CHARACTERISTICS ....................................... 3

IV.  COMMERCE FOCUSES ON THE TIMING OF STEEL PLATE PURCHASES WITHOUT CONSIDERING WHETHER THE PHYSICAL CHARACTERISTICS OF THE FINISHED WIND TOWERS ALSO IMPACT COSTS ........................................... 7

V.   ERRORS WITH RESPECT TO UNITS OF MEASURE UNDERSCORE COMMERCE'S MISTAKEN FOCUS ON STEEL PLATE INPUT DIMENSIONS ...... 10

VI.  EVIDENCE THAT COMMERCE CITES CONFIRMS THAT OBSERVED COST DIFFERENCES ARE RELATED TO THE PHYSICAL CHARACTERISTICS OF THE WIND TOWERS .......................................................................................... 11

VII. COMMERCE'S CLAIM OF SIGNIFICANT COST DIFFERENCES UNRELATED TO THE PHYSICAL CHARACTERISTICS OF THE WIND TOWERS IS CONTRARY TO THE RECORD EVIDENCE ............................................................................ 13

VIII. THE STATUTE AND AGENCY PRACTICE DO NOT PERMIT COMMERCE TO SMOOTH COSTS WITHOUT REASONABLE JUSTIFICATION ............................. 14

IX.  CONCLUSION ...................................................................................... 16

# **TABLE OF AUTHORITIES**

## **Cases**

Burlington Truck Lines, Inc. v. United States, 371 U.S. 156 (1962) ............................................13

Dongkuk S&C Co., Ltd. v. United States, Court No. 20-03686, Slip Op. 21-167 (Ct. Int'l Trade
Dec. 13, 2021)...........................................................................................................................1, 2

Gallant Ocean (Thailand) Co. v. United States, 602 F.3d 1319 (Fed. Cir. 2010) ........................13

U.S. Steel Corp. v. United States, 637 F.Supp.2d 1199 (Ct. Int'l Trade 2009) ............................16


## **Statutes**

19 U.S.C. § 1677b(f)(1)(A) ..........................................................................................................14

## **Administrative Determinations**

Utility Scale Wind Towers form the Republic of Korea, 85 Fed. Reg. 40243 (Dep't of Commerce
July 6, 2020) and accompanying Issues and Decision Memorandum for the Final Affirmative
Determination in the Less-Than-Fair-Value Investigation of Utility Scale Wind Towers from
the Republic of Korea, (Dep't of Commerce June 29, 2020).............................................1, 7, 8

Hot-Rolled Steel Flat Products from the Republic of Korea; 84 Fed. Reg. 12660 (Dep't of
Commerce Mar. 7, 2022) and accompanying Issues and Decision Memorandum (Dep't
Commerce Feb. 28, 2022) ................................................................................................... 14-15

Certain Pasta from Italy, 83 Fed. Reg. 63627 (Dep't Commerce Dec. 11, 2018) and
accompanying Issues and Decision Memorandum (Dep't Commerce Dec. 4, 2018) .........15, 16

Utility Scale Wind Towers from Canada, 85 Fed. Reg. 40239 (Dep't Commerce July 6, 2020)..16

## I.     INTRODUCTION

On behalf of Plaintiff, Dongkuk S&C Co. Ltd. ("DKSC"), we submit these comments in opposition to the U.S. Department of Commerce's ("Commerce's") results of redetermination filed on April 14, 2022, ECF No. 54 ("Remand Results"), REM-PD-6, REM-CD-5, pursuant to Dongkuk S&C Co., Ltd. v. United States, Court No. 20-03686, Slip Op. 21-167 (Ct. Int'l Trade Dec. 13, 2021) ("DKSC I"), ECF No. 45.  Commerce's Remand Results fail to comply with the Court's remand order to explain why the cost differences reported among CONNUMs produced by DKSC were not attributable to the physical characteristics of the finished wind towers. Additionally, Commerce's rationale for adjusting DKSC's costs of finished wind towers is based on a false assumption that steel plate input dimensions dictate the physical characteristics of wind towers.  Commerce continues to focus on the timing of steel plate purchases without considering that the physical characteristics of the finished wind towers also impact costs.  Given multiple errors rendering the Remand Results unsupported by substantial evidence, the Court should order Commerce to re-calculate DKSC's dumping margin without calculating a single weighted-average steel plate cost for all merchandise under consideration ("MUC") during the period of investigation ("POI").

## II.    COMMERCE DID NOT COMPLY WITH THE COURT'S INSTRUCTIONS

In the original final determination, Commerce claimed that by "using the physical characteristics as our guidepost, we analyzed the steel plate costs by grouping CONNUMs by the related height and weight physical characteristics." Utility Scale Wind Towers from the Republic of Korea, 85 Fed. Reg. 40243 (Dep't Commerce July 6, 2020) (final det.), PD-329, and accompanying Issues and Decision Memorandum (Dep't Commerce June 29, 2020) ("Decision Memorandum"), PD-324, at 22.  However, this Court found that "{t}here is nothing in {the Final

1

Cost Calculation Memorandum} that supports a contention that Commerce did in fact group CONNUMs by any of the 11 physical characteristics or otherwise use those characteristics as a 'guidepost.'" DKSC I at 9.  The Court concluded that Commerce's final determination to disregard DKSC's actual costs and to calculate a single weighted-average steel plate cost for all MUC sold to the United States and to Japan was unsupported by substantial evidence, reasoning that "the record fails to demonstrate how Commerce's analysis could lead a reasonable mind to conclude that DKSC's reported costs did not reflect the cost to produce and sell the subject merchandise." Id. at 9-10.  The Court thus remanded Commerce's final determination so Commerce could further explain and/or demonstrate how DKSC's reported cost differences were **not** attributable to the physical characteristics of the finished wind towers. Id. at 11.

But rather than explaining how or why reported cost differences were unrelated to the physical characteristics of the **finished wind towers**, as the Court required, Commerce once again focuses largely on "the dimensions (i.e., thickness, width, and height/length) of the steel plate **input**" used to produce the subject wind towers, Remand Results at 1 (emphasis added), and how an "analysis of the cost of the steel plate input, **which is not a physical characteristic**," demonstrates that DKSC's reported costs do not reflect the costs to produce the MUC. Id. at 3 (emphasis added).  In fact, excluding summaries of interested party comments received, the Remand Results refer to the "dimensions" of steel plate **36 times**.  In contrast, Commerce references "dimensions" with respect to finished wind towers only three times (with one additional reference to both towers and plate).

Critically, and contrary to the Court's instructions, Commerce fails to address the differences in the physical characteristics of the finished wind towers that resulted in reported cost differences among the differing wind towers.  In ignoring such an analysis—which was the

2

focus of the Court's remand given Commerce's previous claim to have grouped CONNUMs by their related height and weight—Commerce failed to comply with the Court's instructions to explain why DKSC's reported costs did not reasonably reflect differences in the physical characteristics of the finished wind towers. There is no dispute whether the thickness, width, and length of steel plate inputs are among any of the physical characteristics that comprise the CONNUM of finished wind towers—they are not. By focusing again on the inputs, Commerce did not comply with the Court's instructions to explain why the cost differences reported among the CONNUMs produced by DKSC were _not_ attributable to the actual physical characteristics of the finished wind towers. Commerce has failed address this issue.

III.   **COMMMERE WRONGLY ASSUMES THAT STEEL PLATE INPUT DIMENSIONS DICTATE WIND TOWER PHYSICAL CHARACTERISTICS**

Even if Commerce believed it was reasonable to ignore the Court's instructions to explain how the cost differences of finished wind towers were not attributable to the physical characteristics of the finished wind towers, the Remand Results nonetheless do not support Commerce's belief that the steel plate input is an appropriate basis to determine if an adjustment is warranted. Commerce first claims that "the steel plate input directly impacts the weight and height physical characteristics of the differing finished wind towers produced." Remand Results at 2 (emphasis added). But immediately thereafter, Commerce adopts the exact opposite view, claiming that it found "the significant cost differences reported for the steel plate inputs for wind towers of differing dimensions are not associated with the differences in the identified physical characteristics (i.e., height and weight) of the wind towers produced." Id. (emphasis added). These statements are not taken out of context. Rather, Commerce has adopted an internally

3

inconsistent approach that seeks to validate its focus on the dimensions of steel plate inputs instead of the different physical characteristics of finished wind towers, as the Court instructed.

The Remand Results also continue to misconstrue DKSC's position with respect to the relationship between the physical characteristics of a wind tower and the costs of the steel plate used to produce a wind tower. First, Commerce acknowledges DKSC's position that "a direct correlation exists between the dimensions of a tower and the steel plate used to produce that tower." Id. at 4 (quoting DKSC's February 12, 2020, Supplemental Section D Response, PD-278, CD-190, at 3). Commerce states in the same paragraph that "DKSC's arguments here seem to imply that the steel plate input does not directly relate to the weight and height physical characteristics of the completed wind tower." Id. at 4. Commerce is mistaken. DKSC's clear position is that a relationship exists between the physical characteristics of a finished wind tower (e.g., its height and weight) and the amount of steel plate needed to produce that tower. Intuitively, taller and heavier wind towers require more plates. But a steel consumption relationship does not mean that there is a direct link between the physical characteristics of a finished wind tower and, separately, the dimensions of the individual steel plates consumed to produce that wind tower. Commerce believes otherwise, and states *categorically* (no less than five times) that the dimensions of the material input steel plate directly impact the weight and height physical characteristics of the finished wind tower. Id. at 2, 4, 18, 19, 20. Repeating a fallacy multiple times does not make it more correct, especially when Commerce can provide no record citation for its unqualified assertion.

Importantly, substantial record evidence demonstrates the inaccuracy of Commerce's absolute assertion. Nowhere is this more evident than in Commerce's own final cost calculation memorandum where Commerce examined the steel plate DKSC used to produce two different

CONNUMs reported in its cost database.  See "Cost of Production and Constructed Value

Calculation Adjustments for the Final Determination – Dongkuk S&C Co., Ltd." (June 29, 2020)

("DKSC Cost Calculation Memorandum"), at Attachment 1, PD-327, CD-230, provided at

**Exhibit 1**.  Based on the individual CONNUM characteristics that DKSC reported for these two

different wind towers (i.e., CONNUMs [

], the net ton weight of the former was [                    ] MT and the latter was substantially

heavier at [                    ] MT.  The two different finished wind towers also had different heights,

with the former [       ] meters tall and the latter [       ] meters tall despite being substantially heavier.

In addition, the former wind tower was composed of [                ] sections while the latter had

[       ] sections.   Despite these considerable physical differences, **Exhibit 1** confirms that DKSC

produced these wind towers with steel plates that shared substantial comparable and overlapping

thickness, width, and length dimensions.[1]

Attachment 2 of the Remand Results contains data showing similar overlap.  For

example, all four of the CONNUMs for which steel plate inputs were purchased in May 2018—

CONNUMs with significant height and weight differences—used steel plates with thicknesses in

the *same* range of [          ] millimeters, and with the [                    ] meters and the

[                              ] meters.  While Commerce claims that "the fact remains that the height

and weight of the wind towers produced dictates the dimensions of the input steel plate used,"

Remand Results at 19, the record evidence clearly establishes that the steel plate dimensions do

not dictate the physical characteristics of the finished wind towers.  Otherwise, DKSC could not

have used similar steel plate to produce CONNUMs with substantially different physical

---

[1] For example, [       ] of the steel plate used for CONNUM [                              ]
was between [          ] millimeters thick and between [              ] meters in width; and [       ] of
the steel plate used for CONNUM [                              ] had these same dimensions.

characteristics, which incontrovertible record evidence presented by Commerce itself establishes that DKSC did.

At the heart of Commerce's fundamental misunderstanding (or failure to acknowledge) is that while the purchase price of the plate is relevant to DKSC's reported costs, it is the consumption of the plate in the production of wind towers with different heights, weights, and tower sections that ultimately determines the different steel costs reported. The remand results consider only the initial plate per-ton purchase costs without considering that DKSC's reported costs are a function of both price **and** the physical characteristics of the finished merchandise. Specifically, DKSC's reported costs are based on the cost of the steel plate cost multiplied by consumption. Thus, DKSC's reported costs—maintained in its normal books and records— incorporate both the steel input costs **and** the physical characteristics of the finished wind towers, and therefore reflect the correlation that exists between the dimensions of a tower versus the steel plate used to produce that tower.

In contrast, Commerce's approach considers only the initial steel plate prices without analyzing how those prices result in different consumption costs for wind towers of different dimensions. In its Remand Results, Commerce considered only the original plate costs alone, and failed to consider that the wind tower dimensions (e.g., height and weight) impact the steel plate consumption—and therefore dictate the plate *costs* reported by DKSC. Consequently, Commerce's conclusion that "the cost of the steel plate consumed is the *only* factor that ultimately determines the raw material cost of the wind tower" is clearly erroneous. See Remand Results at 19 (emphasis in original). If steel plate costs were the *only* factor that mattered, then why is steel plate not part of the wind tower CONNUM characteristics? Or why have CONNUM characteristics at all?

**IV.    COMMERCE FOCUSES ON THE TIMING OF STEEL PLATE PURCHASES WITHOUT CONSIDERING WHETHER THE PHYSICAL CHARACTERISTICS OF THE FINISHED WIND TOWERS ALSO IMPACT COSTS**

In its original final determination, Commerce stated that it analyzed DKSC's steel plate costs by reviewing "the steel plate cost differences between steel grades and dimensions (i.e., thickness, width or height) within the same time period." Decision Memorandum at 22. Commerce said that it "compared the steel plate costs between a project produced for the Japanese comparison market and a project produced for the U.S. market, both of which were purchased within the same month, {and found that} the costs were virtually the same regardless of the grade, thickness, width, or height." Id.[2] But in performing this analysis, Commerce did not compare substantially different steel plate; rather, Commerce compared generally equivalent steel plate types. See DKSC Cost Calculation Memorandum, at Attachment 1 (where Commerce acknowledged the various steel grades to be "comparable" and to have virtually the same yield and tensile strengths); see also Commerce Memorandum, re: "Verification of Cost Response of Dongkuk S&C Co., Ltd. in the Antidumping Duty Investigation of Utility Scale Wind Towers from the Republic of Korea" (Apr. 17, 2020) ("Cost Verification Report"), PD-307, CD-221, at Exhibit 5. Moreover, as discussed above, the plate purchases that Commerce included in its "Comparison of Timing within Comparable Grades" chart had overlapping thickness, width, and length dimensions. See DKSC Cost Calculation Memorandum, at Attachment 1. The result of

---

[2] Commerce repeatedly refers to the "height" of steel plate inputs. See, e.g., Remand Results at 1 ("the dimensions (i.e., thickness, width, and *height*/length) of the steel plate input"); at 21 ("this project also consumed steel plate covering a wide range of dimensions: . . . *heights* ranging from [      ] to [      ] cm."); at 22 ("steel plate . . . {with} *heights* ranging from [      ] to [      ] cm."); and at Attachment 1 ("Steel Plate *Height*"). Of course, steel plate does not have "height" dimensions; rather, plate has "thickness" dimensions. To the degree that Commerce has used the expression "height" as suggestive of the "height" characteristic for the CONNUM of finished wind towers, Commerce's terminology is misplaced.

NON-CONFIDENTIAL VERSION

Commerce's analysis—having "neutralized the effect of time"—therefore was simply to reach the unsurprising conclusion that steel plate purchased in the *same* month with *equivalent* grades and *overlapping* thicknesses, widths, and lengths, had virtually the same prices. But such an obvious outcome did not support Commerce's inference that "the overwhelming factor that caused the differences in the steel plate costs was the timing of the steel plate purchases, rather than the physical characteristics of the merchandise." Decision Memorandum at 22.

Commerce's Remand Results suffer from the same flaw. Instead of addressing the differences in the physical characteristics, as the Court instructed, Commerce continues to focus on the timing of DKSC's purchases of steel plate as the reason for any cost differences among the wind towers produced. See Remand Results at 5, 6.[3] Specifically, Commerce repeats its previous explanation that it examined the same month purchases of steel plate used to produce two CONNUMs reported in DKSC's cost database with different physical characteristic ranges for both the height and weight physical characteristics. Id. at 5. Instead of considering whether it was the [                                        ] of these two CONNUMs that resulted in their having different reported costs over the entire POI, Commerce focuses on the fact that the purchase prices for the steel plate used to produce these two CONNUMs in the same month were substantially the same. Id. But, as reiterated above, the steel plates that DKSC used to produce these CONNUMs in the same month had overlapping thickness, width, and length

---

[3] Commerce's Remand Results provide no analysis related to the actual physical characteristics of finished merchandise. The Remand Results do not address the eleven physical characteristics, nor do they attempt to provide an analysis by grouping any CONNUMs by the related height and weight physical characteristics. Essentially, the Remand Results continue to fail to do what Commerce erroneously stated it did in the original final determination—and what the Court recognized that Commerce did not.

dimensions, and were essentially the same grade of steel.[4]  Therefore, it is unsurprising that

Commerce found "virtually no cost differences" on a per-unit weight for the same month

purchases of the steel plate used to produce these products.  Id. at 22.  That similar steel plate

inputs with similar dimensions and grades purchased in the same month had similar costs

regardless of their thickness, width, and length is both natural and intuitive; it certainly does not

establish that the differences in DKSC's reported costs were unrelated to the physical

characteristics of the finished wind towers.[5]

Having confirmed that the costs in the same month for the same steel plate grades and

dimensions used to produce different CONNUMs were the same, and thus having "mitigated any

distortions related to the timing of the steel plate purchases" as Commerce states, id. at 5, it is

incorrect, illogical, and unreasonable for Commerce to ignore that the reported cost differences

of different CONNUMs might relate to the different physical characteristics of the finished wind

towers, especially when Commerce acknowledges that the CONNUM characteristics of the

---

[4] As explained in DKSC's 56.2 Memorandum, not only does Commerce describe the grades of steel purchased in September 2018 in a chart entitled "Comparison of Timing within Comparable Grades" (see **Exhibit 1**), but the three steel grades have virtually the same physical characteristics.  Specifically, steel plate grades [          ] all have a yield strength of approximately [     ] megapascals ("MPA") and tensile strengths of [          ] Mpa.  See Cost Verification Report, at Exhibit 5.  Moreover, one of the Japanese steel plate grades that Commerce examined (i.e., [          ]) was listed in a published steel plate specification guide as the first "alternative" to the [     ] steel plate grade for the U.S. market.  See DKSC Cost Verification Report, at Exhibit 5.

[5] Commerce's analysis of the four wind tower projects that DKSC sold to the United States for which steel plate was purchased in May 2018 suffer even more shortcomings.  See Remand Results at 22.  First, Commerce provides no analysis related to the cost differences and actual physical characteristics of these four wind tower projects.  Second, as shown in Attachment 2 of the Remand Results, the steel plate purchased in the same month of May 2018 for the four projects all had *identical* steel grade (i.e., not even similar).  Commerce's observation that the May 2018 per-unit purchase costs of the steel plate consumed in these projects generally was the same is not relevant to, and has no bearing on, whether the cost differences reported among these CONNUMs were not attributable to their physical characteristics.

examined merchandise were [                              ].  Even if there were raw material price

fluctuations during the POI, Commerce's Remand Results fail to establish that the timing of

DKSC's plate purchases was the sole reason for any reported cost differences.  Wind towers with

the *same* weight might consume similar volumes of plate.  But these towers could have

significantly *different* heights and different costs—e.g., a higher tower might require thinner

plate with different costs.  Similarly, wind towers with the *same* height and the same number of

sections might have significantly *different* weights and, in turn, different costs.  And, as shown

by the particular examples that Commerce selected, wind towers with different weights, heights,

and numbers of sections can have different costs even if they are produced in the same month.

Commerce's "timing-of-plate-purchase-centric" analysis does not address the physical

characteristics of the finished wind towers let alone establish that any differences in DKSC's

reported plate costs were unrelated to these physical characteristics.

## V.  ERRORS WITH RESPECT TO UNITS OF MEASURE UNDERSCORE COMMERCE'S MISTAKEN FOCUS ON STEEL PLATE INPUT DIMENSIONS

In the Remand Results, Commerce, quite egregiously, appears confused when it describes

what it believes to be the actual dimensions of the steel plate inputs used to produce the

individual wind towers it examined.  Specifically, Commerce describes the steel plate consumed

to produce CONNUM [                              ] as having "thicknesses ranging between [    ]

to [   ] cm; widths ranging from [      ] to [      ] cm, and heights ranging from [      ] to

[      ] cm;" and CONNUM [                              ] as having "thicknesses ranging

between [   ] to [   ] cm; widths ranging from [      ] to [      ] cm, and heights ranging from

[      ] to [      ] cm."  Remand Results at 21.  Based on Commerce's mistaken

understanding, these plate dimensions would result in implausibly large steel plates used to

produce wind towers, with plate almost a [

      ]—i.e., steel plate weighing [         ] kilograms (using [    ] kg/m$^3$) and more

than [   ] times heavier than that heaviest wind tower that DKSC built during the POI.  That

Commerce believes the steel plate inputs to be larger than the wind towers themselves perhaps

explains why Commerce focuses on the steel plate dimensions and not the physical

characteristics of the finished wind towers.

      While it might be tempting to attribute Commerce's dimensional lapses (in which it has

confused centimeters for millimeters) to be "harmless errors" or "excusable neglect," the Court

should not dismiss such mistakes out of hand:  the errors are not harmless and the neglect is not

excusable.[6]  Commerce's entire argument is based on a defense that it engaged in a precise and

careful consideration of the measurement of the steel plates that DKSC consumed in production.

Commerce sets a very high bar for respondents when it comes to reporting correct information,

and Commerce should be held to an equally high standard in justifying its understanding and

reliance on the record information.  If, as part of its remand analysis, Commerce did not

recognize the units of measure in which the steel plate dimensions are stated, then it is even more

obvious that Commerce has not based its findings on substantial evidence.

## VI.    EVIDENCE THAT COMMERCE CITES CONFIRMS THAT OBSERVED COST DIFFERENCES ARE RELATED TO THE PHYSICAL CHARACTERISTICS OF THE WIND TOWERS

      Commerce references its preliminary cost calculation memorandum for the proposition

that there were "differences from the average reported steel plate costs ranging from [    ]

percent to [    ] percent" for products where "there should have been little difference among

---

[6] Commerce never addressed the plate dimension units of measure in its final determination or in the draft remand results or DKSC would have identified this problem earlier.

products of different physical characteristics." Remand Results at 6 (citing the Cost of

Production and Constructed Value Calculation Adjustments for the Preliminary Determination

(Feb. 4, 2020), PD-268, CD-183, at 2 and Attachment 3). Commerce's assertion is incorrect on

multiple levels.

First, the percentages reported in this memorandum are not the "differences **from** the

average reported steel plate costs," but rather, they are the percentages by which Commerce

adjusted DKSC's reported plate costs to align them **to** the average reported costs. The actual

differences **from** the average reported costs are lower and are provided in **Exhibit 2**. Although

DKSC pointed out this mistake to Commerce, and Commerce acknowledged the error,

Commerce did not change its recitation of the inaccuracy. See Remand Results at 24.

Second, Commerce's statement that "there should have been little difference" in costs

among certain CONNUMs is speculation and entirely unsupported by any analysis or empirical

evidence. DKSC also included this argument in its comments on Commerce's Draft Remand

Results, and Commerce provided no response.

Third, the preliminary cost calculation memorandum itself reveals that Commerce's

assertion that costs are unrelated to physical characteristics is incorrect. CONNUM [

], which Commerce cites as having the lowest steel plate costs compared to the

average, also is the CONNUM with the [

] number of sections. Commerce claims that it is the timing

of the plate purchases for this CONNUM that results in its low plate costs, and not the fact that

this wind tower has the *smallest physical characteristics of any wind tower* that results in its low

costs. See Remand Results at 24. In determining whether an administrative decision is

unsupported by substantial evidence, the Court "looks to the record as a whole, including any

12

evidence that fairly detracts from the substantiality of the evidence," <u>Gallant Ocean (Thailand)</u> <u>Co. v. United States</u>, 602 F.3d 1319, 1323 (Fed. Cir. 2010).  Here, Commerce's dismissal of evidence directly linking the lower costs for a particular CONNUM to its small physical characteristics illustrates that Commerce did not make a rational connection between the facts found and the choice made.  <u>See</u> <u>Burlington Truck Lines, Inc. v. United States</u>, 371 U.S. 156, 168 (1962).  Remand is warranted given that the record evidence upon which Commerce relied actually supports—rather than detracts from—the conclusion that DKSC's reported costs reasonably reflect the physical characteristics of the wind towers.

## VII.    **COMMERCE'S CLAIM OF SIGNIFICANT COST DIFFERENCES UNRELATED TO THE PHYSICAL CHARACTERISTICS OF THE WIND TOWERS IS CONTRARY TO THE RECORD EVIDENCE**

The Remand Results fail to demonstrate that significant cost differences existed that were unrelated to the physical characteristics of the wind towers.  Remand Results, at 5, 20-21. Commerce has acknowledged that the grades and dimensions of DKSC's steel plate purchases for Japanese and U.S. projects for September 2018 were "comparable" and had the same physical characteristics.  Yet, without conducting a comprehensive analysis or focusing on the CONNUM characteristics of the finished wind towers, Commerce repeatedly claims that the steel plate inputs caused cost differences unrelated to differences in the finished wind towers' physical characteristics.  But Commerce's analysis compares a subset of steel plate costs within a subset of two months for only a limited number of CONNUMs, without considering that DKSC reported costs for CONNUMs with [   ] combined variations of weight, height, and sections.  <u>Id.</u>

In fact, Commerce has not even demonstrated that any steel plate cost differences across CONNUMs were significant.  Contrary to Commerce's unsupported assertion, only a minor variance exists in DKSC's reported steel plate costs.  **Exhibit 2** contains a comparison of

DKSC's reported steel plate costs across all CONNUMs produced during the POI, and shows

that [        ] of the MUC had steel plate costs with less than a 10% variance from the average

steel plate cost for all products, and that [        ] had less than a 15% variance.  Only [

        ] of minimal production varied more than 15% from the average steel plate cost; and

this CONNUM had [

                    ] number of sections.  When steel plate costs are averaged by weight,

height, and number of sections, [    ] CONNUMs produced by DKSC had steel plate costs with

less than 3% variance from the average.  Id.  As such, no basis existed for Commerce to presume

that DKSC's reported costs based on the company's normal books and records were

unreasonable, much less that the reported cost differences among the wind towers did not

represent differences in the physical characteristics of the finished wind towers.

## VIII.   THE STATUTE AND AGENCY PRACTICE DO NOT PERMIT COMMERCE TO SMOOTH COSTS WITHOUT REASONABLE JUSTIFICATION

Commerce's Remand Results continue to fail to show how the differences in DKSC's

reported CONNUM-specific plate costs justified a departure from the costs recorded in DKSC's

normal books and records, see 19 U.S.C. § 1677b(f)(1)(A), especially in view of agency practice.

In Hot-Rolled Steel Flat Products from the Republic of Korea, Commerce recently determined

that the respondents' reported material cost differences were reasonable because:

> In analyzing the respondents' cost database, for direct material costs, we found
> that within groups of similar CONNUMs, the reported direct material costs are
> reasonably consistent with the group average direct material costs.  While there
> are some outliers, these outliers are small in relation to the totality of the reported
> production information.  Therefore, we now consider it reasonable to rely on the
> respondents' reported product-specific material costs as recorded in their normal
> books and records. . . .

14

87 Fed. Reg. 12660 (Dep't Commerce Mar. 7, 2022) (final results), and accompanying Decision

Memorandum (Dep't Commerce Feb. 28, 2022), at pp. 16-17.  In that case, Commerce

determined that the respondents' reported direct material costs were reasonable after analyzing

the direct material costs based on the relevant CONNUM characteristics and the production

quantities of any outliers.  In the Remand Results, however, Commerce provided no similar

analysis or justification for smoothing DKSC's steel plate costs despite substantial evidence that

DKSC's steel plate costs have minimal variance from the steel plate cost averaged by weight,

height, and number of sections.  Because Commerce failed to show that cost differences among

the wind towers do not represent differences in the physical characteristics of the finished wind

towers, Commerce's revisions to DKSC's reported costs were unreasonable and unsupported by

substantial evidence.

Finally, Commerce claims that its practice of adjusting unreasonable cost reporting

applies both to finished products and to production inputs, and relies on Pasta from Italy for

support.  See Remand Results at 8.  However, the facts are distinguishable.  In Pasta from Italy,

based on a CONNUM-by-CONNUM analysis, Commerce smoothed costs because Commerce

found that there were significantly different *semolina* costs for CONNUMs that were identical in

all physical characteristics except for vitamin enrichment, and that the differences in *semolina*

costs between nearly identical CONNUMs were not related to the CONNUM physical

characteristics.  See Certain Pasta from Italy, 83 Fed. Reg. 63627 (Dep't Commerce Dec. 11,

2018) (final results), and accompanying Decision Memorandum (Dep't Commerce Dec. 4, 2018),

at 9.  In contrast to steel plate in the current appeal, semolina type was one of the CONNUM

physical characteristics that comprised the finished pasta.  Thus, Pasta from Italy confirms that

the relevant "physical characteristics" that Commerce considers in determining whether cost

differences exist among CONNUMs are the physical characteristics of the *finished products* and are not those of the *inputs* used to produce the CONNUMs.

With respect to Commerce's reliance in the Remand Results on <u>Wind Towers from Canada</u>, <u>see</u> Remand Results at 9, this Court has held that "each agency determination is *sui generis*, involving a unique combination and interaction of many variables, and therefore a prior administrative determination is not legally binding on other reviews before this court." <u>U.S. Steel Corp. v. United States</u>, 637 F.Supp.2d 1199, 1218 (Ct. Int'l Trade 2009). Thus, <u>Wind Towers from Canada</u> does not establish a practice that Commerce must follow or that has any precedential authority here. Commerce has not explained why a decision taken in a different proceeding with a different set of facts that are not on the administrative record is in any way relevant to its unsupported decision to smooth DKSC's costs in <u>this</u> proceeding.

## IX.  <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully asks the Court to reject Commerce's Remand Results and issue specific instructions that Commerce must calculate a dumping margin for DKSC using its reported costs and not calculate a single weighted-average steel plate cost for all MUC sold to the United States and to Japan during the POI.

Respectfully submitted,

/s/ Robert G. Gosselink
Robert G. Gosselink
Jarrod M. Goldfeder
MacKensie R. Sugama

**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE, Suite 500
Washington, D.C.  20003
(202) 223-3760

Dated: May 18, 2022                    *Counsel to Dongkuk S&C Co. Ltd.*

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE LEO M. GORDON, JUDGE

| | |
|---|---|
| DONGKUK S&C CO. LTD., )<br> )<br>Plaintiff, )<br> )<br>v. )<br> )<br>UNITED STATES, )<br> )<br>Defendant, )<br> )<br>and )<br> )<br>WIND TOWER TRADE COALITION, )<br> )<br>Defendant-Intervenor. )<br>_____) | Consol. Court No. 20-03686 |

## CERTIFICATE OF COMPLIANCE

The undersigned counsel at Trade Pacific PLLC certifies that the accompanying reply brief complies with the word-count limitation described in the Court's April 21, 2022, Scheduling Order, at 1, ECF No. 56.  These comments contain 4,993 words according to the word-count function of the word-processing software used to prepare the brief, excluding the table of contents, table of authorities, and counsel's signature block.

Respectfully submitted,

/s/ Robert G. Gosselink
Robert G. Gosselink
**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C.  20003
(202) 223-3760

Dated:  May 18, 2022

# EXHIBIT 1

Barcode:3993959-01 A-580-902 INV - Investigation  -

**A-580-902**
**POI: 07/01/2018 - 06/30/2019**
**Public Version**
**Attachment 1**

**Dongkuk S&C Co., Ltd.**
**Wind Towers from Korea**
**Final Determination Cost Calculation Memorandum**

| Comparison of Timing within Comparable Grades | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Country | Date | Project Name | Grade | Thick x Width x Height | Purchase Quantity (KG) | Purchase Amount (KRW) | Unit Costs |

*Reference  4/17/20 Cost Verification Exhibit (CVE) at 19-21*

# EXHIBIT 2

PUBLIC VERSION - BPI Has Been Redacted or Ranged

**Production Quantities with Steel Plate Costs Within 10% and 15% of the Weighted-Average Steel Plate Costs**

| SEQ | CONNUM | WEIGHT | HEIGHT | SECTION | PRODQTY | PLATE | SCRAPOFF | Plate + Scrap Offset Cost | Total Plate Cost | Avg Plate Cost without physical attributes | Variance | Absolute Variance | CONNUM Weight, Height & Section | Avg Plate Cost by CONNUM Weight, Height & Section | Variance | Absolute Variance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | [ | | | | 1,100 | | | | | | % | % | | | % | % ] |
| 2 | [ | | | | | | | | | | % | % | | | % | % ] |
| 3 | [ | | | | | | | 650,000 | | | % | % | | 650,000 | % | % ] |
| 4 | [ | | | | | | | | | | % | % | | | % | % ] |
| 5 | [ | | | | | | | | | | % | % | | | % | % ] |
| 6 | [ | | | | | | | | | | % | % | | | % | % ] |
| 7 | [ | | | | | 650,000 | | | | | % | % | | 650,000 | % | % ] |
| 8 | [ | | | | | | | | | | % | % | | | % | % ] |
| 9 | [ | | | | | | 8,000 | | | | % | % | | | % | % ] |
| 10 | [ | | | | | | | | | | % | % | | | % | % ] |
| 11 | [ | | | | | | | | | | % | % | | | % | % ] |
| 12 | [ | | | | | 650,000 | | | | | % | % | | 650,000 | % | % ] |
| 13 | [ | | | | | | | | | | % | % | | | % | % ] |
| 14 | [ | | | | | | | | | | % | % | | | % | % ] |
| 15 | [ | | | | | | | | | | % | % | | | % | % ] |
| 16 | [ | | | | | 500 | | | 325,000,000 | | | % | % | | | % | % ] |
| 17 | [ | | | | | | | | | | % | % | | | % | % ] |
| 18 | [ | | | | | | | | | | % | % | | | % | % ] |
| | **Total** | | | | [ | ] | | [ | ] | | | | | | | |

**Avg Plate Cost without physical attributes**

Production Quantity within 10% Abs. Variance: [ %  ]
Production Quantity within 15% Abs. Variance: [ %  ]

**Avg Plate Cost by CONNUM weight and height physical attributes**

Production Quantity within 10% Abs. Variance: [ %  ]
Production Quantity within 15% Abs. Variance: [ %  ]

*Source: Data from DKSC Cost Database: dksccop02 (Dec. 19, 2019); and*
*Preliminary Cost Calculation and Calculation Adjustment Memorandum (Feb. 4, 2020), at Attachment 3.*