UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE LEO M. GORDON, SENIOR JUDGE

| | |
|---|---|
| DONGKUK S&C CO. LTD., | ) |
| Plaintiff, | ) |
| v. | ) Consol. Court No. 20-03686 |
| UNITED STATES, | ) |
| Defendant, | ) |
| and | ) |
| WIND TOWER TRADE COALITION, | ) |
| Defendant-Intervenor. | ) |

## **ORDER**

Upon consideration of the Department of Commerce's remand redetermination, plaintiff's comments on the redetermination, defendant's and defendant-intervenor's responses thereto, and all other pertinent papers and proceedings in this action, it is hereby

ORDERED that the redetermination is sustained; and it is further

ORDERED that judgment is entered in favor of the United States; and it is further

ORDERED that the subject entries enjoined in this action shall be liquidated in accordance with the final court decision, as provided in section 516A(e) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(e).

Dated: _____, 2022
New York, NY                                        _____
                                                                    SENIOR JUDGE

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE LEO M. GORDON, SENIOR JUDGE

|  |  |  |
|---|---|---|
| DONGKUK S&C CO. LTD., | ) | |
| Plaintiff, | ) | |
| v. | ) | Consol. Court No. 20-03686 |
| UNITED STATES, | ) | **CONFIDENTIAL VERSION** |
| Defendant, | ) | Business Proprietary Information (BPI) |
|  | ) | Denoted by Brackets On Pp. 9-10, 12, 14, 15 |
| and | ) | |
| WIND TOWER TRADE COALITION, | ) | |
| Defendant-Intervenor. | ) | |

## DEFENDANT'S REMAND RESPONSE COMMENTS

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:                          JOSHUA E. KURLAND
JESUS N. SAENZ                       Senior Trial Counsel
Attorney                             U.S. Department of Justice
Office of the Chief Counsel          Civil Division
for Trade Enforcement and Compliance Commercial Litigation Branch
U.S. Department of Commerce          P.O. Box 480
Washington, D.C.                     Ben Franklin Station
                                     Washington, D.C. 20044
                                     Telephone: (202) 616-0477
                                     E-mail: Joshua.E.Kurland@usdoj.gov

July 20, 2022                        *Attorneys for Defendant United States*

## TABLE OF CONTENTS

ARGUMENT ..................................................................................................................2

I.      Standard Of Review ...........................................................................................2

II.     Commerce Complied With The Court's Remand Order......................................2

III.    Commerce's Weight-Averaging Of DKSC's Reported Steel Plate Costs Across
        CONNUMs Is Supported By Substantial Evidence And Otherwise Lawful.....................6

        A.    Steel Plate Dimensions Affect Wind Tower Physical Characteristics ....................... 6

        B.    The Timing Of Steel Plate Purchases, And Not Physical Characteristics Of
              The Finished Wind Towers, Affected Costs .................................................8

        C.    Commerce's Clerical Error In Listing Units Of Measure In Its Redetermination
              Is Not A Basis To Overturn The Determination........................................11

        D.    Record Evidence Supports Commerce's Finding That Per-Unit Steel Costs Were
              Not Related To The Physical Characteristics Of The Finished Wind Towers.........11

        E.    Record Evidence Supports Commerce's Finding Of Significant Cost Differences
              Unrelated To Wind Towers' Physical Characteristics ...............................14

        F.    Commerce's Weight-Averaging Of DKSC's Reported Steel Plate Costs Across
              CONNUMs Is In Accordance With Law ................................................15

CONCLUSION............................................................................................................17

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Consol. Edison Co. v. NLRB*,
  305 U.S. 197 (1938) ............................................................................................ 2

*Dongkuk S&C Co. v. United States*,
  548 F. Supp. 3d 1376 (Ct. Int'l Trade 2021) .................................................. 1, 2, 4

*Gov't of Argentina v. United States*,
  542 F. Supp. 3d 1380 (Ct. Int'l Trade 2021) ...................................................... 14

*MacLean-Fogg Co. v. United States*,
  100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015) ........................................................ 2

*Marmen Inc. v. United States*,
  545 F. Supp. 3d 1305 (Ct. Int'l Trade 2021) ................................................... 5, 17

*NEXTEEL Co. v. United States*,
  355 F. Supp. 3d 1336 (Ct. Int'l Trade 2019) ................................................... 16-17

### STATUTES

19 U.S.C. § 1516a ............................................................................................... 2

19 U.S.C. § 1677b(f)(1)(A) .................................................................... 1, 2, 14, 16

### ADMINISTRATIVE DETERMINATIONS

*Certain Pasta from Italy*,
  83 Fed. Reg. 63,627 (Dep't of Commerce Dec. 4, 2018) ................................... 5, 16

*Hot-Rolled Steel Flat Products from the Republic of Korea*,
  84 Fed. Reg. 12,660 (Dep't of Commerce Mar. 7, 2022) ....................................... 15

*Utility Scale Wind Towers from Canada*,
  85 Fed. Reg. 40,239 (Dep't of Commerce July 6, 2020) ..................................... 5, 17

*Utility Scale Wind Towers from the Republic of Korea*,
  85 Fed. Reg. 40,243 (Dep't of Commerce July 6, 2020) ......................................... 1

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE LEO M. GORDON, SENIOR JUDGE

| | |
|---|---|
| DONGKUK S&C CO. LTD., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Consol. Court No. 20-03686 |
| | ) |
| UNITED STATES, | ) **PUBLIC VERSION** |
| | ) |
| Defendant, | ) Business Proprietary Information (BPI) |
| | ) Denoted by Brackets On Pp. 9-10, 12, 14, 15 |
| and | ) |
| | ) |
| WIND TOWER TRADE COALITION, | ) |
| | ) |
| Defendant-Intervenor. | ) |
| | ) |

## DEFENDANT'S REMAND RESPONSE COMMENTS

Defendant, the United States, respectfully responds to the comments filed by plaintiff Dongkuk S&C Co. Ltd. (DKSC) concerning the Department of Commerce (Commerce) remand redetermination in this matter.  Final Results of Redetermination Pursuant to Court Remand, ECF No. 54 (Apr. 14, 2022) (Redetermination); *Utility Scale Wind Towers from the Republic of Korea*, 85 Fed. Reg. 40,243 (Dep't of Commerce July 6, 2020), and accompanying Issues and Decision Memorandum (IDM) (P.D. 324) (*Final Determination*).  The Court's December 2021 opinion and order remanded Commerce's final determination, and associated steel plate costs adjustment, for further explanation pursuant to 19 U.S.C. § 1677b(f)(1)(A).  *Dongkuk S&C Co. v. United States*, 548 F. Supp. 3d 1376 (Ct. Int'l Trade 2021).  Because Commerce has complied with the Court's order, and the redetermination is supported by substantial evidence and lawful, we respectfully request that the Court sustain the redetermination.

# ARGUMENT

## I.     Standard Of Review

The Court sustain Commerce's remand redeterminations if they are "in accordance with the remand order, are supported by substantial evidence, and are otherwise in accordance with law." *MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1355 (Ct. Int'l Trade 2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).  "Substantial evidence" connotes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

## II.    Commerce Complied With The Court's Remand Order

Commerce complied with the Court's *Dongkuk* decision, which ordered Commerce to further explain its cost adjustment determination under 19 U.S.C. § 1677b(f)(1)(A).

In its investigation, Commerce determined that DKSC reported differences in the steel plate costs associated with various CONNUMs that were unrelated to differences in products' physical characteristics.  IDM at 19-22.  Rather, Commerce determined that the *timing* of DKSC's steel plate purchases, which was not a physical characteristic, was the factor driving steel plate cost differences among the finished wind towers.  *Id.*  Consequently, to mitigate the significant cost differences unrelated to the products' physical characteristics, and consistent with its practice, Commerce weight-averaged DKSC's reported steel plate costs across all of the reported CONNUMs (also referred to as "smoothing") in its final determination.  *Id.*  The Court found Commerce's explanation of its analysis insufficient to determine whether Commerce's adjustment was reasonable, and thus remanded for further explanation (or reconsideration). *Dongkuk*, 548 F. Supp. 3d at 1381-82.

Commerce further explained and clarified its determination on remand.  In particular, Commerce explained that its analysis had scrutinized all of DKSC's purchases of steel plate of

varying dimensions, as used to produce two different wind tower CONNUMs in DKSC's cost database, during an isolated time period (September 2018).  *Id.* at 4-5 (discussing Final Cost Calculation Memorandum at 1-2 & Att. 1, P.D. 327; C.D. 230 (June 29, 2020)).  Commerce did this to perform a "like for like comparison" that "mitigated any distortions related to the timing of the steel plate purchases or any other factors that could distort such comparisons."  *Id.* at 5.  In other words, Commerce held timing constant, while examining whether DKSC's purchase costs varied based on factors such as CONNUMs' differing physical characteristics or the steel plate's dimensions.  The result was that—despite differences in the CONNUMs' physical characteristics and the steel plate's dimensions—there was "virtually no cost differences on a per-unit weight basis for the different grades and dimensions of steel plate used."  *Id.*[1]

Commerce also discussed the significance of this result (in relation to the Court's concerns).  Commerce explained that it had specifically analyzed the steel plate input costs for the different CONNUMs because steel plate is the primary input that affects the weight and height physical characteristics of the finished wind tower.  *Id.*  Hence, if the cost of the steel plate had varied significantly, with timing held constant, it would have been due to grade and dimensional differences in the steel plate used to produce the different types of wind towers, which in turn would have explained the significant steel plate cost differences between CONNUMs of differing weights and heights.  *Id.*  To the contrary, however, the analysis showed that, after neutralizing timing effects, there was virtually no difference in cost associated with steel plate purchases used to produce different CONNUMs.  *Id.* at 5-6.  Thus, although DKSC's reported per-unit steel plate costs for the two CONNUMs reflected significant differences, the

---

[1] Commerce on remand also performed a similar analysis on four CONNUMs for May 2018, with a similar outcome.  *Id.* at 22, 26 & Att. 1-2.

3

actual purchase price for the steel plate input was very consistent for the selected month (despite being incorporated into wind towers with different physical characteristics).  *Id.* at 6.

Consequently, Commerce concluded that DKSC's reported cost differences did not reflect production differences associated with wind towers' physical characteristics, but instead reflected differences in the *timing* of steel plate purchases.  *Id.*  Indeed, as Commerce elaborated, DKSC repeatedly acknowledged that the cost of steel plate fluctuated before and during the period of investigation.  *Id.* at 7.

Further, in direct compliance with the Court's concern that Commerce had not explained how it had used CONNUM physical characteristics as a "guidepost" in its analysis, *Dongkuk*, 548 F. Supp. 3d at 1381, Commerce explained (based on the analysis described above) how it had done so in comparing DKSC's costs among CONNUMs.  Redetermination at 6.  This stems from the fact that, based on the virtually unchanged per-unit costs Commerce observed, there "should have been little difference among products of different physical characteristics."  *Id.*  But Commerce nonetheless did identify clear differences from the average reported steel plate costs among the CONNUMS that, as discussed above, disappear when it isolated the steel plate purchases' timing while letting physical characteristics fluctuate.  *Id.*  Based on this analysis, which uses the physical characteristics as a guidepost, Commerce concluded that steel plate cost differences among CONNUMs resulted primarily from factors unrelated to physical difference associated with CONNUMs.  *Id.* at 6-7.  Thus, notwithstanding DKSC's claims, Commerce considered the effect of physical characteristics in explaining the significant cost differences across CONNUMs, and rooted its analysis in record evidence indicating that physical characteristics did not explain them.

Finally, in compliance with the Court's concern about Commerce's lack of explanation regarding its practice of adjusting unreasonable cost reporting both for finished products (overall CONNUMs) and for individual inputs for such products, Commerce explained that practice as it had been applied in the original final determination.  Redetermination 8-9.  Commerce cited its determination in *Certain Pasta from Italy*, in which it smoothed the costs for semolina, an input for pasta, upon finding that the respondents reported significantly different costs for the input, resulting in variations in direct material costs between CONNUMs.  *Id.* at 8 (discussing *Certain Pasta from Italy*, 83 Fed. Reg. 63,627 (Dep't of Commerce Dec. 11, 2018), and IDM at 3-11).  Commerce also highlighted its similar determination in its investigation concerning *Utility Scale Wind Towers from Canada*, in which Commerce—as in this case—smoothed the respondent's steel plate input costs upon concluding that reported differences in those costs were based on timing factors rather than differences in the physical characteristics of the wind towers.  *Id.* at 9 (discussing *Utility Scale Wind Towers from Canada*, 85 Fed. Reg. 40,239 (Dep't of Commerce July 6, 2020), and IDM Cmt. 1); *see also Marmen Inc. v. United States*, 545 F. Supp. 3d 1305, 1314-15 (Ct. Int'l Trade 2021) (sustaining Commerce's determination as "consistent with the relevant statute and Commerce's stated practice").

DKSC claims that Commerce failed to comply with the Court's remand order because Commerce's analysis, allegedly, focuses on the dimensions and costs of the steel plate input rather than the physical characteristics of the finished wind towers.  DKSC Cmts. 2-3.  Contrary to this claim, and as shown above, the *whole point* of Commerce's analysis was to examine whether the significant differences that Commerce observed among the input costs for DKSC's different wind tower CONNUMS were related to the wind towers' physical characteristics, which Commerce did by isolating the time period and analyzing whether the costs nonetheless

varied based either on the physical characteristics of the wind towers or the steel input.  This enabled Commerce to conclude that timing was the pertinent factor.

### III.     Commerce's Weight-Averaging Of DKSC's Reported Steel Plate Costs Across CONNUMs Is Supported By Substantial Evidence And Otherwise Lawful

DKSC alleges that Commerce failed to comply with the Court's remand instructions and that Commerce's determination is unsupported, but this effectively ignores the explanation included in Commerce's redetermination.  None of DKSC's arguments are persuasive, and we address each below.  Overall, they do not undermine Commerce's reasonable conclusion "that the significant cost differences reported for the steel plate inputs for wind towers of differing dimensions are not associated with the differences in the identified physical characteristics (*i.e.*, height and weight) of the wind towers produced."  Redetermination at 2.

#### A.  Steel Plate Dimensions Affect Wind Tower Physical Characteristics

Despite Commerce's analysis in its redetermination, DKSC argues that Commerce wrongly assumes that steel plate input dimensions dictate wind tower physical characteristics and that this undermines Commerce's broader determination.  DKSC Cmts. 3.  DKSC is mistaken; Commerce's analysis supports its redetermination.

In its redetermination, Commerce stated that "the cost of the steel plate consumed is the *only* factor that ultimately determines the raw material cost of the wind tower."  Redetermination at 19 (emphasis in original); *id.* ("differences in  the steel plate costs for varying dimensions and grades of the consumed plate are the only raw material cost difference between CONNUMs").  Based on the record evidence, Commerce also determined that "the weight and height product characteristics of the completed wind tower dictate the dimensions and grades of the steel plate consumed . . . ."  *Id.* at 20.  Specifically, in the investigation, DKSC acknowledged that "a *direct* correlation exists between the dimensions of a tower and the steel plates used to produce that

tower." *Id.* at 4, 19 (citing DKSC Supp. Sec. D. Resp., at 3, P.D. 278; C.D. 190 (Feb. 12, 2020) (emphasis by Commerce)); *see* DKSC Supp. Sec. D. Resp. at 3 (stating that "the design of the tower . . . determines the steel plates that will be used"). Further, DKSC agrees in its comments that "a relationship exists between the physical characteristics of a finished wind tower (*e.g.*, its height and weight) and the amount of steel plate needed to produce that tower" and that "{i}ntuitively, taller and heavier wind towers require more plates." DKSC Cmts. 4.

Yet, DKSC argues that Commerce "has adopted an internally inconsistent approach that seeks to validate its focus on the dimensions of steel plate inputs instead of the different physical characteristics of finished wind towers." *Id.* at 4. DKSC also argues that Commerce "failed to consider that the wind tower dimensions (*e.g.*, height and weight) impact the steel plate consumption – and therefore dictate the steel plate costs reported by DKSC." *Id.* at 6.

DKSC misses the point.[2] Commerce determined that input cost differences among the wind tower products did not represent differences in the physical characteristics enumerated at the outset of the investigation, but instead, were attributable to the cost of the steel plate input based on timing. Redetermination at 4-7. Specifically, Commerce stated that "the steel plate costs differences were unrelated to the physical characteristics of the steel plate and the merchandise made from it (*i.e.*, wind towers)." *Id.* at 4. After comparing steel plates of varying dimensions used to produce two *different* CONNUMs with varying physical characteristics, within an isolated period of time, Commerce found that the only significant cost difference associated with the production of the wind towers was the timing of the steel plate purchases. *Id.*

---

[2] Indeed, Commerce's allegedly incorrect statement about the relationship between the tower's dimensions and those of the steel plates used to produce the tower is tangential to the thrust of Commerce's analysis—which is that the per-unit steel plate costs did not vary based on *either* of those physical characteristics if timing was held constant. *See* Redetermination at 5-6.

at 5-6.  This meant that the cost differences reported by DKSC were the not the result of the

enumerated physical characteristics defined by the CONNUM.  *Id.*

By focusing on particular statements in Commerce's remand results with which it

disagrees, DKSC ignores the totality of Commerce's analysis.  Commerce ultimately explained

why its analysis shows that the significant differences in steel plate costs across CONNUMs does

not stem from the physical characteristics of the finished wind towers.  Contrary to the gravamen

of DKSC's arguments, DKSC Cmts. 4, 6, these cost differences are not merely a function of

DKSC's consumption of more steel for certain CONNUMS and not others because the *per-unit*

cost of the steel plate remained constant when time was isolated, despite DKSC reporting per-

unit costs that varied by CONNUM.  Redetermination at 5-6.  Thus, DKSC's criticism of

Commerce's statements are not a basis to overturn Commerce's determination.

### B.  The Timing Of Steel Plate Purchases, And Not Physical Characteristics Of The Finished Wind Towers, Affected Costs

DKSC's arguments that Commerce focused on the timing of DKSC's steel plate

purchases without considering the physical characteristics of the finished wind towers lack merit.

DKSC contends, in this regard, that Commerce's final determination and remand results both

wrongly compared "generally equivalent steel plate types," instead of comparing "substantially

different" steel plate types.  DKSC Cmts. 7.  As a result, according to DKSC, Commerce's

analysis merely compared "equivalent grades and overlapping thicknesses, widths, and lengths"

in the same month.  *Id*. at 8-9.  DKSC thus argues that Commerce's finding of "virtually no cost-

differences" is unsurprising due to the allegedly flawed analysis.  *Id.*

DKSC's argument is inaccurate.  In both the final determination and remand results,

Commerce's comparison analysis included "scores of steel plate purchase transactions that

encompassed different grades and a wide range of dimensions, which were used to produce two

PUBLIC VERSION

*different* CONNUMs (*i.e.*, wind tower projects) with *different* height and weight characteristics." Redetermination at 21 (emphasis added).  Commerce discussed these two examples in detail on remand, explaining that, despite the wide range of grades and dimensions *as well as the differing physical characteristics of the two different CONNUMs involved*, the per-unit cost of the steel plate purchases for all of the dimensions and grades was virtually identical for the two physically different CONNUMs ([     ] Korean won (KRW) per kilogram versus [     ] KRW per kilogram). *Id*. at 20-22.  Hence, when timing was held constant, the physical differences between the CONNUMs *did not* result in a significant difference in per-unit steel input costs that would support DKSC's position.  Nor, as Commerce explained, did the differences in steel grades used for the different CONNUMs result in a significant difference in per-unit steel input costs that would support DKSC's position.  *Id.* at 23.  This refutes both of DKSC's argument that Commerce was just comparing equivalent steel plate inputs, and its broader claim that Commerce's analysis fails to consider the physical characteristics for the finished wind towers.

Underscoring this point, Commerce on remand *additionally* compared per-unit costs for DKSC's steel plate purchases pertaining to four CONNUMs during May 2018.  Redetermination at 22.  This corresponded to wind towers that DKSC sold to four different projects in the United States, each involving different physical characteristics.  *Id.* at Att. 1-2.  Although the steel plate consumed for these four projects entailed a wide range of physical characteristics (*e.g.*, wind tower weight ranging from [     ] to [     ] MT, and height ranging from [     ] to [     ] m), as well as steel plate dimensions (*e.g.*, thickness ranging from [     ] to [     ] mm, widths ranging from [     ] to [     ] mm, and heights ranging from [     ] to [     ] mm), the per-unit cost for the steel plate was once again very similar.  *Id*. at 22, 26, Att. 1-2.[3]  Contrary to DKSC's reporting of

---

[3] Commerce's recounting of the weight and height physical characteristics of the finished wind

significantly different steel plate costs for different CONNUMs (which DKSC tries to attribute to the CONNUMs' different physical characteristics), the per-unit cost difference between these physically different CONNUMs ranged only from [      ] to [      ] KRW/kg. *Id.*

The negligible cost differences that Commerce identified demonstrate that "when timing is neutralized, regardless of the wide range of dimensional plate used  . . . DKSC incurred virtually the same per-unit cost for the steel plate input to produce { } completely different CONNUMs." *Id.* at 21-22.  DKSC's response that Commerce's analysis "is not relevant to, and has no bearing on, whether the cost differences reported among these CONNUMs were not attributable to their physical characteristics" is simply incorrect.  DKSC Cmts. 8 n.5.

More generally, DKSC's contention that Commerce wrongly continues to focus on the timing of DKSC's steel plate purchases instead of addressing wind tower physical characteristics mischaracterizes Commerce's analysis.  Key to Commerce's analysis is that the CONNUMs it compared had different physical characteristics.  This is what enabled Commerce to determine that, despite DKSC's reporting of significant cost differences among CONNUMs, the actual per-unit costs *did not* vary significantly among CONNUMs when timing was held constant.  As Commerce explained, its "analysis showed that the purchase price for input steel plate in the selected month was very consistent, despite the fact that the steel plate was incorporated into finished wind towers with different physical characteristics (*i.e.*, weight and height), while DKSC's reported per-unit costs for the two selected CONNUMs reflected significant cost differences for the steel plate input."  Redetermination at 6 (footnotes omitted).  The differing physical characteristics of the CONNUMs were thus crucial to Commerce's analysis, and

---

towers and the consumed steel plates demonstrates both that the steel plates it used for the comparison are not "equivalent" and that the analysis considered the role of the finished product's physical characteristics.  *Id.* at 21-22.

enabled Commerce to conclude "that the material cost differences DKSC reported in its cost database were not attributable to the physical characteristics defining the CONNUMs." *Id*.

Finally, DKSC argues that Commerce's purported lack of grouping by CONNUMs and lack of discussion of the eleven enumerated physical characteristics defining the CONNUMs is proof that Commerce did not consider the physical characteristics in its analysis. DKSC Cmts. 8 n.3. This argument fails to consider that Commerce's analysis *did* include comparisons that were grouped by CONNUMs and the differing physical characteristics they entail. *See*, *e.g.*, Redetermination at 20-26, Att. 1-2. Hence, rather than merely demonstrating that "similar steel plate inputs with similar dimensions and grades purchased in the same month had similar costs," DKSC Cmts. 9, Commerce's analyses support Commerce's cost-smoothing determination.

### C. Commerce's Clerical Error In Listing Units Of Measure In Its Redetermination Is Not A Basis To Overturn The Determination

Commerce admits to its mistaken use of centimeters rather than millimeters in listing steel plate dimensions on pages 21 to 22 of the redetermination. DKSC claims that this error is sufficiently egregious to be cause for discounting Commerce's entire remand analysis and indicates that "Commerce has not based its finding on substantial evidence." DKSC Cmts. 11. Notably, however, DKSC does not deny the accuracy of the ranges listed, aside from the unit of measure. Hence, Commerce's clerical error in listing the unit of measure does not undermine the results and import of the agency's analysis. Regardless of the correct unit of measure, the figures still demonstrate the broad range of steel plate dimensions that Commerce used in its analysis.

### D. Record Evidence Supports Commerce's Finding That Per-Unit Steel Costs Were Not Related To The Physical Characteristics Of The Finished Wind Towers

DKSC contends that the evidence Commerce cited actually supports the conclusion that DKSC's reported costs reflect the physical characteristics of the wind towers. DKSC Cmts. 11-

13.  In this regard, DKSC first claims that percentages that Commerce listed in its preliminary cost calculation memorandum to denote the broad range of DKSC's average reported steel plate costs among CONNUMs are actually the "percentages by which Commerce adjusted DKSC's reported plate costs to align them **to** the average reported costs."  *Id*. at 12 (discussing percentage range listed in Redetermination at 6 (emphasis in original)).  DKSC further claims that it identified the mistake to Commerce, which allegedly "acknowledged the error" but "did not change its recitation of the inaccuracy."  *Id.*

Commerce addressed this claim in the redetermination—explaining the mathematical difference between Commerce's and DKSC's version of the calculation and that DKSC's version did not alter Commerce's findings.  Redetermination at 23-24.  Indeed, Commerce explained that "{e}ven under DKSC's methodology, the steel plate costs vary from [      ] percent to [      ] percent" from the average.  *Id*. at 24.  Hence, Commerce still found that there were significant differences in DKSC's steel costs, and that the differences were not related to the wind tower physical characteristics.  *Id*.  DKSC's suggestion that there was actually not a significant difference in its reported steel plate costs is unsupported.

Commerce's redetermination also addressed DKSC's additional arguments regarding the record evidence.  For example, DKSC claims that Commerce's statement that "there should have been little difference" in costs among certain CONNUMs is speculation and entirely unsupported by any analysis or empirical evidence.  DKSC Cmts. 12 (quoting Redetermination at 6).  To the contrary, Commerce's preceding analysis indicated why it made the statement:  Commerce had "computed the CONNUM-specific reported steel plate costs on a per-unit weight basis."  Redetermination at 6.  But its analysis "showed that the purchase price for input steel plate in the selected month was very consistent . . . while DKSC's reported per-unit costs for the two

selected CONNUMs reflected significant cost differences for the steel plate input." *Id.*
Commerce's statement merely describes the dissonance between DKSC's reporting and the
results of Commerce's analysis, illustrating why Commerce concluded that the significant cost
differences that DKSC reported did not reflect the physical characteristics of the CONNUMs.

Similarly, Commerce in the redetermination addressed DKSC's claims that the highest
and lowest steel input costs that DKSC reported merely reflect the largest and smallest finished
wind towers. *Compare* DKSC Cmts. 12-13 *with* Redetermination at 24-25. Commerce
explained that DKSC's focus on the CONNUM corresponding to the wind tower with the
smallest physical characteristics is misplaced because, notwithstanding that fact, the steel plate
for the CONNUM "was purchased in 2017, during a period when steel plate costs were low."
Redetermination at 24 (citing DKSC Supp. Sec. D. Resp., at 2-3, P.D. 278; C.D. 190). As
Commerce further highlighted, DKSC repeatedly acknowledged that the cost of steel plate
fluctuated due to the timing of the steel plate purchases before and during the period of
investigation. *Id.* at 26 (citing DKSC Supp. Sec. D. Resp., at 2; DKSC Cost Verification Report,
at 18-19, P.D. 307; C.D. 221 (Apr. 17, 2020)). Thus, "it is logical based on the timing of the
steel plate purchase costs for this CONNUM that the per-unit cost would be low, not because of
the physical characteristics of the wind tower, but because of the timing of the purchases of steel
plate." *Id.* at 24-25.

Regarding the CONNUM DKSC identified as corresponding to the largest and heaviest
wind tower, Commerce explained that DKSC's claim was factually incorrect because the
CONNUM with the highest reported steel plate costs was *actually* one whose physical
characteristics were smaller, and thus inconsistent with DKSC's contentions (leading DKSC to
drop this argument before the Court). *Id.* at 25.

The foregoing demonstrates that, contrary to DKSC's claims, Commerce considered and weighed the information to which DKSC refers in its comments brief, but ultimately disagreed with DKSC's conclusion.  DKSC's "mere disagreement" with Commerce's weighing of record evidence is not a basis to overturn Commerce's determination.  *Gov't of Argentina v. United States*, 542 F. Supp. 3d 1380, 1395 (Ct. Int'l Trade 2021) (citation omitted).

### E.  Record Evidence Supports Commerce's Finding Of Significant Cost Differences Unrelated To Wind Towers' Physical Characteristics

DKSC next claims that Commerce's analysis is flawed because it compares only a subset of the steel plate costs corresponding to particular CONNUMs in particular months.  DKSC Cmts. 13-14.  Commerce, however, explained the basis for its analysis:  "Commerce's analysis was performed within the same month to reflect a 'like for like' comparison that mitigated any distortions related to the timing of the steel plate purchases or any other factors that could distort such comparisons."  Redetermination at 5.  DKSC suggests that Commerce was required to compare all of the CONNUMs produced during the investigation for Commerce's analysis to be valid.  DKSC Cmts. 13.  But assuming such a thing were even feasible while still isolating the timing factor, there is no such requirement under 19 U.S.C. § 1677b(f)(1)(A).  In any event, Commerce on remand analyzed data for a number of additional CONNUMs, while also detailing how the steel cost data for one particular CONNUM increased over time, and found that this evidence further "supports that timing is the main factor affecting the significant cost differences for the wind tower."  Redetermination at 26-27.

DKSC also reprises its contentions that "Commerce has not even demonstrated that any steel plate cost differences across CONNUMs were significant," because "only a minor variance exists in DKSC's reported steel plate costs."  DKSC Cmts. 13-14.  Commerce, however, found that the variance ranged from [     ] to [     ] percent.  Redetermination at 23-24 (citing Prelim.

Cost Calculation Memorandum, at 2 & Att. 3, Column f, P.D. 268; C.D. 183 (Feb. 4, 2020)).

Commerce further explained that, under both DKSC's and Commerce's calculations, steel plate

costs varied widely.  *Id*. at 23-24.  Although DKSC claims that differences in steel plate costs

were insignificant, even DKSC admits that the variance from the *average* (let alone each other)

reached 5, 10, or above 25 percent.  DKSC Cmts. 14, Ex. 2.  Such variance is far from minor.

### F. Commerce's Weight-Averaging Of DKSC's Reported Steel Plate Costs Across CONNUMs Is In Accordance With Law

Lastly, DKSC argues that the statute and agency practice do not permit Commerce to

smooth costs without a reasonable justification, and that the redetermination fails to justify

Commerce's smoothing of steel plate costs across CONNUMs.  DKSC Cmts. 14-16.

DKSC cites *Hot-Rolled Steel from Korea* as an instance in which Commerce declined to

smooth costs based on its analysis of the record in that case.  DKSC Cmts. 14 (citing *Hot-Rolled

Steel Flat Products from the Republic of Korea*, 84 Fed. Reg. 12,660 (Dep't of Commerce Mar.

7, 2022), and IDM pp. 16-17)  In that case, however, Commerce determined not to smooth costs

because its concluded that "within groups of similar CONNUMs, the reported direct material

costs are reasonably consistent with the group average direct material costs."  *Hot-Rolled Steel

from Korea* IDM at 16.  That is not akin to Commerce's findings in this case.  DKSC nonetheless

argues, that unlike *Hot-Rolled Steel from Korea*, Commerce did not group CONNUMs to

support smoothing DKSC's steel plate costs, and that evidence indicates that DKSC's costs have

minimal variance if averaged by weight, height, and number of tower sections.  DKSC Cmts. 15.

Aside from the fact that the *Hot-Rolled Steel from Korea* proceeding is a separate case

with a different record, the evidence in this case contradicts DKSC's claim.  As we explain

above—and Commerce explained on remand—even using DKSC's version of the variance

calculation, the steel plate costs still vary from [       ] to [       ] percent from the average.

Redetermination at 24.  Moreover, Commerce did group CONNUMs by month in its analysis,

stating that it "identified all purchases of steel plate of varying dimensions . . . that occurred

within an isolated period of time (*i.e.*, September 2018), that was used to produce two different

CONNUMs reported in DKSC's cost database." *Id.* at 4-5 (citation omitted).  Commerce

conducted a similar analysis for May 2018 by comparing costs for four different CONNUMs in

that month.  *Id.* at 22, Att. 1-2.  Commerce's analysis supports its finding that purchase timing

was the main factor affecting the significant cost differences for the wind towers.  *Id.* at 26-27.

DKSC next argues that *Pasta from Italy* stands for only the proposition that Commerce

may engage in cost smoothing when cost differences exist among CONNUMs based on an input

that is itself a physical characteristic of the finished product, rather than fluctuating input costs

generally.  DKSC Cmts 15-16 (citing *Certain Pasta from Italy*, 83 Fed. Reg. 63,627 (Dep't of

Commerce Dec. 4, 2018), and IDM at 9).  However, consistent with Commerce's reliance on

*Pasta from Italy* as an example of its practice to smooth costs based on differences for both

overall products and individual inputs, Commerce explained that "{w}hen there is an absence of

meaningful physical characteristics in the input, Commerce will smooth costs for that input."

Redetermination at 8 (citing *Pasta from Italy* IDM at 3-11).  The key for Commerce to apply cost

smoothing is the need to address distortions when Commerce encounters cost differences that are

attributable to factors beyond differences in products' physical characteristics.  Redetermination

at 4, 9 (citations omitted).  That is what Commerce found in this case—and it does not depend on

whether the steel plate input's specification also constitutes one of the physical characteristics

defining different CONNUMs.  *See* 19 U.S.C. § 1677b(f)(1)(A) (indicating that records must

"reasonably reflect" production costs); *cf. NEXTEEL Co. v. United States*, 355 F. Supp. 3d 1336,

1361-62 (Ct. Int'l Trade 2019) (sustaining determination focusing on cost differences for hot-rolled steel coil input).

Finally, despite citing other Commerce determinations for support, DKSC attempts to distance itself from one of Commerce's most clearly analogous determinations:  Commerce's determination to similarly smooth steel plate input costs in *Wind Towers from Canada*.  DKSC Cmts. 16 (claiming that determination is not "any way relevant"); *but see Utility Scale Wind Towers from Canada*, 85 Fed. Reg. 40,239, at IDM Cmt. 1 (smoothing steel plate input costs); *Marmen*, 545 F. Supp. 3d at 1314-15 (sustaining determination).  As in this case, Commerce in the Canada investigation found that there should be minimal, if any, cost differences for the steel plate input, and that cost differences that the respondent reported were based on *timing* rather than differences in the wind towers' physical characteristics.  Redetermination at 9.  Given that *Wind Towers from Canada* involved a similar determination for the same product, and applied the smoothing adjustment based on cost fluctuations of the *steel plate input*, it is highly relevant.

## CONCLUSION

For these reasons, we respectfully request that the Court sustain the redetermination.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General


PATRICIA M. McCARTHY
Director


/s/ Reginald T. Blades, Jr.
REGINALD T. BLADES, JR.
Assistant Director

PUBLIC VERSION

OF COUNSEL:                                      /s/ Joshua E. Kurland
JESUS N. SAENZ                                   JOSHUA E. KURLAND
Attorney                                         Senior Trial Counsel
Office of the Chief Counsel                      U.S. Department of Justice
for Trade Enforcement and Compliance            Civil Division
U.S. Department of Commerce                      Commercial Litigation Branch
Washington, D.C.                                 P.O. Box 480
                                                 Ben Franklin Station
                                                 Washington, D.C. 20044
                                                 Telephone: (202) 616-0477
                                                 E-mail: Joshua.E.Kurland@usdoj.gov

July 20, 2022                                    *Attorneys for Defendant United States*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the word limitation set forth in the Court's April 21, 2022 scheduling order and contains 4,997 words, excluding the parts of the brief exempted from the word limitation.  In preparing this certificate of compliance, I have relied on the word count function of the word processing system used to prepare the brief.

/s/ Joshua E. Kurland

July 20, 2022