NON-CONFIDENTIAL VERSION

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| DONGKUK S&C CO., LTD.,<br><br>                Plaintiff,<br><br>   v.<br><br>UNITED STATES,<br><br>                Defendant,<br><br>   and<br><br>WIND TOWER TRADE COALITION,<br><br>                Defendant-Intervenor. | Before: Hon. Leo M. Gordon,<br>            Senior Judge<br><br>Court No. 20-03686<br><br><u>NON-CONFIDENTIAL VERSION</u><br><br>Business Proprietary Information Removed from Pages 5, 7-11, 14, 15 |

<u>DEFENDANT-INTERVENOR WIND TOWER TRADE COALITION'S<br>COMMENTS ON FINAL RESULTS OF REDETERMINATION PURSUANT<br>TO COURT REMAND</u>

                                                                    Alan H. Price, Esq.<br>
                                                                    Robert E. DeFrancesco, III, Esq.<br>
                                                                    Derick G. Holt, Esq.

                                                                    WILEY REIN LLP<br>
                                                                    2050 M Street, NW<br>
                                                                    Washington, DC 20036<br>
                                                                    (202) 719-7000

                                                                    *Counsel to Wind Tower Trade Coalition*

Dated: July 20, 2022

Ct. No. 20-03686                                                    NON-CONFIDENTIAL VERSION

## TABLE OF CONTENTS

Page

I.   INTRODUCTION ............................................................................................... 1
II.  BACKGROUND .................................................................................................. 1
III. SUMMARY OF ARGUMENT ........................................................................... 3
IV.  COMMERCE COMPLIED WITH THE COURT'S INSTRUCTIONS ............. 3
V.   COMMERCE EXPLAINED WHY THE STEEL PLATE INPUT DIMENSIONS DIRECTLY IMPACT THE WIND TOWER'S PHYSICAL CHARACTERISTICS ................................................................... 6
VI.  COMMERCE REFERENCED SOURCE DOCUMENTS WITH THE CORRECT UNIT OF MEASURE ....................................................................... 8
VII. SUBSTANTIAL EVIDENCE CONFIRMS THAT TIMING WAS THE CAUSE OF THE OBSERVED COST DIFFERENCES IN THE WIND TOWERS ............................................................................................................. 9
VIII. SUBSTANTIAL RECORD EVIDENCE DEMONSTRATES THAT DKSC'S SIGNIFICANT COST DIFFERENCES WERE UNRELATED TO THE PHYSICAL CHARACTERISTICS ..................................................... 11
IX.  THE STATUTE AND AGENCY PRACTICE PERMIT COMMERCE TO SMOOTH COSTS WHEN COSTS DIFFERENCES ARE UNRELATED TO THE PHYSICAL CHARACTERISTICS OF THE SUBJECT MERCHANDISE ................................................................................................. 11
X.   CONCLUSION .................................................................................................. 15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Marmen Inc. v. United States*,
　545 F. Supp. 3d 1305 (Ct. Int'l Trade 2021) ...................................................................13, 14

*Thai Plastic Bags Indus. Co. v. United States*,
　746 F.3d 1358 (Fed. Cir. 2014).................................................................................................12

**Statutes**

19 U.S.C. § 1677b(f)(1)(A).................................................................................................................12

**Administrative Materials**

*Certain Hot-Rolled Steel Flat Products From the Republic of Korea*,
　87 Fed. Reg. 12,660 (Dep't Commerce Mar. 7, 2022) .............................................................14

*Certain Pasta From Italy*,
　83 Fed. Reg. 63,627 (Dep't Commerce Dec. 11, 2018) .......................................................2, 13

*Welded Carbon Steel Standard Pipe and Tube Products from Turkey*,
　82 Fed. Reg. 49,179 (Dep't Commerce Oct. 24, 2017) ...........................................................13

Ct. No. 20-03686 NON-CONFIDENTIAL VERSION

I. **INTRODUCTION**

On behalf of Defendant-Intervenor Wind Tower Trade Coalition ("WTTC"), we respectfully submit the following comments on the April 14, 2022 final results of redetermination on remand filed by the U.S. Department of Commerce ("Commerce"). *See* Final Results of Redetermination Pursuant to Court Remand, *Dongkuk S&C Co., Ltd. v. United States*, Court No. 20-03686, Slip. Op. 21-167 (Ct. Int'l Trade Dec. 13, 2021) (Apr. 14, 2022), ECF No. 54 ("Final Remand Results").

II. **BACKGROUND**

In the original investigation, Commerce determined that the reported differences in steel plate costs between CONNUMs did not appear to be related to differences in the physical characteristics of the products. *See* Issues and Decision Memorandum accompanying *Utility Scale Wind Towers from the Republic of Korea*, 85 Fed. Reg. 40,243 (Dep't Commerce July 6, 2020) (final deter. of sales at less than fair value and final affirm. deter. of critical circumstances), P.R. 324 ("IDM"). In response to supplemental questionnaires and at verification, Dongkuk S&C Co., Ltd. ("DKSC") explained that the differences in its plate costs were due to the timing of its steel purchases, not a physical characteristic. *See* Letter from Trade Pacific PLLC to Sec'y Commerce, re: *Utility Scale Wind Towers from the Republic of Korea; Response to the Department's February 5 Supplemental Section D Questionnaire* (Feb. 12, 2020), C.R. 190-191, P.R. 278 at S6-2 ("2nd Supp DQR"); *see also* Memorandum from Chunyun (Kelly) Pan, Sr. Accountant, through Taija A. Slaughter, Supervisory Accountant & Neal M. Halper, Dir., Off. of Accounting, to The File, re: *Verification of Cost Response of Dongkuk S&C CO., Ltd. in the Antidumping Duty Investigation of Utility Wind Towers from Republic of Korea* (Apr. 17, 2020), C.R. 221, P.R. 307 at 18-19 ("DOC Verification Memo"). In particular, the respondent candidly

1

stated: "{d}ue to the fluctuating raw material prices during the POI, DKSC's reported CONNUMs sold in the third country show differing plate costs from CONNUMs sold in the U.S. market." *See* 2nd Supp DQR at S6-2 (emphasis added). As a result, Commerce weight averaged DKSC's reported steel plate costs for all reported CONNUMs (also referred to as "smoothing") in its final determination to mitigate the significant cost differences unrelated to the products' physical characteristics. *See* IDM at 21-22. DKSC appealed.

On appeal, the Court remanded a single issue for further explanation or reconsideration, finding that Commerce did not provide a sufficient explanation for the Court to determine if the agency's adjustment to DKSC's reported steel plate costs was reasonable. *Dongkuk S&C Co. v. United States*, No. 20-03686, slip op. 21-167 at 11 (Ct. Int'l Trade Dec. 13, 2021), ECF No. 45 at 11 ("Slip Op. 21-167"). In particular, the Court found that Commerce did not group the CONNUMs by any of the 11 physical characteristics or otherwise use those characteristics as a "guidepost." *Id.* at 8-9. According to the Court, Commerce also did not make reference to its "practice" of adjusting costs based solely on an analysis of individual inputs, nor did the agency rely on *Certain Pasta from Italy* in reaching its determination on this issue. *Id.* at 9; *Certain Pasta From Italy*, 83 Fed. Reg. 63,627 (Dep't Commerce Dec. 11, 2018) (final results of antidumping duty admin. rev.; 2016-2017) ("*Certain Pasta from Italy*").

After releasing draft results and considering comments by the parties, Commerce issued its Final Remand Results on April 14, 2022. In its Final Remand Results, Commerce correctly and sufficiently explained that it adjusted DKSC's plate costs because the cost differences were related to the timing of purchases, not the physical characteristics of the wind towers, and the agency did not change its final determination from the underlying investigation.

III. **SUMMARY OF ARGUMENT**

Commerce's findings in its Final Remand Results are supported by substantial record evidence and are in accordance with law. On remand, Commerce fully explained: (1) why it was appropriate to smooth DKSC's steel plate costs; (2) that the dimensions of the steel plate directly impact the weight and height of the completed tower; (3) how the agency used the weight and height CONNUM characteristics as the guideposts for its analysis; (4) the significance of controlling for timing in its final calculation memorandum; and (5) the agency's practice of adjusting costs related to CONNUM characteristics and individual inputs of such products. While DKSC has reversed course and now claims that physical characteristics of the wind tower are responsible for the differing plate costs, the respondent completely ignores the fact that it expressly explained to Commerce that "{d}ue to the fluctuating raw material prices during the POI, DKSC's reported CONNUMs sold in the third country show differing plate costs from CONNUMs sold in the U.S. market." *See* 2nd Supp DQR at S6-2 (emphasis added). The Court should find it reasonable that Commerce took DKSC's explanation at face value. Given that Commerce has fully complied with the Court's remand order by further explaining its cost smoothing adjustment, Commerce's remand results are supported by substantial evidence and in accordance with law.

IV. **COMMERCE COMPLIED WITH THE COURT'S INSTRUCTIONS**

Commerce's Final Remand Results fully comply with the Court's remand instructions and order. Contrary to DKSC's claims, the Court "ordered that Commerce's determination as to an adjustment for steel plate costs is remanded to Commerce for further explanation, and if appropriate, reconsideration of its cost analysis under 19 U.S.C. § 1677b(f)(1)(A)." Slip. Op. 21-167 at 11. In other words, the Court merely requested that Commerce further explain its cost smoothing adjustment but did not require the agency to remove the adjustment. *Id.*

In response, Commerce's Final Remand Results fully address the Court's opinion and further explain: (1) why it was appropriate to smooth DKSC's steel plate costs; (2) that the dimensions of the steel plate directly impact the weight and height of the completed tower; (3) how the agency used the weight and height CONNUM characteristics as the guideposts for its analysis; (4) the significance of controlling for timing in its final calculation memorandum; and (5) the agency's practice of adjusting costs related to CONNUM characteristics and individual inputs of such products. By doing so, Commerce has fully complied with the Court's remand order.

In its remand comments, DKSC simply created its own, additional remand instructions which are not rooted in the Court's opinion. To be clear, nowhere in the Court's opinion does the Court state that it remanded "Commerce's final determination so Commerce could further explain and/or demonstrate how DKSC's reported cost differences were not attributable to the physical characteristics of the finished wind towers." *See* Pl. DKSC's Comments in Opp'n to the Final Results of Redetermination Pursuant to Ct. Remand (May 18, 2022), ECF No. 58 at 2 ("DKSC Remand Comments"). Indeed, DKSC cites to page 11 of the Court's opinion which simply states: "ORDERED that Commerce's determination as to an adjustment for steel plate costs is remanded to Commerce for further explanation, and if appropriate, reconsideration of its cost analysis under 19 U.S.C. § 1677b(f)(1)(A)." Slip. Op. 21-167 at 11. DKSC misreads the Court's instructions and has attempted to impose requirements on Commerce which do not exist. Because of DKSC's misinterpretation of the Court's instructions, the respondent's entire argument is based on its belief that Commerce must explain how the cost differences in the direct inputs of finished wind towers were not attributable to the physical characteristics of the finished wind towers, DKSC Remand

Comments at 3, when the Court simply instructed Commerce to further explain the basis for its adjustment.

At best, the Court in footnote 7 provided Commerce with an opportunity to address in its remand results DKSC's argument that "even if Commerce's steel plate analysis were relevant, the analysis does not support Commerce's finding that 'the significant cost fluctuations found in the steel plate consumption costs for different CONNUMs was not due to differences in physical characteristics, but rather due to timing of the steel plate purchases.'" Slip Op. 21-167 at 10 n.7. And Commerce did so. In fact, Commerce specifically identified DKSC's argument in its Final Remand Results, and explained the following:

> Next, DKSC contends that Commerce's analysis in the Preliminary Determination reveals that Commerce incorrectly concluded that cost differences are unrelated to physical characteristics of the wind towers. Specifically, DKSC states that CONNUM [         ] in Commerce's analysis, which has the lowest steel plate costs compared to the average, is actually the CONNUM with the [
>                      ]. In addition, CONNUM [
>  ] in Commerce's analysis, which has the highest steel plate cost compared to the average, is actually the CONNUM with the [
>                                 ]. DKSC's contentions are misplaced. With regard to CONNUM [                       ], while it is true that this CONNUM represents the [                        ] among all reported CONNUMs, the steel plate for this CONNUM was purchased in 2017, during a period when steel plate costs were low. Accordingly, it is logical based on the timing of the steel plate purchase costs for this CONNUM that the per-unit cost would be low, not because of the physical characteristics of the wind tower, but because of the timing of the purchases of steel plate.
>
> DKSC also contends that CONNUM [                        ], which has the highest steel plate costs compared to the average steel plate cost, is the CONNUM with the [                                ] among all reported CONNUMs. However, contrary to DKSC's contention, we did not find that this CONNUM, the [           ] wind tower among all reported CONNUMs, resulted in the highest steel plate costs. Rather we found that CONNUM [         ], which is the [        ] in height and [           ] in weight among all reported CONNUMs, has the highest net steel plate costs. Consequently, we disagree that DKSC's claim here supports the conclusion that

5

> Commerce should not have smoothed its reported steel plate cost for finished wind towers.

Final Remand Results at 24-25 (internal citations omitted).

Commerce fully explained its "adjustment for steel plate costs" and even specifically addressed DKSC's argument. Therefore, Commerce has fully complied with the Court's remand instructions and its Final Remand Results are supported by substantial evidence and in accordance with law.

### V. COMMERCE EXPLAINED WHY THE STEEL PLATE INPUT DIMENSIONS DIRECTLY IMPACT THE WIND TOWER'S PHYSICAL CHARACTERISTICS

Commerce fully explained that the steel plate input directly relates to the weight and height physical characteristics of the completed tower in its Final Remand Results. *Id.* at 4-5. While DKSC claims that the agency wrongly assumes that the steel plate input dimensions dictate wind tower physical characteristics, DKSC Remand Comments at 3-6, Commerce fully explained how the steel plate directly impacts the physical characteristics of the wind tower and why the per-unit costs of the steel plate directly impact the cost of the finished tower.

Although steel plate is not a part of the CONNUM, the second and third most important physical characteristics of the CONNUM are the weight and height of the tower. *See* IDM at 21-22. As confirmed by DKSC in its second supplemental Section D questionnaire response, "a direct correlation exists between the dimensions of a tower and the steel plate used to produce that tower." *See* 2nd Supp DQR at S6-3. The dimensions of the steel plate (*i.e.*, thickness, width, and length), directly impact the weight and height of the tower given that steel plate accounts for the vast majority of the completed tower's weight and the number of discrete plates which are bent and welded together to form cylindrical cones have a direct impact on the height of the tower. *See* Final Remand Results at 6; *See* Letter from Wiley Rein LLP to Sec'y Commerce, re: *Utility Scale*

*Wind Towers from Canada, Indonesia, the Republic of Korea, and the Socialist Republic of Vietnam: Comment on Product Matching Characteristics* (Aug. 20, 2019), C.R. 31-33, P.R. 64-65 at 8; *See* Letter from Trade Pacific PLLC to Sec'y Commerce, re: *Response to the Department's November 14 and 20 Supplemental Questionnaires* (Dec. 9, 2019), C.R. 137-151, P.R. 213-215 at Exhibits S2-7, S2-8 ("DKSC Dec. 2019 SQR"). As DKSC is well aware, the weight of each steel plate is calculated as length x width x height x density, and the combined weight of each discrete plate that is bent and welded together forms weight of the tower. *See* DKSC Remand Comments at 10-11.

As shown in Exhibit S2-7 of DKSC's Supplemental A-C QR, the shop drawing for SEQ2U 875 shows a visual representation of the relationship between the steel plate and the tower height. For example, [     ]." DKSC Dec. 2019 SQR at Exhibit S2-7. On the [

    ]. *Id.* The same is true for [

    ]. *Id.* The [

    ] that was reported as a CONNUM characteristic.

The Department's analysis focuses on the per-kg cost of the steel plate because the record shows that each of the discrete plates used to produce towers that were [

    ]. Final Remand Results at Attachment 2. Of course, "DKSC's {total} reported costs are based on the cost of the steel plate cost multiplied by consumption," DKSC Remand Comments at 6, but the record shows

that the price for the steel, which is negotiated and contracted for on a weight per unit basis does not change regardless of the dimensions of the steel plate. DKSC argues that wind towers with the same weight might consume similar volumes of plate. But these towers could have significantly different heights and different costs—*e.g.*, a higher tower might require thinner plate with different costs. Similarly, wind towers with the same height and the same number of sections might have significantly different weights and, in turn, different costs. However, this is speculation. DKSC points to nowhere on the record where there are observed differences for longer, wider, or thinner plates. In fact, [      ] project used plates that were between [      ] in thickness, between [      ] in width, and between [      ] in length, but each discrete plate had the [   ] per-unit price of [        ], regardless of grade. Final Remand Results at Attachment 2. Thus, Commerce sufficiently explained why the steel plate dimensions directly impact the wind towers' physical characteristics and why it focused on the per-kg weight of the steel plate.

VI.  **COMMERCE REFERENCED SOURCE DOCUMENTS WITH THE CORRECT UNIT OF MEASURE**

DKSC's argument that Commerce made an error with respect to the units of measure when explaining why the differences in the respondent's reported costs were due to the timing of its plate purchases is a red herring. DKSC Remand Comments at 10-11. While Commerce inadvertently referred to the dimensions of the plate in centimeters, DKSC failed to explain how the units of measure actually had a material impact on Commerce's analysis. *Id.* DKSC is well aware that the per-kg price and weight that it reported to Commerce are based on steel plate dimensions measured in [       ]. And Commerce's Final Remand Results calculations reference the "final cost calculation memorandum" as well as DKSC's own cost verification Exhibits CVE 9 and CVE 11, which are source documents that show the unit of measure is

8

[            ]. Final Remand Results at Attachment 2. Thus, the reference to centimeters did not have a material impact on Commerce's analysis, and substantial evidence supports Commerce's finding that timing of the purchases was the reason for the observed cost differences.

## VII. SUBSTANTIAL EVIDENCE CONFIRMS THAT TIMING WAS THE CAUSE OF THE OBSERVED COST DIFFERENCES IN THE WIND TOWERS

In its Final Remand Results, Commerce fully explained why timing was the cause of the observed cost differences in DKSC's reported costs for finished wind towers. The Court's primary reason for remanding this case was that it believed the record evidence did not "support{} a conclusion that Commerce did in fact group CONNUMs by any of the 11 physical characteristics or otherwise use those characteristics as a 'guidepost.'" *See* Slip Op. 21-167 at 9. As explained in its Final Remand Results, the steel plate consumed directly impacts the weight and height of the completed tower, so the agency's analysis of the steel plate incorporates the weight and height CONNUM characteristics as a guidepost. Final Remand Results at 4-5. Commerce also explained that it analyzed the weight and height characteristics of different CONNUMs as well as similar CONNUMs to guide its analysis. *Id.* at 5-8 The final calculation memorandum incorporated its analysis of CONNUMs with different height and weight physical characteristics but controlled for the timing of purchases because the steel for both projects was purchased in the same month (*i.e.*, September 2018). *Id.* at 5-6. Although the weight and height characteristics of the CONNUMs analyzed in the agency's final calculation memorandum were different, this would suggest that the costs for steel plate should likewise be different if the steel plate costs were in fact related to the physical characteristics of the CONNUM. *See id.* But the agency's final calculation memorandum analysis showed that the per-unit steel plate costs remained the same for different dimensions and grades of steel plate used to produce two completely different CONNUMs. *Id.* at 6. Based on this analysis, the Department reasoned that DKSC's per-unit steel plate costs [            ] two

towers which differ significantly based on the weight and height CONNUM characteristics because of the timing of when the steel plate was purchased. The Department's conclusion that the timing of steel plate purchases caused the differences in steel plate costs is consistent with DKSC's own statements throughout the proceeding and even before the Court. *See* 2nd Supp DQR at S6-2; *see also* DOC Verification Memo at 18-19.

On the other hand, the Department also compared towers [     ] weight and height CONNUM characteristics as guideposts for its analysis. DOC Verification Memo at 6-7. The Department explained in its Final Remand Results that when it "computed the CONNUM-specific reported steel plate costs on a per-unit weight basis, for which there should have been little difference among products of different physical characteristics, it nonetheless found differences from the average reported steel plate costs ranging from [   ] percent to [   ] percent." Final Remand Results at 6. Because the record demonstrated that the significant steel plate costs difference among the CONNUMs resulted primarily from factors unrelated to differences in the physical characteristics of the products associated with various CONNUMs, the Department smoothed DKSC's reported steel plate costs for all CONNUMs to mitigate the unreasonable differences in material costs that were unrelated to the wind tower's physical characteristics. *Id.* at 7. As a result, Commerce addressed the Court's concerns by fully explaining how it "explicitly used the physical characteristics (*i.e.*, weight and height) as a 'guidepost' to compare DKSC's reported CONNUM-specific steel plate costs with steel plate costs for other CONNUMs." Commerce also fully explained how timing was the cause of the observed cost differences in DKSC's observed costs.

## VIII. SUBSTANTIAL RECORD EVIDENCE DEMONSTRATES THAT DKSC'S SIGNIFICANT COST DIFFERENCES WERE UNRELATED TO THE PHYSICAL CHARACTERISTICS

DKSC claims that Commerce's analysis does not show that significant costs differences are unrelated to the physical characteristics of the wind tower. According the DKSC, Commerce's analysis only "compares a subset of steel plate costs within a subset of two months for only a limited number of CONNUMs," and "only a minor variance exists in DKSC's reported steel plate costs." DKSC Remand Comments at 13. According to DKSC, Commerce has not demonstrated that any steel plate cost differences across CONNUMs were significant. DKSC's claims are without merit.

The Final Remand Results at Attachment 1 and 2 group two sets of CONNUMs (*i.e.*, SEQs 1-3, and SEQs 4-7) which demonstrate that steel plate purchased in the same month had virtually the same per unit costs regardless of steel plate dimensions or grade of steel. The analysis that DKSC provides in Exhibit 2 also shows that more than [   ]% of the towers produced had prices that deviated significantly from the average cost of steel plate across projects. Beyond DKSC's concession that timing was the cause of the significant cost differences, the record shows that the cost differences were unrelated to the physical characteristics of the wind towers.

## IX. THE STATUTE AND AGENCY PRACTICE PERMIT COMMERCE TO SMOOTH COSTS WHEN COSTS DIFFERENCES ARE UNRELATED TO THE PHYSICAL CHARACTERISTICS OF THE SUBJECT MERCHANDISE

As explained above, Commerce's Final Remand Results fully explain that the significant fluctuations found in the steel plate consumption costs for different CONNUMs were due to the timing of the steel plate purchases, which is not a physical characteristic of the subject merchandise. This is consistent with DKSC's own explanation during the investigation, when the respondent unequivocally stated "{d}ue to the fluctuating raw material prices during the POI,

DKSC's reported CONNUMs sold in the third country show differing plate costs from CONNUMs sold in the U.S. market." *See* 2nd Supp DQR at S6-2 (emphasis added). It is well established that when a respondent's books and records do not reasonably reflect the cost to produce and sell the subject merchandise, Commerce has the authority to adjust costs to address distortions in the respondent's data. *See* 19 U.S.C. § 1677b(f)(1)(A). Normally, when cost differences among products do not represent differences in their physical characteristics, the agency will make adjustments, such as weight-averaging or smoothing such costs. *See Thai Plastic Bags Indus. Co. v. United States*, 746 F.3d 1358, 1368 (Fed. Cir. 2014) (explaining that "physical differences in products 'generally account' for major differences in costs" and "{r}eliance on physical characteristics, because of its ability to promote consistency, is a predictable methodology that is administrable across all investigations and administrative reviews.").

In the final determination, Commerce found that DKSC's steel plate costs did not reasonably reflect the costs to produce wind towers because the differences in costs were related to the timing of the purchases, which is not a physical characteristic of the steel. IDM at 21-22. As a result, Commerce appropriately smoothed DKSC's plate cost to eliminate the distortions in its reported costs due to the timing of steel plate purchases. *Id.*; *see also* Memorandum from Chunyun Pan, Sr. Accountant, through Taija A. Slaughter, Supervisory Accountant, to Neal M. Halper, Dir., Off. of Accounting, re: *Less than Fair Value Investigation of Utility Scale Wind Towers from the Republic of Korea: Cost of Production and Constructed Value Calculation Adjustments for the Final Determination – Dongkuk S&C Co., Ltd.* (June 29, 2020), C.R. 230, P.R. 327 at 1-2.

First, Commerce's Final Remand Results fully explains its practice of adjusting unreasonable cost reporting to both the finished product's CONNUM characteristics and to

individual inputs for such products. Final Remand Results at 7-10, 18-27. In its opinion, the Court found that Commerce made no reference to its practice of adjusting costs based solely on an analysis of individual inputs, nor did the agency rely on *Certain Pasta from Italy* in reaching its determination on the issue. *See* Slip Op. 21-167 at 9. However, in its Final Remand Results, Commerce explained that it has a "practice of adjusting unreasonable cost reporting both to finished products (*i.e.*, CONNUMs) and to individual inputs for such products" citing *Welded Carbon Steel Standard Pipe and Tube Products from Turkey*, *Certain Pasta from Italy*, and the companion case decided concurrent with this investigation, *Wind Towers from Canada*. *See Welded Carbon Steel Standard Pipe and Tube Products from Turkey*, 82 Fed. Reg. 49,179 (Dep't Commerce Oct. 24, 2017) (final results of antidumping duty admin. rev. and final deter. of no shipments; 2015-2016) ("*Standard Pipe and Tube Products from Turkey*") and accompanying Issues and Decision Memorandum at cmt. 2 (reallocating costs for zinc input); *Certain Pasta from Italy*, 83 Fed. Reg. 63,627, and accompanying Issues and Decision Memorandum at 3-11 (smoothing costs for semolina, an input for pasta); *Marmen Inc. v. United States*, 545 F. Supp. 3d 1305, 1315 (Ct. Int'l Trade 2021). While DKSC argues that *Certain Pasta from Italy* is inapplicable because the agency adjusted the cost of a CONNUM characteristic, Commerce cited the case to explain its practice of adjusting (by weight averaging) the respondent's submitted input costs to "smooth" the cost differences unrelated to the physical characteristics of pasta and avoid distortions in the final calculations. Notably, DKSC does not challenge the agency's analysis of *Standard Pipe and Tube Products from Turkey*, which provides and an example of Commerce adjusting the individual inputs of the merchandise under consideration. *See generally*, DKSC Remand Comments.

While DKSC claims that Commerce has not explained the relevance of *Marmen,* this is argument is without merit. Commerce's decision to smooth costs in *Wind Towers from Canada*, which has now been upheld by the Court is persuasive authority because the facts are analogous to the facts of here given that both investigations cover the same product (*i.e.*, wind towers), the same input (*i.e.*, steel plate), cost were reported on the same basis (*i.e.*, project specific costs), and the same period of review. *See Marmen*, 545 F. Supp. 3d at 1315. In *Marmen*, the Court explained:

> Because record evidence cited by Commerce indicates that Marmen's plate costs did not differ between plates of varying physical characteristics and that higher priced CONNUMs were sold earlier in the period of investigation, the Court concludes that Commerce's determination that differences in plate prices were related to timing of production and factors other than differences in physical characteristics is supported by substantial evidence.

*Id.*

Finally, in its Remand Comments, DKSC cites *Hot-Rolled Steel Flat Products from the Republic of Korea*, a separate administrative review involving an input that is not used as a primary input in the merchandise under consideration, which was decided almost two years after the agency's final determination here. DKSC Remand Comments at 14-15; *Certain Hot-Rolled Steel Flat Products From the Republic of Korea*, 87 Fed. Reg. 12,660 (Dep't Commerce Mar. 7, 2022) (final results of antidumping duty admin. rev.; 2019-2020) ("*Hot-Rolled Steel from Korea*") and accompanying Issues and Decision Memorandum. Additionally, the respondent in *Hot-Rolled Steel from Korea* reported product-specific costs, not project-specific costs which directly affect the margin calculations when [    ]% of the steel plate costs for third country sales are affected by the timing of the steel plate purchases. Finally, to the extent *Hot-Rolled Steel from Korea* disregarded outliers after determining there were significant cost differences unrelated to the physical characteristics of the product, DKSC's own analysis shows that the projects are not merely outliers - the timing of steel plate purchases affect projects that account for more than

14

[  ]% of its entire database. DKSC Remand Comments at Exhibit 2. Thus, Commerce's determination to the smooth DKSC's cost in this investigation is supported by substantial evidence and in accordance with law.

## X. CONCLUSION

For the reasons described above, WTTC respectfully submits that the Court should sustain Commerce's results on redetermination consistent with the evidence on the record demonstrating that the agency properly and fully explained its decision to smooth DKSC's steel plate costs because the observed cost differences were unrelated to the physical characteristics of the wind towers.

                                                                          Respectfully submitted,

                                                                          */s/ Derick G. Holt*
                                                                          Alan H. Price, Esq.
                                                                          Robert E. DeFrancesco, III, Esq.
                                                                          Derick G. Holt, Esq.

                                                                          **WILEY REIN LLP**
                                                                          2050 M Street, NW
                                                                          Washington, DC 20036
                                                                          (202) 719-7000

                                                                          *Counsel to Wind Tower Trade Coalition*

Dated: July 20, 2022

CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1)(b), the undersigned certifies that these comments on remand comply with the word limitation requirement. The word count for Wind Tower Trade Coalition's Comments on Final Results of Redetermination Pursuant to Court Remand, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 4,580 words.

*/s/ Derick G. Holt*
(Signature of Attorney)

Derick G. Holt
(Name of Attorney)

Wind Tower Trade Coalition
(Representative Of)

July 20, 2022
(Date)