Slip Op. 22-125

UNITED STATES COURT OF INTERNATIONAL TRADE

DONGKUK S&C CO., LTD.,

    Plaintiff,

v.

UNITED STATES,

    Defendant,

and

WIND TOWER TRADE COALITION,

    Defendant-Intervenor.

Before: Leo M. Gordon, Judge

Court No. 20-03686

**OPINION**

[Sustaining Commerce's surrogate data selection from the Final Determination, and Commerce's Remand Results as to steel plate cost smoothing.]

Dated: November 17, 2022

  Robert G. Gosselink, Jarrod M. Goldfeder, and MacKensie R. Sugama, Trade Pacific PLLC, of Washington, D.C., for Plaintiff Dongkuk S&C Co., Ltd.

  Joshua E. Kurland, Senior Trial Counsel, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., for Defendant United States. With Mr. Kurland on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, and Reginald T. Blades, Jr., Assistant Director. Of counsel on the brief was Jesus N. Saenz, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, Washington, D.C.

  Alan H. Price, Robert E. DeFrancesco III, and Derick G. Holt, Wiley Rein LLP, of Washington, D.C., for Defendant-Intervenor Wind Tower Trade Coalition.

  Gordon, Judge: This action involves the U.S. Department of Commerce's ("Commerce") final affirmative determination in the antidumping ("AD") duty investigation

of utility scale wind towers ("wind towers") from the Republic of Korea. See <u>Utility Scale Wind Towers from the Republic of Korea</u>, 85 Fed. Reg. 40,243 (Dep't of Commerce July 6, 2020) ("Final Determination"), and the accompanying Issues and Decision Memorandum, A-580-902, PD[1] 324 (Dep't of Commerce June 29, 2020), https://enforcement.trade.gov/frn/summary/korea-south/2020-14438-1.pdf (last visited this date) ("Decision Memorandum").

Before the court is Commerce's Final Results of Redetermination Pursuant to Court Remand, ECF No. 54-1 ("Remand Results"), filed pursuant to the court's remand order in <u>Dongkuk S&C Co. v. United States</u>, 45 CIT ___, 548 F. Supp. 3d 1376 (2021) ("Dongkuk I"). See Pl. Dongkuk S&C Co. Ltd.'s ("DKSC") Comments in Opp'n Final Results of Remand Redetermination Pursuant to Ct. Remand, ECF No. 58[2] ("Pl.'s Cmts."); see also Def.'s Remand Resp. Comments, ECF No. 62 ("Def.'s Resp."); Def.-Intervenor Wind Tower Trade Coalition's Comments on Final Results of Redetermination Pursuant to Ct. Remand, ECF No. 65. Additionally, the court will consider DKSC's challenge to Commerce's selection of surrogate financial data that was reserved in <u>Dongkuk I</u>. See <u>Dongkuk I</u>, 45 CIT at ___, 548 F. Supp. 3d at 1382. The court has jurisdiction pursuant to Section 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2018),[3] and 28 U.S.C. § 1581(c). For the

---

[1] "PD" refers to a document in the public administrative record, which is found in ECF No. 15-3, unless otherwise noted. "CD" refers to a document in the confidential administrative record, which is found in ECF No. 15-2, unless otherwise noted.

[2] All citations to the Remand Results, the agency record, and the parties' briefs are to their confidential versions unless otherwise noted.

[3] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2018 edition.

reasons that follow, the court sustains the Remand Results, as well as Commerce's selection of surrogate data in its Final Determination.

## I. Background

The court presumes familiarity with the procedural history of and the prior decision in this action; however, the court highlights the following background information as an aid to the reader. DKSC is a mandatory respondent in the underlying investigation. See Final Determination, 85 Fed. Reg. at 40,243. Wind towers are large structures designed to support the nacelle and rotor blades of a wind turbine and may vary in height, weight, and other physical characteristics. See Dongkuk I, 45 CIT at ___, 548 F. Supp. 3d at 1379. Wind towers typically consist of three to five cylindrical or conical sections, with each section consisting of multiple steel plates—the main material input—rolled and welded together to create a steel shell. Id. At the outset of its investigation, Commerce identified the 11 most significant characteristics differentiating the cost between completed wind towers. Id. at ___, 548 F. Supp. 3d at 1379 n.3 (listing characteristics). When combined, the physical characteristics identified by Commerce define unique products, i.e., CONNUMs,[4] used for sales comparison purposes. Id. at ___, 548 F. Supp. 3d at 1379 (citing Decision Memorandum at 21). Commerce then determined that a wind tower's height and weight were the two of the most important physical

---

[4] A "CONNUM" is a contraction of the term "control number," and is Commerce jargon for a unique product (defined in terms of a hierarchy of specified physical characteristics determined in each antidumping proceeding). All products whose product hierarchy characteristics are deemed to be identical are part of the same CONNUM and are regarded as "identical" merchandise for the purposes of price comparison. The hierarchy of product characteristics defining a unique CONNUM varies from case to case depending on the nature of the subject merchandise.

characteristics of a completed wind tower. Decision Memorandum at 21; see also Dongkuk I, 45 CIT at ___, 548 F. Supp. 3d at 1380.

Commerce rejected DKSC's reported specific steel plate costs for each individual wind tower during the period of investigation ("POI"), finding that those costs "were significantly different between [CONNUMs] sold in the Japanese comparison market and those sold in the U.S. market." Decision Memorandum at 19. To determine the cause of price differences in each of those markets, Commerce analyzed DKSC's reported costs "[u]sing physical characteristics as [its] guidepost" and "grouping CONNUMs by the related height and weight physical characteristics, and the steel plate cost differences between steel grades and dimensions (i.e., thickness, width, or height) within the same time period." Id. at 22. As a result, Commerce concluded that the "overwhelming factor" causing the variation in those costs was the timing of the steel plate input purchase, not the physical characteristics of the subject merchandise. Id. at 22. Commerce then adjusted the steel plate costs to address distortions not attributable to the physical characteristics of the wind tower by weight averaging "the reported steel plate costs for all reported CONNUMs." Id. at 21.

In this action, DKSC challenged Commerce's decision to adjust DKSC's reported steel plate costs under 19 U.S.C. § 1677b(f)(1)(A), as well as the agency's selection of surrogate financial data to calculate DKSC's constructed value profit and selling expenses under 19 U.S.C. § 1677b(e)(2)(B)(iii). See Mem. in Supp. of Mot. for J. upon the Agency R. of Dongkuk S&C Co., Ltd. at 3–11, 17–26, ECF No. 22 ("Pl.'s Br."). After observing that there did not appear to be anything in the record "that supports a conclusion that

Commerce did in fact group CONNUMs by any of the 11 physical characteristics or otherwise use those characteristics as a 'guidepost,'" the court remanded Commerce's steel plate cost adjustment for reconsideration or additional explanation. Dongkuk I, 45 CIT ___, 548 F. Supp. 3d at 1381. As noted above, the court also reserved decision on DKSC's challenge to Commerce's selection of surrogate financial data.

## II. Standard of Review

The court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006); see also Universal Camera Corp. V. NLRB, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must also take into account whatever in the record fairly detracts from its weight."). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).

Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr. Administrative Law and Practice § 9.24[1] (3d ed. 2022). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." 8A West's Fed. Forms, National Courts § 3.6 (5th ed. 2022).

### III. Discussion

### A. Steel Plate Cost Adjustment

In an antidumping duty investigation where Commerce is to determine whether sales of the foreign like product were made at less than the cost of production of the subject merchandise, Commerce normally calculates costs based on the company's records. These records are used "if such records are kept in accordance with the generally accepted accounting principles of the exporting country … and reasonably reflect the costs associated with the production and sale of the merchandise." 19 U.S.C. § 1677b(f)(1)(A). In applying this provision, Commerce determined that it will "adjust costs to address distortions when it encounters cost differences that are attributable to factors beyond differences in the products' physical characteristics." See Remand Results at 4 (citing Thai Plastic Bags Indus. Co. v. United States, 746 F.3d 1358 (Fed. Cir. 2014) and NEXTEEL Co. v. United States, 43 CIT ___, ___, 355 F. Supp. 3d 1336, 1361–62 (2019)). Here, Commerce identified all purchases of steel plate of varying dimensions that occurred within the POI that were used to produce two different CONNUMs. See id. at 5. Commerce then performed a "like for like" comparison by

examining the purchases made in the same month of different dimensions and grades of steel plate that were used to produce those two CONNUMs.  Id.  Commerce found virtually no cost difference on a per-unit weight basis for the different grades and dimensions of steel plate used.  Id.  Commerce explained that "if the cost of the steel plate varied significantly, it would have been due to grade and dimensional differences in the steel plate used to produce the different types of wind towers, which would have explained the significant steel plate cost differences between CONNUMs of differing weights and heights."  Id.  Commerce, however, found "that, after neutralizing the effect of timing, there was virtually no difference in the cost associated with the different dimensions and grades of steel plate purchases used to produce the CONNUMs analyzed."  Id. at 5–6 (further noting that "the analysis showed that the purchase price for input steel plate in the selected month was very consistent, despite the fact that the steel plate was incorporated into finished wind towers with different physical characteristics (i.e., weight and height), while DKSC's reported per-unit costs for the two selected CONNUMs reflected significant cost differences for the steel plate input").  Consequently, Commerce determined that the material cost differences reported in DKSC's database were not attributable to the physical characteristics defining the CONNUMs, but rather due to the timing of the steel plate purchases.  Id.

Based on these findings, Commerce again found that DKSC's reported steel plate costs did not reasonably reflect the cost of producing the wind towers.  Commerce therefore continued to adjust DKSC's reported costs under § 1677b(f)(1)(A) to "address distortions where cost differences occurred that were not attributable to the physical

characteristics of the products." See Remand Results at 1, 10.  Commerce explained that "its analysis of the dimensions (i.e., thickness, width, and height/length) of the steel plate input is an appropriate and reasonable basis to use in the analysis to determine if adjustment is warranted because the steel plate input directly impacts the weight and height physical characteristics of the differing wind towers produced." See id.  Commerce also observed that its prior analysis of the dimensions of the steel plate input is reasonable because the steel plate input directly impacts the physical characteristics of the finished wind towers.  See id. at 9.  Commerce therefore determined that DKSC's reported costs required a smoothing adjustment in order to accurately reflect the cost to produce the subject wind towers.  See id. at 9–10.

DKSC contends that Commerce's Remand Results do not comply with the court's instructions in Dongkuk I, arguing that the court directed Commerce to "explain and/or demonstrate how DKSC's reported cost differences were not attributable to the physical characteristics of the finished wind towers."  Pl.'s Cmts. at 2.  DKSC maintains that Commerce wrongly focused on the steel plate input dimensions, rather than addressing the finished product dimensions as ordered by the court.  Id. at 3.  DKSC's argument ignores the fact that the standard for the court's review is whether Commerce's decision-making is reasonable given the circumstances provided by the record as a whole, not whether the agency "complied with the court's order."  See 19 U.S.C. § 1516a(b)(1)(B)(i).

In Dongkuk I, the court held that Commerce's Final Determination lacked analytical support, specifically noting that the record did not reflect how Commerce evaluated the

CONNUMs in light of the 11 identified physical characteristics, or how it used such characteristics as a "guidepost" for its analysis. See Dongkuk I, 45 CIT at ___, 548 F. Supp. 3d at 1381 (observing that without such support in record, "Commerce's analysis may not constitute a reasonable application of 19 U.S.C. § 1677b(f)(1)(A)"). While the court concluded that "the record fails to demonstrate how Commerce's analysis could lead a reasonable mind to conclude that DKSC's reported costs did not reflect the cost to produce and sell the subject merchandise," see Dongkuk I, 45 CIT at ___, 548 F. Supp. 3d at 1382, Plaintiff's challenge to the Remand Results focuses solely on a narrow reading of the language in the court's remand order rather than the substance of the Remand Results. In remanding this matter, the court ordered that Commerce further explain its "adjustment for steel plate costs," and if appropriate, reconsider its cost analysis under 19 U.S.C. § 1677b(f)(1)(A). Dongkuk I, 45 CIT at ___, 548 F. Supp. 3d at 1382.

On remand, Commerce provided a more thorough explanation as to how and why its cost analysis and the record supported its determination to reject DKSC's reported steel plate costs in accordance with 19 U.S.C. § 1677b(f)(1)(A). See Remand Results at 3–10, 19–27. Specifically, Commerce noted that it considered variations in DKSC's reported costs and concluded that such discrepancies warranted adjustment as they not caused by differences in physical characteristics of the finished wind towers. Id. Given this, the court does not agree with DKSC that Commerce failed to comply with the court's remand order.

Court No. 20-03686                                                                                                                                     Page 10

DKSC also contends that: (1) the Remand Results do not support Commerce's conclusion that steel plate is an appropriate basis to determine if an adjustment to DKSC's reported costs is warranted because steel plate does not dictate a wind tower's physical characteristics, Pl.'s Cmts. at 3–7; (2) Commerce failed to consider whether the physical characteristics of the finished wind towers also impact costs, Pl.'s Cmts. at 7–10; and (3) evidence cited by Commerce confirms cost differences are related to the physical characteristics of the completed wind towers. Pl.'s Cmts. at 11–14.

The court is not persuaded by Plaintiff's arguments. Commerce's explanation of its cost analysis on remand supports a conclusion that Commerce grouped CONNUMs by the physical characteristics of height and weight and used them as guideposts. To that end, Commerce found that the steel plate used in producing the subject merchandise impacts those physical characteristics of the completed wind towers and that "the cost of the steel plate consumed is the only factor that ultimately determines the raw material cost of the wind tower." Remand Results at 19.

During the investigation, DKSC noted that "fluctuating raw material prices during the POI" led to differing reported plate costs for DKSC's reported CONNUMs sold in the comparison market (Japan) and CONNUMs sold in the U.S. market. Resp. of Dongkuk S&C Co., Ltd. to Dep't's Feb. 5, 2020 Supp. D Questionnaire S6-2, Feb. 12, 2020, PD 278, CD 190. In order to neutralize the impact the time of purchase may have had on steel plate costs, Commerce identified purchases of steel plate required to produce two different CONNUMs in a one-month period, i.e., September 2018, and compared the reported costs. If, as DKSC suggests, the variation in steel plate costs was due to the

height and weight physical characteristics, Commerce anticipated that its comparison of two CONNUMs, varying in height and weight, would result in different steel plate costs for each CONNUM. Remand Results at 5. Yet, as Commerce explains, its analysis showed no difference in steel plate costs between the two CONNUMs. Id. at 5–6.

Commerce also compared the steel plate cost of a particular CONNUM in May 2018 and September 2018. Id. at 26–27. The comparison "showed that the per-unit costs of steel plate purchased to build this wind tower increased from … May 2018 to … September 2018." Id. at 26. Commerce concluded that the timing of the steel plate purchase affected the price because "[n]either the physical characteristics of the wind tower, nor the type of steel plate purchased for its construction changed during this period." Id. at 26–27.

DKSC argues remand is again warranted because Commerce did not conduct "a comprehensive analysis" or focus on the CONNUM characteristics of the finished wind towers as Commerce's analysis compared "a subset of steel plate costs within a subset of two months for only a limited number of CONNUMs . . . ." Pl.'s Cmts. at 13. DKSC further maintains that Commerce has failed to demonstrate significant steel plate cost differences across CONNUMs. Id. DKSC's arguments, however, do little more than ask the court to reweigh the evidence. See Downhole Pipe & Equipment, L.P. v. United States, 776 F.3d 1369, 1376 (Fed. Cir. 2015) ("It is not for this court on appeal to reweigh the evidence or to reconsider questions of fact anew." (internal citation omitted)). The Remand Results demonstrate that Commerce compared and made findings as to the differences in steel plate costs across CONNUMs, differing in height and weight

physical characteristics using a "like for like" comparison, Remand Results at 4–7, considered evidence detracting from its findings, id. at 19, 21–25, and explained the rationale for its ultimate determination, consistent with its statutory obligation.

Contrary to Plaintiff's argument, by comparing both the steel plate costs for CONNUMs with differing height and weight physical characteristics in an isolated time period, as well as comparing the steel plate costs for the same CONNUM across different time periods, Commerce used those physical characteristics as guideposts for its analysis under § 1677b(f)(1)(A).  See 19 U.S.C. § 1677b(f)(1)(A); see also, e.g., Marmen Inc. v. United States, 45 CIT ___, 545 F. Supp. 3d 1305 (2021) (upholding Commerce's adjustment to steel plate input costs for wind towers where Commerce determined that cost variation was unrelated to physical characteristics of the wind towers); NEXTEEL Co. v. United States, 43 CIT ___, 355 F. Supp. 3d 1336 (2019) (upholding Commerce's adjustment to reported cost of input where price of input declined substantially during period of review).  Given this analysis, it was reasonable for Commerce to determine that DKSC's reported costs were not reflective of the costs associated with the production and sale of the subject merchandise, and to adjust those costs accordingly.

In explaining its cost adjustment rationale, Commerce also relied on the determination in the AD investigation of wind towers from Canada.  See Remand Results at 9 (citing Utility Scale Wind Towers from Canada: Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances, 85 Fed. Reg. 40,239 (Dep't of Commerce July 6, 2020) ("Wind Towers from Canada"), and accompanying Issues & Decision Memorandum at Cmt. 1 (smoothing costs for steel

plate)).  Commerce noted that its similar findings of cost differences "amongst CONNUMs which were unrelated to differences in the product's physical characteristics" justified the same approach in this proceeding as in Wind Towers from Canada, i.e., to apply cost smoothing to the steel plate input.  Id.

DKSC argues that Wind Towers from Canada cannot be relied upon because it is a prior administrative determination that "does not establish a practice that Commerce must follow or that has any precedential authority here."  See Pl.'s Cmts at 16.  As Commerce explained, both administrative proceedings involve Commerce's application of a weighted average to variable reported steel plate costs used in the construction of wind towers.  Remand Results at 9.  Although each of Commerce's determinations involve a unique combination and interaction of many variables, DKSC fails to identify what facts, if any, distinguish Wind Towers from Canada from this proceeding.  The court therefore does not agree that Commerce acted unreasonably in relying on Wind Towers from Canada in reaching its determination here.  Given the record as a whole, the court sustains Commerce's determination to smooth DKSC's reported steel plate costs.

### B. CV Profit and Selling Expenses

When calculating constructed value, Commerce typically relies on "the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative expenses, and for profits,

in connection with the production and sale of a foreign like product."[5] 19 U.S.C. § 1677b(e)(2)(A). When the actual data is not available, Commerce may use "any other reasonable method" to determine the profit and selling expenses incurred and realized. 19 U.S.C. § 1677b(e)(2)(B)(iii). In selecting surrogate financial data to calculate profit and selling expenses, Commerce relies on "(1) the similarity of the potential surrogate companies' business operations and products to the respondent's business operations and products; (2) the extent to which the financial data of the surrogate company reflects sales in the home market and does not reflect sales to the United States; … (3) the contemporaneity of the date to the POI; … [and (4)] the extent to which the customer base of the surrogate and the respondent were similar." Decision Memorandum at 26 (citing Pure Magnesium from Israel, 66 Fed. Reg. 49,349 (Dep't of Commerce Sept. 27, 2001) (notice of final determination of sales at less than fair value) and the accompanying Issues and Decision Memorandum Cmt. 8, A-821-813 (Dep't of Commerce Sept. 27, 2001)). Commerce generally relies on financial statements which have "completed and fully translated audited financial statements and accompanying notes on the record." Id. Here, Commerce selected the 2018 consolidated financial statement from SeAH Steel Holdings Corporation's ("SSHC") as the basis for its constructed value calculations.

DKSC argues that Commerce's decision to calculate constructed value using SSHC's 2018 consolidated financial statement is unsupported by substantial evidence because SSHC's consolidated financial statement included financial data for products not

---

[5] These expenses are colloquially referred to as profit and selling expenses. See Decision Memorandum at Cmt. 8.

comparable to wind towers and included six months of financial data outside the POI. Pl.'s Br. at 18. DKSC contends that Commerce should instead use the standalone financial statement of SeAH Steel Corporation because it reflects "financial results from September 1, 2018 to December 31, 2018, a period falling entirely within the POI," and reports "financial results from the exclusive production of comparable merchandise." Id. at 18–19.

While Plaintiff may have preferred that Commerce select SeAH Steel Corporation's financial statement, Plaintiff has failed to demonstrate that Commerce acted unreasonably by selecting SHCC's statement instead. Commerce explained that the record contained 11 possible surrogate sources for calculating DKSC's constructed value profit and selling expenses. Decision Memorandum at 25. In support of selecting SHCC's consolidated financial statement, Commerce explained that only SHCC's consolidated financial statement was complete and satisfied all four of the criteria relied on by Commerce. Id. at 26–27. While Commerce acknowledged that business activities unrelated to the comparable merchandise were included in the consolidated financial statement, it explained that SHCC's statement "is the only option on the record that includes 12 months of financial data, and reflects profits on the production and sale of comparable merchandise that is produced and sold in the Korean market." Id. at 27. Commerce considered Plaintiff's argument to use SeAH Steel Corporation's standalone financial statement, but ultimately rejected it because, although it reflects the production of comparable merchandise, it does "not reflect a full year of financial results." Id. Accordingly, the court sustains as reasonable Commerce's use of SHCC's consolidated

financial statement to calculate DKSC's profit and selling expenses under 19 U.S.C. § 1677b(e)(2)(B)(iii).

## IV. Conclusion

For the foregoing reasons, the court sustains Commerce's determination that DKSC's reported steel plate costs do not reasonably reflect the cost of producing the wind towers and its adjustment of those costs by using a weighted average, as well as Commerce's use of SHCC's consolidated financial statement to construct DKSC's profit and selling expenses. Judgment will enter accordingly.

                                                /s/ Leo M. Gordon
                                                Judge Leo M. Gordon

Dated: November 17, 2022
      New York, New York